UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 3:03-CV-30314-MAP

| | |
|---|---|
| KAREN KAROWSKI,<br>        Plaintiff | )<br>)<br>) |
| vs. | )<br>) |
| ERIC CERRETA, DAVID HASKELL,<br>CHRISTOPHER MORRIS, and<br>THE INHABITANTS OF THE TOWN OF<br>WILLIAMSBURG,<br>        Defendants | )<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' FEDERAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS

1.      The plaintiff, Karen Karowski (the "plaintiff"), had held the position of police secretary for the Town of Williamsburg (the "Town"), from 1997 until July 10, 2003 when the Board of Selectmen for the Town (the "Select Board") declined to reappoint her.  (See Verified Amended Complaint at ¶ 9, attached hereto and hereinafter referred to as Exhibit 1).

2.      The plaintiff worked approximately 25 hours per week at $13.70 per hour.  (See Exhibit 1 at ¶ 13).

3.      The position of police secretary is a yearly appointed position by Select Board. (See Exhibit 1 at ¶ 11).

4.      The Select Board, which is the governing body of the Town, at all times relevant hereto, was comprised of the defendants, Eric Cerreta ("Cerreta"), Christopher Morris ("Morris") and David Haskell ("Haskell").   (See Exhibit 1 at ¶¶ 15-16). (Cerreta, Morris and Haskell hereinafter collectively referred to as the "defendants").  (See also Affidavits of Morris, Haskell and Cerreta, attached hereto and hereinafter referred to as Exhibits A, B and C, respectively).

5.      The defendants decided not to reappoint the plaintiff to the position of police secretary and communicated same to her in a July 10, 2003 letter.  (See Exhibit 1 at ¶ 11; see

426049

also July 10, 2003 letter from the defendants to the plaintiff, attached hereto and hereinafter referred to as Exhibit 2).

6.      While serving as the police secretary, the plaintiff was also the elected Treasurer for the Town and an elected member of the Finance Committee. In her capacity as Town Treasurer, the plaintiff worked approximately 20 hours a week and earned $14,000 a year with benefits.  (See Exhibit 1, ¶¶ 14, 17, 25; see also deposition of the plaintiff at p. 22-23, attached hereto and hereinafter referred to as Exhibit 3).

7.      The plaintiff regularly and publicly disagreed with and criticized the decisions of the defendants in their capacity as Select Board however, the plaintiff never disclosed in what capacity she spoke when she engaged in this criticism.  (See Exhibit 1 at ¶¶ 19, 21).

8.      During Finance Committee meetings, and as a member of the Finance Committee, the plaintiff would provide her opinions without identifying the fact that she was voicing her opinion as a private citizen and not as a public employee.  (See Exhibit 3 at pp. 102-103).

9.      The letter from the Select Board informing the plaintiff that she was not reappointed made it clear that the Select Board was unhappy with the plaintiff's constant criticisms of the Board with regard to their decisions concerning Town business, and its belief that it was inappropriate for the police secretary or administrative assistant to "relentlessly complain about the decisions the Board members make in their capacity as police commissioners."  Finally, the letter stated that the Board felt the need to fill the position with someone who would not "constantly attempt to undermine [the Board's] authority."  (See Exhibit 2).

10.     The plaintiff continued as police secretary after she received the July 10th letter and, in fact, never lost a day of paid work as police secretary as a consequence of the Select Board's initial decision not to reappoint her.  (See Exhibit 1 at ¶ 39; and Exhibits A, B and C).

11.     The plaintiff admitted discussing an arrest with a Town employee, Maxine Schmidt ("Schmidt") with whom she shared an office in the Town Hall.  (See Exhibit 3 at p. 42).

12.     The plaintiff could not remember if the Town Collector, Tess Barstow, or if the Town Assessor, Marge Dunphy, were present during the aforementioned conversation with Schmidt.  (See Exhibit 3 at p. 44-45).

13.     Prior to the decision not to reappoint her in July, 2003, the Chief of Police, Patrick Archbald (hereinafter the "Chief"), discussed with the plaintiff the fact that one of the Assessors told him about a conversation she had overheard the plaintiff to have with Schmidt concerning confidential police business.  (See Exhibit 3 at pp. 46-47; 56).

14.     The plaintiff was aware that certain police officers raised issues with the Chief regarding her performance as police secretary and about conversations being held in the police station regarding Town business that was not police business.  (See Exhibit 3 at pp. 72-74).

15.     The plaintiff allowed individuals to come to the police station while she was being paid in her capacity as police secretary to conduct non-police business.  (See Exhibit 3 at pp. 76-77).

16.     The Chief told the plaintiff that two police officers complained to him about her failure to keep up with filing work.  (See Exhibit 3 at p. 84).

17.     The plaintiff never talked to the Chief about voicing her personal opinions as opposed to the opinions perceived to be those of the police department when she acted in any of her various capacities for the Town.  (See Exhibit 3 at pp. 103-104).

18.     The plaintiff was aware that in the summer of 2003, the Town Clerk presented a memo to the Board of Selectmen regarding several positions in the Town, including police secretary, where the Board had the power to reappoint but had failed to do so in the past year or two.  (See Exhibit 3 at p. 108-109).

426049

19.    There is no evidence that any defendant asked the Town Clerk to find a way to make the police secretary an appointed position nor is there evidence that the Town Clerk provided the information to the Select Board knowing it did not want to reappoint the plaintiff. (See Exhibit 3 at pp. 110-116).

20.    The plaintiff never lost any time from her job as police secretary nor any income as a result of any conduct on the part of the defendants.  (See Exhibit 3 at p. 137; and Exhibits A, B and C).

21.    The plaintiff claims that she was uncomfortable going out after she was not reappointed, embarrassed and depressed, however, she never sought help for her depression, nor was she ever medicated for her depression.  (See Exhibit 3 at pp. 149-150).

22.    Marjorie Dunphy was the elected Town Assessor at all times relevant to this matter and had held that position for 14 years.  (See Deposition of Marjorie Dunphy at p. 6, attached hereto and hereinafter referred to as Exhibit 4).

23.    Dunphy had also been a member of the Town's Board of Appeals.  (See Exhibit 4 at p. 6).

24.    Dunphy worked across the hall from the plaintiff in the Town Assessor's Office. (See Exhibit 4 at p. 8).

25.    The shared office was near the Town Collector's Office.  (See Exhibit 4 at p. 8).

26.    Theresa Barstow was the Town Collector in 2002-2003.  (See Exhibit 4 at pp. 8-9).

27.    Dunphy had complained to Morris or to the chair of the Police Commissioner on the Select Board because people in the Treasurer's office and the Collector's office were being discussed by the plaintiff and references made about people with ongoing criminal cases.

Dunphy wanted Morris as the police liaison Select Board member to address it. (See Exhibit 4 at pp. 10-11).

28.     Dunphy recalled at her deposition that Town residents were discussed regularly by the plaintiff and in particular she remembered the name of one Town resident who had been charged with a crime and was being discussed by the plaintiff. (See Exhibit 4 at pp. 13-15).

29.     Dunphy also complained about the plaintiff's non-police duties to Morris, specifically that taxpayers were being discussed between the plaintiff and Barstow. (See Exhibit 4 at p. 17).

30.     Dunphy overheard conversations between the plaintiff and other Town employees and stated that these were not all related to matters concerning the Town Collector or Town Treasurer's business. (See Exhibit 4 at pp. 18-19).

31.     Dunphy spoke to the Chief after a Town meeting and told him that she was concerned that a criminal investigation was being discussed in the Collector's office. (See Exhibit 4 at pp. 20-21).

32.     The Chief received verbal complaints from police officers as well as a complaint from the Select Board regarding the plaintiff. (See Deposition of the Chief Archbald at pp. 26-27, attached hereto and hereinafter referred to as Exhibit 5).

33.     The Chief had been told that the plaintiff was discussing non-police business while at work as the police secretary and was aware that visitors would do non-police business in the police station during the hours the plaintiff was working as police secretary. (See Exhibit 5 at p. 29).

34.     Prior to July 2003 the Chief discouraged the plaintiff from conducting non-police business at the station. (See Exhibit 5 at p. 32).

426049

35.    Prior to the July, 2003 letter, Morris, who was the police department liaison at the time, complained to the Chief that there was excessive conversation going on during the day about Town business unrelated to police matters and that the entire Select Board was concerned about it.  (See Exhibit 5 at pp. 34-35).

36.    The Chief took no action with respect to Morris' complaint although he believed he was expected to take an action.  (See Exhibit 5 at pp. 35-36).

37.    After the aforementioned meeting with Morris, the Chief left with a clear understanding that the Select Board had gotten information the plaintiff was engaging in unrelenting criticism of the Select Board.  (See Exhibit 5 at pp. 36-37).

38.    The Chief did not discuss this meeting with the plaintiff nor did he make any written notes into her personnel file with respect to this conversation.  (See Exhibit 5 at pp. 37-38).

39.    Morris also had a conversation with the Chief about the plaintiff inappropriately representing the police department.  (See Exhibit 5 at pp. 38-39).  Morris complained to the Chief that the plaintiff would inappropriately express strong opinions while acting in her official capacity on the Finance Committee which the Select Board considered acts outside the scope of her job.  (See Exhibit 5 at pp. 38-39; 42).

40.    A previous board member, Bertle Leander, told the Chief that he was concerned over the "many hats" the plaintiff wore and her expressing opinions outside the scope of her position.  (See Exhibit 5 at pp. 40-41).

41.    Morris also complained to the Chief that the plaintiff had discussed confidential police information with at least two other Town employees, Maxine Schmidt and Tess Barstow. (See Exhibit 5 at pp. 43-45).

426049

42.    Morris complained to the Chief as well about a complaint he had received by a person on the custodial staff regarding the plaintiff.  (See Exhibit 5 at p. 65).

43.    Officer Scoble and Sergeant Graham both spoke to the Chief about wanting the plaintiff to make filing paperwork as the police secretary a priority and did not think the plaintiff was doing this.  The Chief testified that he had it "corrected."  (See Exhibit 5 at p. 85).

44.    Haskell also spoke to the Chief about the plaintiff's "relentless criticism" of the Board.  (See Exhibit 5 at p. 87).

45.    In the plaintiff's 2000 evaluation, the Chief made a general reference about the plaintiff being involved in "inner political wranglings of the Town and persons to whom she does not agree."  (See Exhibit 5 at p. 101).

46.    The Chief never wrote any of the complaints received by the Select Board regarding the plaintiff's conduct as police secretary into the plaintiff's personnel record.  (See Exhibit 5 at pp. 102-103).

47.    Morris was a Selectman during all times relevant to this matter.  (See deposition of Christopher Morris at p. 11, attached hereto and hereinafter referred to as Exhibit 6; and Exhibits A).

48.    Morris served as the police liaison at all times relevant to this action.  As the police liaison, he was the contact point for the Police Chief who would bring concerns of the Chief to the Board and vice versa.  (See Exhibit 6 at pp. 12-13; and Exhibit A).

49.    Morris was responsible for the initial draft of the letter to the plaintiff about her non-reappointment in July, 2003 and presented the draft to the other Board Members.  (See Exhibit 6 at pp. 18-19; and Exhibit A).

50.     Morris remembered seeing in the plaintiff's evaluation by the Chief the statement of concern regarding her discussing political issues at the police station unrelated to Town business and while working as police secretary.  (See Exhibit 6 at p. 21).

51.     Morris voiced concern to the Chief over the plaintiff's raising issues concerning police business at Finance Department meetings as well as issues Morris believed had already been discussed and resolved with the Chief.  (See Exhibit 6 at pp. 23 and 33; and Exhibit A).

52.     Morris voiced further concern to the Chief that he believed that it was the Chief's job, as the spokesman for the department, and not the police secretary's job to raise issues to the Select Board concerning police matters.  (See Exhibit 6 at pp. 23-24; and Exhibit A).

53.     Morris was unclear at times whether the plaintiff was speaking as a member of the Finance Committee or as the police secretary.  (See Exhibit 6 at p. 27; and Exhibit A).

54.     Morris never criticized the plaintiff for any criticism she made in private conversations and when not acting in the scope of her employment.  (See Exhibit 6 at pp. 26-27).

55.     Morris expected the Chief as the plaintiff's direct supervisor to talk to her about his concerns.  (See Exhibit 6 at p. 29; and Exhibit A).

56.     Morris spoke to the Chief about the custodian of the police station who was leaving because the work environment as unpleasant and who specifically had issues with the way the plaintiff treated him.  (See Exhibit 6 at p. 34; and Exhibit A).

57.     Morris expressed to the Chief in two conversations that the tensions with the plaintiff as police secretary were contributing to the tension between the Select Board and the police department.  (See Exhibit 6 at p. 36; and Exhibit A).

58.     Morris expressed to the Chief that the perception was that the plaintiff's views as police secretary on police matters and the Select Board's policies must be the Chief's views as

426049

well and that this was not good for the relationship between the Select Board and the police department.  (See Exhibit 6 at pp. 35-36; and Exhibit A).

59.     Morris raised the issues of appearance of conflict of interests in terms of the police secretary voting on any motions at the Financing Committee related to the police department.  (See Exhibit 6 at pp. 36-37; and Exhibit A).

60.     Morris believed the plaintiff had the right to criticize the decision of the Select Board involving the police department as a private citizen but not in her capacity as police secretary.  (See Exhibit 6 at p. 46).

61.     Morris believed it made an impression that there was dissention with the police department and that the Chief was unhappy with the Select Board's decision and that the police officers may be unhappy as well.  (See Exhibit 6 at pp. 46-47; and Exhibit A).

62.     Morris informed the Chief that Dunphy had heard the plaintiff talking to Barstow in the Collector's Office in a voice that could be easily heard and in a public area during business hours regarding the details of a recent arrest.  (See Exhibit 6 at p. 52; and Exhibit A).

63.     Morris asked Dunphy to inform the Chief about this directly.  (See Exhibit 6 at pp. 56-57).

64.      Morris was aware that the plaintiff conducted non-police business during her time as police secretary.  (See Exhibit 6 at pp. 88-89; and Exhibit A).

65.     Morris' issue was not that the plaintiff was performing Town business at the police station which was not related to police work but rather he made the distinction between Town business (e.g., payroll questions) and discussing Town politics (e.g., complaining about what the Finance Committee did the night before).  (See Exhibit 6 at p. 96).

66.     It was the general consensus that the plaintiff's public discussion of confidential police business was the most troubling concern of the defendants and that this fact should not be

in the July 10, 2003 letter for fear that it would lead to further disclosure of confidential information. (See Exhibits A, B and C).

67.    David Haskell spent five terms as a Selectman and was a member of the Finance Committee. (See Deposition of David Haskell at pp. 11 and 21, attached hereto and hereinafter referred to as Exhibit 7; and Exhibit B).

68.    While serving on the Finance Committee, Haskell believed that the plaintiff should have recused herself from certain votes having to do with the police department rather than lobbying and voting for those issues. (See Exhibit 7 at pp. 21-23).

69.    In his capacity as Selectman, Haskell was aware of several concerns regarding the conduct of the plaintiff in her position as police secretary. (See Exhibit B).

70.    Eric Cerreta was chairperson of the Select Board at all times relevant to this matter. (See Deposition of Eric Cerreta at pp. 11-12, attached hereto and hereinafter referred to as Exhibit 8; and Exhibit C).

71.    The entire Select Board participated in the appointment decision during Cerreta's tenure on the Board. (See Exhibit 8 at pp. 22-23).

72.    The plaintiff was reappointed as police secretary on July 11, 2002 for one year. (See Exhibit 8 at pp. 34-35).

73.    Cerreta spoke with the Chief and told him that it was the Chief's job to talk to the Board about decisions the Board was making that the Chief was not comfortable with. (See Exhibit 8 at pp. 54-55; and Exhibit C).

74.    Specifically, Cerreta told the Chief that he should be speaking on behalf of the police department at Finance Committee meetings and not have the administrative assistant be the police department's representative. (See Exhibit 8 at p. 55; and Exhibit C).

426049

75.     The Chief acknowledged to Cerreta that it had been a problem in the past and gave Cerreta the impression that he would look into the issue of the plaintiff's speaking on behalf of the police department.  (See Exhibit 8 at p. 55).  Cerreta believes that this conversation occurred sometime between January, 2003 and March, 2003.  (See Exhibit 8 at p. 56).

76.     At the time of the failure to reappoint the plaintiff, the Board had known that the plaintiff had talked about an arrest made in Town.  (See Exhibit 8 at pp. 66-68; and Exhibit C).

77.     Cerreta was aware that the Chief evaluated his employees in writing once a year and that the Chief had failed to include incidents regarding complaints about the plaintiff in her evaluation.  (See Exhibit 8 at pp. 71-72).

78.     Cerreta was aware of the issue with the custodian leaving his job because he could not work with the plaintiff.  (See Exhibit 8 at pp. 73-74; and Exhibit C).

79.     Cerreta had heard complaints from police officers that if they didn't want anything to be talked about they should not talk about the subject in front of the plaintiff.  (See Exhibit 8 at pp. 76-77; and Exhibit C).

80.     Cerreta was aware that the Chief had received criticism of the plaintiff prior to July 1, 2003.  (See Exhibit 8 at p. 83; and Exhibit C).

81.     The minutes of the Selectmen's meeting held July 24, 2003 reflect that a petition was given to the Board regarding the non-reappointment of the plaintiff.  (See Exhibit 8 at pp. 92-94).

82.     In a November 3, 2003 letter, the Board sent a letter saying that it had voted to reappoint the plaintiff to the police secretary's position for the remainder of the fiscal year.  (See November 3, 2003 letter attached hereto and hereinafter referred to as Exhibit 9).

426049

83.     The letter of reappointment asked that the plaintiff recuse herself in the future from voting on and/or discussing any issues which would violate G.L. c. 260, § 8A.  (See Exhibit 9 at p. 108).

84.     The letter also stated that the plaintiff must be clear in the future that if she speaks on police matters, she speaks for herself and not the department.  (See Exhibit 9 at p. 111).

85.     Cerreta had the impression that prior to the November 3, 2003 letter, that whenever the plaintiff spoke at a public meeting she gave the impression that she was speaking on behalf of the police department.  (See Exhibit 8 at pp. 111-112).

86.     The November 3, 2003 letter also informed the plaintiff that during office hours as the police secretary, she was only to conduct police business and that while working as police secretary, she would refrain from contacting other Town employees to discuss non-police business.  (See Exhibit 9 at pp. 115-121).

87.     Michael Beattie was an elected member of the Finance Committee and the local school committee.  (See Deposition of Michael Beattie at p. 13, attached hereto and hereinafter referred to as Exhibit 10).   As a member of the Finance Committee he communicated with Cerreta and Morris about the plaintiff during 2002-2003.  (See Exhibit 10 at p. 21).

88.     Beattie told Cerreta that after several Finance Committee meetings, the plaintiff had spoken about the Select Board in a non-professional and unflattering manner.  (See Exhibit 10 at p. 23).

89.     Beattie could not tell in what capacity the plaintiff made her derogatory comments.  (See Exhibit 10 at pp. 24-25).

90.     Beattie testified that the plaintiff criticized the Select Board quite often in his presence.  (See Exhibit 10 at p. 27).

426049

91.   Beattie told the secretary of the Finance Committee, Linda Rowley, that he was upset with comments that the plaintiff made and was going to tell the Board of Selectmen. (See Exhibit 10 at pp. 31-32).

92.   Beattie remembers talking to Morris at least three times concerning the plaintiff. (See Exhibit 10 at pp. 34-35).

93.   Beattie testified that he was the plaintiff's assistant when she was Treasurer. (See Exhibit 10 at p. 39).

94.   Beattie testified that every time he worked with the plaintiff, she had a criticism of the Select Board. (See Exhibit 10 at pp. 40-41). Beattie mentioned this fact to Cerreta and to Morris. (See Exhibit 10 at p. 41).

95.   Beattie characterized the criticism as a "constant tirade" that if the Select Board didn't behave the way the plaintiff wanted, she complained about it. (See Exhibit 10 at pp. 41-42).

96.   Beattie considered the plaintiff's statements unprofessional, tiring and annoying. Beattie did not tell the plaintiff how he felt because she was his boss. (See Exhibit 10 at p. 42).

97.   Beattie believed that many of the plaintiff's comments about the Select Board seemed hostile. (See Exhibit 10 at p. 43).

98.   Among the things Beattie remembered the plaintiff to complain about were the budget, police department business and about the Select Board's administrative assistant whom she referred to as lazy. (See Exhibit 10 at p. 44).

99.   Beattie was aware that the plaintiff talked about police department business inappropriately. (See Exhibit 10 at pp. 50-51).

100.   When the plaintiff was police secretary, Beattie talked constantly to her on the job about non-police business as well as non-Town business. (See Exhibit 10 at p. 52).

101.    It was common knowledge in the Town that the plaintiff was doing non-police business while functioning as the police secretary.  (See Exhibit 10 at p. 54).

THE DEFENDANTS
ERIC CERRETA, DAVID HASKELL,
CHRISTOPHER MORRIS AND THE
INHABITANTS OF THE TOWN OF
WILLIAMSBURG


By____*/s/ Nancy Frankel Pelletier*_____
Nancy Frankel Pelletier, Esq.
Dorothy Varon, Esq., both of
Robinson Donovan, P.C.
1500 Main Street, Suite 1600
Springfield, Massachusetts 01115
Phone (413) 732-2301 Fax (413) 785-4658
BBO No.:  544402
BBO No.: 629609


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 1st day of May, 2006.

_____*/s/ Nancy Frankel Pelletier*_____
Nancy Frankel Pelletier, Esq.

426049