1              UNITED STATES DISTRICT COURT FOR

2              THE DISTRICT OF MASSACHUSETTS

3                      No. 3:03-CV-30314-MAP

4

5

6  KAREN KAROWSKI
              Plaintiff

7  vs.

8  ERIC CERRETA, ET ALS
              Defendants

9

10

11         DEPOSITION OF:  KAREN KAROWSKI, taken

12  before ROXANNE C. COSTIGAN, Notary Public

13  Stenographer, pursuant to Rule 30 of the

14  Massachusetts Rules of Civil Procedure, at the

15  offices of ROBINSON DONOVAN, P.C., 1500 Main Street,

16  Suite 1600, Springfield, Massachusetts on February 1,

17  2005.

18

19

20  APPEARANCES:  (See Page 2)

21

22

23

24              Roxanne C. Costigan
              Registered Merit Reporter

1       A.      Three years, until I became treasurer

2    myself.

3       Q.      So, you became treasurer in 1998?

4       A.      Yes.

5       Q.      Did the number of hours that you spent as

6    a treasurer's assistant remain the same between 1995

7    and 1998 when you became the treasurer?

8       A.      They varied.  Some weeks, I didn't work

9    at all.  Some weeks, I worked two or three hours.

10      Q.      Who did you run against for that

11   position?

12      A.      No one.

13      Q.      Was it an elected position?

14      A.      Yes.

15      Q.      Other than working as the secretary to

16   the treasurer, what if any training did you have to

17   be the treasurer?

18      A.      Specifically, none.

19      Q.      What was the role of the treasurer in the

20   Town of Williamsburg in 1998?

21      A.      The role?

22      Q.      What was your job?

23      A.      Payroll, accounts payable, borrowing.

24      Q.      Is that it?

1        A.     I'm sure there's other duties that don't

2    come to mind right now, but that's the majority of

3    it.

4        Q.     How many hours a week did you spend as

5    the treasurer in 1998?

6        A.     On average, twenty.

7        Q.     Did you receive some income?

8        A.     I did.

9        Q.     What was your income from the position of

10   treasurer in 1998?

11       A.     I don't recall.  Somewhere around

12   $14,000, I believe.

13       Q.     Did you receive any benefits?

14       A.     Yes.

15       Q.     What were the benefits?

16       A.     As a twenty hour a week or more employee,

17   I received health insurance, sick leave, all the

18   benefits in the personnel policy.

19       Q.     For what period of time did you remain

20   the treasurer of the Town of Williamsburg?

21       A.     I still am.

22       Q.     You still retain all the benefits as a

23   twenty hour employee?

24       A.     Yes.

1          MR. MILES:  Just answer the question

2     that's asked now.

3          THE WITNESS:  Okay.

4          MS. PELLETIER:  Well, that's the

5     question I asked and she read it back.  So --

6          THE WITNESS:  No.  In a previous

7     question --

8          MR. MILES:  Just answer the

9     question.

10          THE WITNESS:  All right.

11          MS. PELLETIER:  Do you want to

12     correct your testimony --

13          THE WITNESS:  Repeat it again.

14     Q.    (By Ms. Pelletier)  Do you want to

15     correct your testimony with regard to a response to a

16     previous question?

17     A.    No.  Go ahead.

18     Q.    With whom did you have a conversation

19     regarding an arrest in the Town of Williamsburg other

20     than the arrest of Michael Beattie?

21     A.    Maxine Schmidt.

22     Q.    Where were you when the conversation took

23     place?

24     A.    In the Collector's office which I shared.

1    would not be able to meet the time limits they had

2    given him to do whatever it was they asked him to do.

3         Q.    Did you respond to that?

4         A.    I don't know that I had a response.  She

5    was just giving me information why she had asked the

6    question.

7         Q.    What words did you say to Maxine Schmidt

8    other than you didn't know and if she wanted further

9    information, she needed to contact Officer Scoble?

10        A.    I don't recall that I said anything else.

11        Q.    You didn't have any substantive

12   conversation about the individual that she was asking

13   you about?

14        A.    No.

15        Q.    Who else was present in the office at the

16   time?

17        A.    I don't recall if the collector was there

18   or not.

19        Q.    What was the collector's name?

20        A.    Theresa Barstow.

21        Q.    You sat through the deposition of

22   Margie --

23                   MR. MILES:  Dunphy.

24        Q.    (By Ms. Pelletier)  Dunphy, correct?

1       A.      Yes.

2       Q.      Was Margie Dunphy there?

3       A.      I don't know if she was on the other side

4    of the wall where I couldn't see her.

5       Q.      Is it your position that the information

6    that Margie Dunphy provided in the deposition was

7    false?

8                   MR. MILES:  Objection to form of the

9           question.  You can answer.

10                  THE WITNESS:  Yes.

11      Q.      (By Ms. Pelletier)  Yes?

12      A.      Yes.

13      Q.      Since you became aware that Margie Dunphy

14   claims to have heard a conversation between you and

15   either Maxine Schmidt or Tess Barstow regarding the

16   arrest of an individual, have you spoken to either

17   Maxine Schmidt or Tess Barstow about it?

18      A.      Yes, I have.

19      Q.      When did you have that conversation?

20   Strike that.

21                  How many conversations have you had?

22      A.      One.

23      Q.      When was that?

24      A.      I don't recall exactly.

1       Q.      Approximately?

2       A.      In the last year.

3       Q.      When did you first become aware that

4   Margie Dunphy claimed to have heard this

5   conversation?

6       A.      I don't know the exact date.  The chief

7   spoke to me about it.  That was the first I knew.

8       Q.      You also sat through the chief's

9   deposition, correct?

10      A.      Yes, I did, no not the entire thing.  I

11  did not.  I came in late.

12      Q.      Have you read the transcript?

13      A.      No, I have not.

14      Q.      Have you read any portion of the

15  transcript?

16      A.      I have not.

17      Q.      What did the chief speak to you about?

18      A.      He said that one of the assessors had

19  approached him after a meeting somewhere and

20  mentioned the conversation, and he felt that he, you

21  know, had to bring it to my attention, although he

22  did not feel that the information she relayed to him

23  did breach any confidentiality.  He just asked me to

24  restate the conversation, which I did, and he didn't

1    feel that any breach had occurred and end of

2    discussion.

3          Q.    When did that conversation take place?

4          A.    I don't know exactly.

5          Q.    Do you have any idea?

6          A.    I don't.

7          Q.    Did the chief tell you that Mr. Morris

8    had spoken to him as well?

9          A.    He did not.

10         Q.    Prior to Mr. Morris' deposition at which

11   you were present, did you have any knowledge that Mr.

12   Morris had been spoken to by Marge Dunphy?

13         A.    I did not.

14         Q.    Prior to Mr. Morris' deposition, did you

15   have any knowledge that Mr. Morris had spoken to

16   Chief Archbald regarding the incident involving the

17   alleged conversation between you and Maxine?

18         A.    I did not.

19         Q.    Was the conversation that you had with

20   the chief part of an evaluation?

21         A.    No.

22         Q.    Where did it take place?

23         A.    In his office.

24         Q.    Do you have any recollection as to how

1    scenario?

2        A.    I don't recall.

3        Q.    You had knowledge prior to your

4    nonreappointment that the chief was made aware of

5    some conversation that allegedly occurred between you

6    and Maxine Schmidt, correct?

7        A.    Correct.

8        Q.    But you had no information prior to your

9    nonre-appointment that the Select Board members had

10    been made aware of that information, is that fair to

11    state?

12        A.    Not to my recollection.

13        Q.    I may have already asked you this, but

14    just for clarification, the chief certainly never

15    told you that Mr. Morris had approached him about

16    that alleged conversation?

17        A.    No, he did not.

18        Q.    He told you that Margie Dunphy had

19    approached him?

20        A.    Correct.

21        Q.    Do you keep a diary or notes of any sort?

22        A.    No, I do not keep a diary.

23        Q.    Or any notes of any sort?

24        A.    Pertaining to?

1    were you ever made aware that anybody else had ever

2    made any complaints about you in the performance of

3    your work as police secretary?

4        A.    No, I was not.

5        Q.    Were you ever made aware that any police

6    officers had raised issues with the chief about the

7    performance of your work as police secretary?

8        A.    Yes.

9        Q.    What would you consider those, not

10    complaints?

11        A.    I just didn't understand correctly the

12    first time when I said no.  I thought you meant

13    outside of the police department.

14        Q.    So, just to separate then, other than the

15    Margie Dunphy situation, we can use some shorthand

16    here, you're not aware of any other complaints

17    outside the police station?

18        A.    Yes.

19        Q.    But you're aware of some inside the

20    police station?

21        A.    Yes.

22        Q.    When did you become aware of the

23    complaints inside the police station?

24        A.    I don't recall exactly.  I don't even

1    know what year.  It was approximately at the time

2    that the chief would have been doing evaluations one

3    year which might have been like July, he usually did

4    them on his vacation.  There was an issue written in

5    my evaluation.

6         Q.    What was the issue?

7         A.    I don't know the exact wording.  It was

8    about conversations being held in the police station

9    about town business, and one of the officers had

10   mentioned it to the chief.

11        Q.    Do you know who the officer was?

12        A.    I believe it was Officer Scoble, now

13   Corporal Scoble.

14        Q.    Did you ever approach Officer Scoble

15   about that?

16        A.    I believe we had a conversation.

17        Q.    When did you have the conversation?

18        A.    Somewhere within that time frame, within

19   after I had had my interview with the chief and we

20   had talked about it.

21        Q.    Can you give me any more detail about the

22   conversation that you had with the chief, what you

23   said, what he said?

24        A.    Just in general, not word for word.  He

1    said that Peter Scoble had said to him that, you

2    know, some conversations had happened, that while he

3    was in the building, and usually it was around Town

4    Meeting time where -- so, usually by the time the

5    chief spoke to me for evaluation, some time had

6    passed.  It didn't, you know, it was July or August.

7    I don't remember.  This would have been conversations

8    in the station in April or May.

9         Q.    More than one year?

10        A.    No.  I'm just referring to the one that

11   I'm aware of.

12        Q.    You said usually it would be around Town

13   Meeting time.  What do you mean by that?

14        A.    Wrong choice of words.  Excuse me.

15   Around Town Meeting time, I'm trying to get a time

16   frame there for you.

17        Q.    So, the chief said to you that Officer

18   Scoble said to him that it was around Town Meeting

19   time or did the chief --

20        A.    No.  He just said that the conversations

21   had happened and the chief asked me when that might

22   have happened, and that was the only time I could

23   recall.

24        Q.    What were the conversations?

1       Q.     Did they change over time or were they

2  always the same?

3       A.     They've changed periodically.

4       Q.     Let's look at calendar year 2002, what

5  were your hours?

6       A.     I'm not sure when the changes -- they

7  were all within a half hour.

8       Q.     What were the hours?

9       A.     At that time specifically, I don't

10  recall.  It might be nine to 12:30.  It might have

11  been 8:30 to 12:30.

12       Q.     Did you have specific hours where you

13  would perform your duties as the treasurer?

14       A.     No, I did not at that time.

15       Q.     Did you ever post any hours so that

16  townspeople would know when they could come see you

17  as the treasurer?

18       A.     No, because I didn't have an office.

19       Q.     Did you ever tell anybody that they could

20  come talk to you or see you at the police station

21  while you were performing your job as police

22  secretary to conduct business other than police

23  business?

24       A.     On occasion.

1      Q.      Who did you tell?

2      A.      Might have been a banker.  Other town

3   employees.

4      Q.      Is there some reason why you couldn't do

5   that business after 12:30?

6      A.      I'm not sure that I specifically, as far

7   as town employees, maybe with forms and things, that

8   I specifically said, come see me at the police

9   station.  Sometimes they were sent to me at the

10  police station from the town office.  And as far as

11  bankers, sometimes there were documents that needed

12  to be signed pertaining to borrowing or something

13  that had to be filed by noon.

14     Q.      Who were the bankers?

15     A.      It would depend.  We would deal with

16  several banks.  It might have been Unibank, Clark

17  Roul, our fiscal adviser.

18     Q.      Were those the people that you understood

19  Officer Scoble was complaining about?

20     A.      No.

21     Q.      Well, then, what did you understand

22  Officer Scoble was complaining about?

23     A.      Other town people that came in, Chris

24  Morris, Michael Beattie.

1    know what was -- he might have had something going on

2    that day, that it just irritated him more than usual

3    and didn't mean to cause me any problems over it.

4         Q.    If I understand it correctly, the chief

5    didn't bother to mention this to you when Officer

6    Scoble came to him, it came up during your

7    evaluation?

8         A.    Correct.

9         Q.    And the only person identified was

10   Officer Scoble?

11        A.    Yes.

12        Q.    Did you ever have any other complaints by

13   any other officers regarding your performance of your

14   duties as police secretary?

15        A.    I believe in my most recent evaluation, I

16   wasn't given names.  The chief did say I believe two

17   officers mentioned something to him about filing.

18        Q.    When was the last time you -- strike

19   that.

20             Have you actually seen your evaluations

21   or were they just reported to you verbally?

22        A.    No.  We receive them.  We are allowed to

23   review them and comment.

24        Q.    Did you ever review your evaluations at

1    of this litigation, have you had any conversations

2    with Chief Archbald about the litigation other than

3    the one that you have mentioned already?

4         A.    I don't recall other than the one that I

5    already told you about.

6         Q.    Did anyone other than the chief

7    participate in your evaluations?

8         A.    Not to my knowledge.  I don't know.

9         Q.    Other than the comments that you have

10   told us about, those of Officer Scoble and the most

11   recent evaluation where two officers mentioned issues

12   regarding your filing, have you been made aware of

13   any other negative comments by anybody in the police

14   station about your performance as police secretary?

15        A.    I don't believe so.

16        Q.    Were you ever told that the custodian who

17   worked in the police station had some complaints

18   about you?

19        A.    I was not told that.

20        Q.    Have you since been made aware of that?

21        A.    Yes.

22        Q.    How did you become aware of it?

23        A.    I believe it was in one of the settlement

24   documents that we had, it was mentioned.

1      Q.      Are you aware that the chief testified as

2  to the issue of the custodian?

3      A.      Yes.

4      Q.      Were you there when he testified as to

5  that?

6      A.      Yes, I was.

7      Q.      Do you now understand that the custodian

8  had complaints about you?

9      A.      Apparently.

10      Q.      You didn't mention those earlier because

11  you were not made aware of those complaints?

12      A.      Correct.

13      Q.      You now understand they existed, however?

14      A.      I'm not sure in what form they existed or

15  what they actually were.  I was never told that.

16      Q.      What is your understanding as to why the

17  custodian left?

18      A.      That the addition was put on the town

19  offices and he was increasing his time over there and

20  would not have time to give to us.

21      Q.      Since becoming aware that the custodian

22  allegedly complained about you, have you had any

23  conversations with anyone excluding counsel about

24  that?

1    Q.    Number of months.

2    A.    I'm not sure.

3    Q.    I'm going to read you a question and an

4    answer from Mr. Archbald's, Chief Archbald's

5    deposition and ask if you recall being present during

6    this portion of the deposition.  Did you ever receive

7    any complaints from anybody that Ms. Karowski was not

8    working well with any member of the custodial staff?

9    Answer, could you repeat the question?  Question, did

10   you ever have any discussions with anybody or

11   communications with anybody regarding Ms. Karowski's

12   relationship with any member of the custodial staff?

13   Answer, no.

14           MR. MILES:  Excuse me.  Could I have

15       the page and line?

16           MS. PELLETIER:  65, line 1.

17           MR. MILES:  Thank you.

18   Q.    (By Ms. Pelletier)  Began with 64, line

19   20.  Question, did you receive any complaints from

20   the Select Board on the way Ms. Karowski related to

21   any member of the custodial staff?  Answer, yes.

22           Do you remember being present when that

23   portion of the chief's deposition took place?

24   A.    I believe I was.

1    Q.    Do you recall that the chief then went on

2    to relay a conversation that he had had with Chris

3    Morris relating to a custodian whose first name was

4    Russ?

5    A.    I don't remember the exact testimony, no.

6    Q.    Do you remember that that's what we're

7    talking about, however, is complaints by a custodian

8    whose name was Russ?

9    A.    Yes.

10    Q.    And that the chief acknowledged that he

11    had in fact received a communication from Mr. Morris

12    relating to that?

13    A.    Okay.

14    Q.    Do you recall that?

15    A.    I don't recall it but --

16    Q.    Let me read it then.  Tell me about what

17    you received.  Answer, my best recollection is it may

18    have been part of the conversation I had with Chris

19    Morris.  Question, what do you recall?  Answer, I

20    don't recall his last name.  His first name was Russ.

21    I don't recall the details.  But I think at the time

22    there was a transition between him working.  He

23    worked part time for us, just a few hours a week if

24    that.  I don't even recall how many hours a week.  He

1                                      portion of record read)

2                        THE WITNESS:   I may have.

3        Q.      (By Ms. Pelletier)   Do you have any

4    recollection of doing so?

5        A.      Not specifically.

6        Q.      Your complaint alleges, quote, as a

7    citizen and registered voter, Karowski has voiced her

8    opinion about positions the Selectmen have taken

9    concerning the Williamsburg police department

10   including opposing the Selectmen's position towards

11   compensation of Williamsburg's only full-time police

12   officer and the Selectmen's position on the Quinn

13   Bill.  Do you understand that your complaint makes

14   that allegation?

15       A.      Mm-hmm.

16       Q.      That's yes for the record?

17                       MR. MILES:  Yes or no.

18                       THE WITNESS:  Yes.  I'm sorry.  Yes.

19       Q.      (By Ms. Pelletier)   Where and when did

20   you allegedly voice those opinions?

21       A.      It would have been at a Finance Committee

22   meeting.

23       Q.      So, it's your position that while you

24   were sitting as a member of the Finance Committee,

1   you were acting as a citizen and registered voter in

2   voicing your opinions, is that correct?

3          A.     Yes.

4          Q.     Not as a member of the Finance Committee?

5          A.     Well, I was not voicing an opinion for or

6   against the Quinn Bill.

7          Q.     That's not the question.

8          A.     But it was in a Finance Committee meeting

9   and I guess my position would have been as a Finance

10  Committee member.

11         Q.     Not as --

12         A.     As it related to that.

13         Q.     Not as a citizen and registered voter?

14         A.     That also, but I didn't identify that.

15         Q.     Did you identify what hat you were

16  wearing when you made your statements on those

17  issues?

18         A.     I don't believe I did.

19         Q.     At any time have you been asked to

20  identify which hat you're wearing in connection with

21  the voicing of your opinions on various issues in the

22  Town of Williamsburg?

23         A.     Not that I recall.

24         Q.     Have you had any conversations with the

1    police chief regarding the voicing of your personal

2    opinions as opposed to opinions perceived to be those

3    of the police department when you were acting in any

4    of your various capacities in the Town of

5    Williamsburg?

6         A.    I did not.

7         Q.    To this day, have you identified which

8    hat you were wearing in any communications that you

9    have had in any of your various positions in the Town

10   of Williamsburg?

11        A.    Yes.

12        Q.    Why?

13        A.    When providing information, at a

14   committee meeting, I do identify which hat I'm

15   wearing.

16        Q.    Why?

17        A.    Because I'm aware that I hold different

18   positions.

19        Q.    And you were aware of that in 2002,

20   correct?

21        A.    Yes.

22        Q.    But you didn't so identify, correct?

23        A.    If I was in a Finance Committee meeting

24   and expressing or participating in a discussion, I

1          Q.      You allege that before 2002 the chief of

2    police had the authority to hire and fire the police

3    secretary, do you understand that?

4          A.      Yes.

5          Q.      On what do you base that allegation?

6          A.      Minutes of the Select Board meetings.

7          Q.      Through what period of time?

8          A.      I believe in 1991, it was made an

9    appointment by the chief.

10          Q.      Okay.  Did you go back and research that?

11          A.      I did.

12          Q.      When?

13          A.      I'm not sure of the exact time.  It was

14    after the nonreappointment.

15          Q.      Did you become aware of a memo dated July

16    of 2003 from the town clerk to the Select Board

17    regarding the appointment of various positions in the

18    town including the police secretary in the course of

19    your research?

20          A.      Only at one of the depositions where it

21    was presented.

22          Q.      So, prior to the deposition, you were not

23    aware that the town clerk had presented a memorandum

24    to the Board of Selectmen in the summer of 2003

 1    regarding several positions including the police

 2    secretary?

 3         A.    The town clerk mentioned to me at one

 4    point that she had brought it to their attention.  I

 5    was not aware of a written memo.  She just said, I

 6    might have brought that information to their

 7    attention.

 8         Q.    What prompted you to be having this

 9    conversation with the town clerk?

10         A.    She prompted it after the

11    nonreappointment.

12         Q.    She came to you and said --

13         A.    Not -- I'm sorry.  Not after the

14    nonreappointment.  After the meeting in which they

15    made it an appointment of their Board.  She did say

16    that she had brought it to their attention.  I was

17    not told in what format she did that.

18         Q.    Okay.  So, was this -- did she approach

19    you somehow either by telephone or physically?

20         A.    I don't recall the circumstance.  I think

21    it might have been a conversation just in the office.

22         Q.    What was the town's clerk name?

23         A.    Charleen Nardi.

24         Q.    Who spoke first?

1      A.      I don't recall.

2      Q.      Other than, I might have brought that to

3    their attention, what was the substance of the

4    conversation?

5      A.      I don't recall.

6      Q.      Did she ever indicate to you that the

7    Select Board members had gone out and asked her to go

8    figure out a way to make the police secretary an

9    appointed position?

10      A.      No.

11      Q.      Did you ever ask her whether any of the

12    selected Board members ever asked her to go out and

13    figure out a way to make the police secretary an

14    appointed position?

15      A.      No, I did not.

16      Q.      So, you have absolutely no idea what

17    prompted her to come up and make this statement to

18    you?

19      A.      She saw that, as I said, the minutes of

20    the Select Board meeting, that they had made an

21    appointment.  She said to me, you know that I was the

22    one that had brought it to their attention.

23      Q.      So, you now, sitting here today, have

24    knowledge that the town clerk did in fact bring to

1     the attention of the Select Board members that

2     several positions including the police secretary had

3     previously been positions appointed through the

4     Select Board, correct?

5          A.     No.  She said that according to her

6     records since she had been town clerk, there was no

7     indication who made the appointment, and so, she

8     brought it to their attention that it wasn't a formal

9     appointment at that point.  She had not done any

10    research.  Just that it was not an appointed

11    position.  And so she had brought it to their

12    attention that this appointment was not being made by

13    them annually along with several others.

14         Q.     You lost me.  Can you start again.  She

15    told you what?

16         A.     She provides them with a list of

17    appointments every year, and she told me that she had

18    pointed out to them that the police secretary was not

19    on that list, and she brought it to their attention

20    along with several others.

21         Q.     I see.  So, she told you that she was the

22    person who every year would provide whoever was on

23    the Board of Selectmen with a list of people they

24    needed to appoint?

1        A.      Yes.

2        Q.      And that it came to her attention

3   sometime in 2003 that there were several positions

4   that she had not been including in the list and that

5   included the police secretary, is that right?

6        A.      Something like that.  I'm not sure

7   exactly how she came to the information herself.

8        Q.      Did you ask her any questions about that?

9        A.      I did ask if she had any knowledge why it

10  hadn't been and she said no.  So, I researched it.

11       Q.      So, after the conversation with her is

12  when you conducted your research?

13       A.      Mm-hmm.

14               MR. MILES:  Yes?

15               THE WITNESS:  Yes.

16       Q.      (By Ms. Pelletier)  You determined that

17  what?

18       A.      That, in the past, the Select Board had

19  in fact taken a vote to make it an appointment of the

20  chief and it had been under such authority from then

21  until the Selectmen made it an appointment, but that

22  vote was never rescinded.

23       Q.      It's your understanding that the

24  Selectmen made it an appointment as a result of the

1    fact that the town clerk brought it to their

2    attention?

3          A.    I can't speak for them.

4          Q.    It's your understanding, is it not, that

5    the town clerk brought to the attention of the Select

6    Board that there were -- there was more than one

7    position that she had not been including for

8    appointments and that included the police secretary?

9          A.    Yes.

10          Q.    It's not a situation, ma'am, where these

11    Select Board members went out and figured out a way

12    to -- strike that.

13                You allege in your complaint that in 2002

14    the Selectmen re-defined the position of police

15    secretary as one subject to annual appointment by the

16    Selectmen, do you understand that?

17          A.    Yes.

18          Q.    Is it your position that that was done to

19    prevent you from remaining as the police secretary?

20          A.    I don't know.

21          Q.    Is that your allegation?

22          A.    I think it was probably considered.

23          Q.    And upon what do you --

24          A.    That's my opinion.

1      Q.      Based on what?

2      A.      Based on issues I had been having with

3   the Board.

4      Q.      Other than the conversation that you had

5   with the town clerk, did you ever have any

6   conversation with any other employee of the Town of

7   Williamsburg on the issue of the appointment versus

8   -- appointment by the Selectmen of the police

9   secretary as opposed to the hiring by the chief?

10      A.      Yes.

11      Q.      Who?

12      A.      Chris Morris.

13      Q.      Before or after the nonreappointment?

14      A.      Before.

15      Q.      When do you claim to have had a

16   conversation with Chris Morris?

17      A.      After they took the vote to make it an

18   appointed position by the Board.

19      Q.      Other than that conversation, have you

20   had any other conversations with any other town

21   employee regarding the issue of the appointment by

22   the Selectmen of the police secretary as opposed to

23   hiring by the chief?

24      A.      Other than the town clerk and the

1    assistant town clerk, no.

2         Q.    Well, you haven't told us anything about

3    an assistant town clerk, I don't believe.  Charleen

4    Nardi is the clerk, right?

5         A.    Yes.

6         Q.    Have you told us about all conversations

7    that you have had with Charleen Nardi on this issue?

8         A.    I believe so.

9         Q.    And as far as I understand it, you never

10   had any conversation with Charleen Nardi where she

11   indicated that anybody on the Board of Selectmen ever

12   approached her to research this issue correct?

13        A.    I never asked her that.

14                   MS. PELLETIER:  Can you repeat the

15        question?

16                        (Whereupon, requested

17                         portion of record read)

18             THE WITNESS:  Correct.

19        Q.    (By Ms. Pelletier)  During the

20   conversation that you had with Charleen Nardi, did

21   she identify any Board of Select person as having

22   anything to do with what she did in connection with

23   that memorandum?

24        A.    No.

1    Q.    Do you have any facts within your

2    personal knowledge to indicate that Charleen Nardi

3    provided the information that she did to the Board of

4    Selectmen because the Board of Selectmen didn't want

5    to reappoint you?

6    A.    No.

7    Q.    You testified that you also had a

8    conversation with the assistant town clerk, is that

9    correct?

10    A.    Correct.

11    Q.    Who is that?

12    A.    She's no longer there.  Barb Charlefont.

13    Q.    When did that conversation take place?

14    A.    I don't recall specifically.

15    Q.    Was it before or after the vote to make

16    the appointment of the police secretary one by the

17    Board of Selectmen?

18    A.    After.

19    Q.    Who initiated the conversation?

20    A.    I did.

21    Q.    What was the substance of the

22    conversation?

23    A.    I needed to research -- I wanted to

24    research the minutes of previous meetings to -- as

1        A.      Not for that purpose, no.

2        Q.      You never lost any income as a result of

3    any action by the defendants in this case, is that

4    fair to state?

5        A.      Yes.

6        Q.      For what period of time do you claim to

7    have suffered this emotional distress because you are

8    a single parent and you would have lost half your

9    income?

10       A.      During the time before my reappointment.

11       Q.      For what period of time?

12       A.      Sometime in July to sometime in November.

13       Q.      Did you seek employment elsewhere?

14       A.      I did not.

15       Q.      Did you seek any medical attention of any

16   sort?

17       A.      I did see a therapist on two occasions,

18   psychologist.

19       Q.      You did not identify the psychologist in

20   your automatic disclosure, is that correct?

21       A.      I don't know.  I thought we had.

22   Apparently not.

23       Q.      You said apparently not?

24       A.      Yes.

1          A.     Other people's assumption.

2          Q.     Did someone articulate that to you at any

3    of these events?

4          A.     Not in detail, just in general, you know.

5    It was in the paper what, you know.

6          Q.     No, I don't.

7          A.     The fact that I was not reappointed

8    indicated that there was something wrong with my

9    performance for them to have done that.

10         Q.     People specifically articulated that to

11   you?

12         A.     Some, yes.

13         Q.     Can you identify those individuals?

14         A.     Not specifically, no.

15         Q.     Not one?

16         A.     No.

17         Q.     That caused you emotional distress, that

18   manifested itself how?

19         A.     It was uncomfortable going out, going out

20   around town, not knowing how people did feel about

21   it, not having been able to defend myself against the

22   accusations.  They were only seeing one side of it.

23         Q.     Other than not being comfortable going

24   around town, did it manifest itself in any other way?

1        A.     I looked at other jobs. I didn't apply

2    for any, but I looked at other jobs, but it's a

3    little difficult to submit an application somewhere

4    when, you know, publicly, you've not been reappointed

5    for some reason, and the position was not being

6    advertised. At that point I was able to stay in the

7    position only until this was resolved or a suitable

8    replacement was found. That was in the newspaper.

9    Which would make it difficult to go find another job

10   when in fact I wanted to keep the one I had.

11        Q.     But my question relates to how this

12   manifested itself in you, how did it affect you, that

13   you claim you --

14        A.     Depressed, sad.

15        Q.     Did you seek any help for depression

16   other than that which you've already discussed?

17        A.     No.

18        Q.     Do you claim that you were actually

19   suffering from clinical depression?

20        A.     No.

21        Q.     Were you ever prescribed any kind of

22   medication for depression?

23        A.     No.

24        Q.     So, are you using the term depressed in