**MARJORIE DUNPHY**
**January 13, 2005**

Page 1

```
 1              THE UNITED STATES DISTRICT COURT FOR
 2                  THE DISTRICT OF MASSACHUSETTS
 3                         Western Division
 4             Civil Action No. 03-CV-30314-MAP
 5    ********************************************
 6    KAREN KAROWSKI,                              *
 7              Plaintiff                          *
 8    vs.                                          *
 9    ERIC CERRETA, DAVID HASKELL,                 *
10    CHRISTOPHER MORRIS, and THE                  *
11    INHABITANTS OF THE TOWN OF WILLIAMSBURG,     *
12              Defendants                         *
13    ********************************************
14
15              DEPOSITION OF MARJORIE DUNPHY
16                  Taken at the Law Offices of
17           GREEN, MILES, LIPTON, & FITZ-GIBBON
18                       77 Pleasant Street
19                  Northampton, Massachusetts
20                       January 13, 2005
21                       1:19 - 1:42 p.m.
22
23                  Deborah Leonard Lovejoy
24              Registered Professional Reporter
```

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

```
 1      A.    Yes.
 2      Q.    What is your current employment?
 3      A.    I'm an assessor for the town of
 4   Williamsburg.
 5      Q.    How long have you been an assessor
 6   for the town?
 7      A.    Fourteen years.
 8      Q.    Is that an elected position?
 9      A.    Yes.
10      Q.    Do you hold any other town office?
11      A.    No.
12      Q.    Have you ever held any other town
13   office?
14            MS. PELLETIER:  Objection.
15            Go ahead.  You can answer.
16      A.    I was a member of the board appeals.
17      Q.    (By Mr. Miles)  When was that?
18      A.    Roughly, '74 to '92, or '94,
19   something like that.
20      Q.    Have you had any postgraduate
21   education with respect to your employment?
22      A.    Yes.  I've taken courses that the
23   Department of Revenue has run for assessors.
24      Q.    And have you held any other
```

MARJORIE DUNPHY
January 13, 2005

Page 8

```
 1      A.      No.
 2      Q.      Do you know Karen Karowski?
 3      A.      Yes.
 4      Q.      How do you know Karen Karowski?
 5      A.      She lives in the same town.  We've
 6   got kids the same age.  She's employed by the
 7   town.
 8              (Momentary pause in proceedings)
 9      Q.      (By Mr. Miles)  Where are your
10   offices in the town hall located with respect to
11   where Karen Karowski works at present?
12      A.      She's across the hall.
13      Q.      Okay.  And has that changed, again
14   since 2002?
15      A.      Yes.
16      Q.      How has it changed?
17      A.      Her office used to be in the same
18   room as mine, but divided by a half wall.
19      Q.      When did that change?
20      A.      I'm not sure.  In the last year or
21   so.
22      Q.      Is your office in the vicinity of
23   the town collector's office?
24      A.      Yes.
```

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

MARJORIE DUNPHY
January 13, 2005

Page 9

1   Q.   And who is the town collector?
2   A.   Teresa Barstow.
3   Q.   And was she the town collector in
4   2002-2003?
5   A.   Yes.
6   Q.   And where is her office in relation
7   to your office and Karen Karowski's office?
8   A.   Karen and Teresa used to share an
9   office, which would have been in the same room as
10  mine, but divided by the half wall.
11  Q.   Currently, where is Teresa Barstow's
12  office?
13  A.   She's in the same place.
14  Q.   Have you ever talked to Teresa
15  Barstow about Karen Karowski's position as police
16  secretary?
17  A.   Not that I recall.
18  Q.   And have you ever talked to Bonnie
19  Roberge about Karen Karowski's position as police
20  secretary?
21  A.   Not that I recall.
22  Q.   Did you ever talk to anyone employed
23  by the town about the manner in which Karen
24  Karowski performed her job as police secretary?

**MARJORIE DUNPHY**
**January 13, 2005**

Page 10

1  A.  Specifically as police secretary?
2  Q.  Yes.
3  A.  I -- I don't think that --
4      Ask the question again.
5  Q.  Sure.  Did you ever talk to anybody
6  employed by the town about how Karen Karowski
7  performed her job as police secretary?
8  A.  I don't think I was talking to
9  anyone about how she performed as police
10 secretary.
11 Q.  Okay.  Did you ever talk to anybody
12 about how Karen Karowski performed her job as
13 town treasurer?
14 A.  No.
15 Q.  Did you ever talk to anybody about
16 how Karen Karowski performed her job as a member
17 of the finance committee of the town?
18 A.  No, I don't have anything to do with
19 finance committee.
20 Q.  Did you ever tell anybody that Karen
21 Karowski had disclosed confidential police
22 information?
23 A.  Yes.
24 Q.  Okay, when did that occur?

MARJORIE DUNPHY
January 13, 2005

Page 11

1   A.   I spoke to Chris Morris, who was
2 chairman of the police -- of the select board,
3 because people in the treasurer's and collector's
4 office were being discussed and references were
5 made about people when there were ongoing cases
6 from the police department.  And I felt it was
7 inappropriate.  And my hope was that the select
8 board member, who was also the police liaison,
9 would address that.
10   Q.   Okay, let me go back a little bit
11 and break this down into some detail.  Do you
12 recall when that conversation occurred?
13   A.   No.
14   Q.   How many times did you talk to
15 Mr. Morris about this issue?
16   A.   Just the one time, that I recall.
17   Q.   Do you remember what year it was?
18   A.   My life is a blur.  I -- it was a
19 year or two ago.  Before the office was moved in
20 the office.
21   Q.   Is there any way you can pin it down
22 more closely?
23   A.   I don't even remember when the
24 offices moved, except that it was in the last

**MARJORIE DUNPHY**
**January 13, 2005**

Page 13

```
 1            MS. PELLETIER:  Objection.
 2            Go ahead.  Go ahead.
 3       A.   People were discussed on a regular
 4  basis.  I recall one case in particular that was
 5  mentioned.
 6       Q.   (By Mr. Miles)  What case was that?
 7       A.   Cos Ferrante.
 8       Q.   How do you spell that?
 9       A.   Cosmo Ferrante.  F-E-R-R-A-N-T-E.
10       Q.   Okay, when did that occur?
11       A.   When I expressed a concern to Chris.
12       Q.   Okay.  And was that the incident
13  that triggered your expression of concern?
14       A.   Yes.
15       Q.   And what was disclosed about
16  Mr. Ferrante?
17            MS. PELLETIER:  I'm going to object.
18       And I have some CORI concerns.  If she
19       (Indicating) expressed information that may
20       violate CORI, I'm certainly not going to
21       put her in a position of having to do that
22       by you asking her to repeat what she said.
23       If you can ask -- if she can answer it in a
24       general fashion, I don't have a problem
```

Page 14

```
 1    with that.  But I don't want to put her in
 2    a position of potentially violating CORI.
 3         MR. MILES:  I don't disagree with
 4    your position.  I'm willing to seal this
 5    portion of the deposition, if that fixes
 6    the problem, so that it's nondisclosable.
 7    And I'm willing to agree to a protective
 8    order that before I use it in any other
 9    context, I will seek either your agreement
10    or the permission of the court.
11         MS. PELLETIER:  As long as she's
12    (Indicating) bound by it.
13         MR. MILES:  I'll agree that she's
14    bound by it, as well.
15         MS. PELLETIER:  Okay.
16         Go ahead.  You can answer.
17    Q.   (By Mr. Miles)  What did you hear
18    being said about Mr. Ferrante?
19    A.   That there was an on -- I don't
20    remember exactly what was said, but reference was
21    made to the fact that he was being investigated
22    for far more than they had been discussing.
23         I try to tune out what they're
24    talking about most of the time.
```

MARJORIE DUNPHY
January 13, 2005

Page 15

1  Q.  Do you recall any more specifics?
2  A.  He had been charged with something,
3  and references were made to that case, that he
4  was also being investigated for something else.
5  Q.  Okay.  So, as I understand it,
6  whatever else he was being investigated for was
7  never conveyed to you; is that correct?
8  A.  That's correct.
9  Q.  Okay.  And do you know what he was
10 being investigated for that, apparently, had been
11 talked about?
12        MS. PELLETIER:  Objection.
13        Go ahead.
14 A.  I wouldn't know.
15 Q.  (By Mr. Miles)  Okay.  So you
16 weren't told that.
17 A.  No.
18 Q.  And you didn't overhear specifics
19 about the investigation.
20 A.  They were not talking about the
21 investigation; they were talking about the fact
22 that he was being investigated for something
23 else.
24 Q.  Okay.  But you were -- you were

Page 17

```
 1        A.    Regarding police matters.
 2        Q.    (By Mr. Miles)  Okay.  And what did
 3  you relate to Mr. Morris with respect to
 4  nonpolice matters?
 5        A.    My concern was that taxpayers were
 6  being discussed and references were made to
 7  ongoing investigations.
 8        Q.    Okay.  The ongoing --
 9        A.    Ongoing investigation, singular.
10        Q.    And the discussion of taxpayers was
11  between Ms. Karowski and Ms. Barstow?
12        A.    Yes.
13        Q.    At the time did you understand that
14  Ms. Karowski was town treasurer?
15        A.    Yes.
16        Q.    And did you understand that
17  Ms. Barstow was town collector?
18        A.    Of course.
19        Q.    Did the discussions have to do with
20  matters associated with the office of the town
21  collector or the office of treasurer?
22        A.    Sometimes.
23        Q.    Were there any that did not?
24        A.    Sure.
```

MARJORIE DUNPHY
January 13, 2005

Page 18

1  Q. And do you have any specific
2  recollection of any discussion --
3  A. No.
4  Q. -- that did not concern something --
5  a matter connected to either town collector or
6  the town treasurer?
7  A. Nope.
8  Q. Did you keep a log or record --
9  A. No.
10 Q. -- of your conversations?
11 MS. PELLETIER: You've got to wait
12 until he finishes the questions, okay?
13 A. No, I didn't.
14 Q. (By Mr. Miles) Did you approach
15 either Ms. Barstow or Ms. Karowski about the
16 inappropriateness of the conversations, as you
17 perceived them?
18 A. No.
19 Q. Who was the first person you
20 informed about the conversations?
21 A. Chris Morris.
22 Q. Did Mr. Morris -- what did
23 Mr. Morris say to you when you reported this to
24 him, when you reported the conversation about

MARJORIE DUNPHY
January 13, 2005

Page 19

```
 1  Mr. Ferrante to him?
 2       A.    I don't recall.
 3       Q.    Did you have any further
 4  conversations with Mr. Morris about the incident
 5  involving Mr. Ferrante?
 6       A.    That's the third time you asked me
 7  that.  No.
 8       Q.    Did you have any conversations with
 9  anybody else about the references to Mr. Ferrante
10  that you overheard?
11       A.    Not that I recall.
12       Q.    Where were you when you overheard
13  the references to Mr. Ferrante?
14       A.    In the assessor's office.
15       Q.    How close is that -- how close were
16  you physically to Ms. Barstow at the time?
17       A.    Ten, twelve feet.
18       Q.    Did she know you were there?
19       A.    Yes.
20       Q.    If you -- did you tell Mr. Ferrante
21  that you overheard this conversation?
22       A.    No.
23       Q.    And have you told any of the other
24  people to whom references were made that you
```

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

**MARJORIE DUNPHY**
**January 13, 2005**

Page 20

```
 1   overheard conversations regarding them?
 2        A.    No.
 3              I did talk to somebody else, you're
 4   right.  I thought you meant in the town office.
 5        Q.    No.
 6        A.    I spoke to Pat Archbald.
 7        Q.    Okay, when did you speak to Pat
 8   Archbald?
 9        A.    After a town meeting.
10        Q.    Do you remember which one?
11        A.    Nope.
12        Q.    Was it an annual meeting or a
13   special meeting?
14        A.    Don't remember.  I happened to be
15   walking out the door at the same time as he was.
16        Q.    Okay.  Were there other people in
17   the vicinity?
18        A.    No, or I wouldn't have talked to
19   him.
20        Q.    What did you say to him, and what
21   did he say to you?
22        A.    I said, basically, that I was
23   concerned that investigation -- an investigation
24   was being discussed in the collector's office,
```

MARJORIE DUNPHY
January 13, 2005

Page 21

1 that I thought he should know about it.
2   Q.   What did he say?
3   A.   "Thank you."
4   Q.   Did he and you ever talk any further
5 about that communication?
6   A.   No.
7   Q.   Did you file a formal complaint with
8 the police department about conversation you
9 overheard?
10        MS. PELLETIER:  Objection.
11        Go ahead.
12        MR. MILES:  I'll withdraw it and
13   rephrase.
14   Q.   (By Mr. Miles)  Did you file a
15 complaint with the police department about the
16 conversation you overheard about Mr. Ferrante?
17   A.   No.
18   Q.   Did you file a complaint with the
19 police department about any conversations that
20 you overheard between Ms. Karowski and
21 Ms. Barstow?
22   A.   No.
23   Q.   By the way, how do you know that
24 Ms. Barstow was talking to Ms. Karowski?