```
                                                           Page 1
 1              COMMONWEALTH OF MASSACHUSETTS

 2               Department of the Trial Court

 3

 4   Western Division      C.A No.:   03-CV-30314-MAP

 5

 6   * * * * * * * * * * * * * * * *

 7   KAREN KAROWSKI,                         *

 8            Plaintiff                      *

 9   v.                                      *

10   ERIC CERRETA, DAVID HASKELL,            *

11   CHRISTOPHER MORRIS, AND THE             *

12   INHABITANTS OF THE TOWN OF              *

13   WILLIAMSBURG,                           *

14            Defendants                     *

15   * * * * * * * * * * * * * * * *

16

17           DEPOSITION OF:   PATRICK ARCHBALD

18              Green, Miles & Fitz-Gibbon

19                  77 Pleasant Street

20              Northampton, Massachusetts

21                  November 19, 2004

22

23               Jessica M. DeSantis

24                  Court Reporter
```

Page 26

1  average you can give us over the last year?
2      MS. PELLETIER: Objection. Go
3  ahead.
4      THE WITNESS: Two, three hours.
5  Q.  (By Mr. Miles) Did she also put in
6  overtime that was compensated?
7  A.  Very rarely.
8  Q.  Now, did you ever receive any
9  complaints about Ms. Karowski's work?
10 A.  Yes.
11 Q.  Okay. And what complaints did you
12 receive?
13 A.  Complaints from police officers and
14 a complaint from the board, the select board.
15 Q.  Let's talk about police officers
16 first.
17     What complaints did you receive from
18 police officers?
19 A.  Verbal, often in passing.
20 Q.  Okay. And what kinds of
21 complaints -- strike that.
22     What were the complaints?
23 A.  That she would be discussing
24 business other than police-related business while

Page 27

1  at work.
2  Q.  From who did you receive those
3  complaints?
4  A.  Various officers. I don't recall.
5  Q.  Did you document or memorialize any
6  of those complaints?
7  A.  I did not.
8  Q.  Did you speak to Ms. Karowski about
9  them?
10 A.  I have.
11 Q.  When did you speak with her?
12 A.  I don't recall.
13 Q.  When was the last time you spoke
14 with her?
15     MS. PELLETIER: About that issue?
16     MR. MILES: About these complaints,
17 yeah.
18     THE WITNESS: I don't recall.
19 Q.  (By Mr. Miles) And do you know what
20 other business she was discussing while she was
21 at the police department?
22 A.  Me personally or from the officers
23 complaints?
24 Q.  From the officers.

Page 28

1  A.  Yes.
2  Q.  What was it?
3  A.  It would be related to any other --
4  what you might expect from a conversation with
5  someone who works for another board. It would be
6  finance related. It might be school related.
7  Q.  Would it be accurate to say that the
8  other business she was discussing was
9  town-related business?
10 A.  Yes.
11 Q.  Did she also see people with respect
12 to non police town-related business at the police
13 station?
14 A.  I'm aware of that.
15 Q.  And how often did that occur?
16 A.  In the context of my part-time
17 position?
18 Q.  Yes.
19 A.  And only being there -- being there
20 quite infrequently. It was very infrequent that
21 I saw it.
22 Q.  Okay. Did you hear about it from
23 other officers?
24 A.  Yes.

Page 29

1  Q.  And, again, how frequently did you
2  hear about that from other officers?
3  A.  In this particular case of visitors
4  doing town business in the police station. It
5  would have only been Sergeant Graham who brought
6  it to my attention a handful of times.
7  Q.  Did you speak to Ms. Karowski about
8  that?
9  A.  I did not have an issue with it.
10 Q.  Okay.
11 A.  No.
12 Q.  And I take it then you didn't
13 discipline her for that?
14 A.  I did not.
15 Q.  Okay. Do you know if other town
16 officials came to the police station to do town
17 business with Ms. Karowski?
18 A.  Yes.
19 Q.  Okay. And do you know who came to
20 the police station to do town business with Ms.
21 Karowski?
22 A.  Over her full employment?
23 Q.  Yes.
24 A.  I've seen many select board members.

Page 30

1  Well, I've seen Chris Morris at our station.
2  Jeff Ciuffreda.
3      Q.  Mr. Ciuffreda was a selectman at
4  some point?
5      A.  Yes.
6      Q.  And do you know how to spell his
7  name?
8      A.  C-I-U-F-F-R-E-D-A.
9      Q.  Go ahead.
10     A.  Dick Childs was a frequent
11 visitor.
12     Q.  Was he a selectman as well?
13     A.  No.  On another board.  Water and
14 sewer possibly.
15     Q.  All right.
16     A.  Michael Beady.
17     Q.  And what was his position?
18     A.  I don't know at the time.  And in
19 terms of Michael Beady.  I don't know if, at the
20 time he was at our station, whether he was a part
21 of a board or not.
22         But the others I am certain were
23 there in their official capacity.
24     Q.  How often did Mr. Morris visit the

Page 31

1  station to conduct town business?
2      A.  Once or twice to my recollection.
3      Q.  Is that of your personal
4  knowledge?
5      A.  Yes.
6      Q.  Have you heard about him visiting
7  the station more frequently from any officer?
8      A.  No.
9      Q.  Okay.  Did Ms. Karowski ever
10 indicate to you that she needed assistance to
11 stop anybody from coming to the station to
12 conduct business that was not police business?
13     A.  Repeat the question.
14     Q.  Sure.
15         Did Ms. Karowski ever indicate to
16 you that she needed help to stop someone from
17 coming to the station to conduct business that
18 was not police business?
19     A.  No.
20     Q.  Did she ever have a conversation
21 with you about Michael Beady?
22     A.  In this time frame?
23     Q.  Yes.
24         MS. PELLETIER:  Objection.  Go

Page 32

1  ahead.
2          THE WITNESS:  Not that I recall.
3      Q.  (By Mr. Miles) Okay.  And did you
4  have any policy with respect to the conducting of
5  town business that was not police business in the
6  police station?
7      A.  A policy?
8      Q.  Yes.
9      A.  No.
10     Q.  Did you ever prohibit Ms. Karowski
11 to conduct non police business in the police
12 station?
13     A.  Forbid, no.
14     Q.  Okay.  Did you ever discourage her
15 from conducting non police business in the police
16 station?
17     A.  Yes.
18     Q.  And when did you do that?
19     A.  I don't recall.
20     Q.  Was it within the last year?
21     A.  No.
22     Q.  How long ago was it if you
23 remember?
24     A.  If I could look at the

Page 33

1  evaluations.
2      Q.  Sure.  Go ahead.
3      A.  1999, approximately.
4      Q.  Okay.  Did she -- did you and she
5  have a discussion about it?
6      A.  I don't recall.
7      Q.  Okay.  How did you discourage her
8  from doing non police business in the police
9  station?
10     A.  By business you mean phone or
11 personal?  I mean, person to person or by phone
12 business?
13     Q.  All right.
14     A.  I never discouraged her from
15 doing -- by people coming in to do town business.
16 I understood that that needed to happen.
17         But from times when officers might
18 bring it to my attention that Karen was on the
19 phone doing non police business.  That is --
20 those officers brought that to my attention and
21 then I spoke with Karen.
22     Q.  Now, you said you got a complaint
23 from the select board about Ms. Karowski doing
24 non police business at the police station.

9 (Pages 30 to 33)

Page 34

1  When did that occur?
2  A.  It was a meeting I had with Chris
3  Morris when he came to the station.
4  Q.  When was that?
5  A.  I don't recall.
6  Q.  Was it this year?
7  A.  No.
8  Q.  Was it 2003?
9  A.  May have been.
10 Q.  Was it 2002?
11 A.  More likely 2003.
12 Q.  Was it before or after Ms. Karowski
13 had been reappointed in 2000?
14 A.  Before.
15 Q.  What did Mr. Morris say to you and
16 what did you say to him?
17 A.  The general context of the
18 conversation, my recollection, is that it was
19 believed there was excessive conversation going
20 on during the day about town business, not police
21 related, from Karen.
22 Q.  Did Mr. Morris tell you from who he
23 had learned this?
24 A.  I don't recall.

Page 35

1  Q.  Did Mr. Morris indicate to you why
2  that was a concern -- strike that.
3        Was Mr. Morris speaking on behalf of
4  the select board or individually?
5  A.  I believe at the time, I believe, it
6  was a concern for all board members, yes.
7  Q.  Was Mr. Morris police liaison at
8  that time?
9  A.  I believe so.
10 Q.  Did he make the complaint in
11 writing?
12 A.  No.
13 Q.  Did you object to specific kinds of
14 non police business being conducted in the police
15 station?
16 A.  I don't recall.
17 Q.  And did he ask you to do anything in
18 particular?
19 A.  I left that meeting with the
20 expectation that I would follow up and correct
21 the behavior.
22 Q.  And what did you do?
23 A.  I did nothing with that
24 information.

Page 36

1  Q.  And why is that?
2  A.  It wasn't a significant enough
3  concern for me.
4  Q.  Did you report back to Mr. Morris
5  about any follow up?
6  A.  No.
7  Q.  Did Mr. Morris inquire again about
8  any follow up?
9  A.  No.
10 Q.  Did you receive any inquiry from any
11 other board of selectmen about Ms. Karowski
12 conducting non police business at the police
13 station?
14 A.  No.
15 Q.  Did you receive any inquiry from any
16 other town official regarding Ms. Karowski
17 conducting non police business at the police
18 station?
19 A.  No.  That was not the sum total of
20 the conversation.
21 Q.  I'm sorry.  Then give me the sum
22 total of the conversation, please.
23 A.  I left that meeting with the clear
24 understanding that the board had gotten

Page 37

1  information about, as I recall, unrelenting
2  criticism of the board.  And that they had
3  reached a point that they wanted something done
4  about it.
5  Q.  Did anybody tell you -- strike that.
6        Was that conversation with
7  Mr. Morris or with any other member of the
8  board?
9  A.  Just Mr. Morris.
10 Q.  What unrelenting criticism did
11 Mr. Morris object to?
12 A.  I don't recall that detail.
13 Q.  And what did you do?
14 A.  With the information?
15 Q.  Yes.
16 A.  I did nothing with Karen.
17 Q.  Did you do anything else?
18 A.  No.
19 Q.  So if I understand it correctly Ms.
20 Karowski was unaware of this conversation you had
21 with Mr. Morris?
22     MS. PELLETIER:  Objection.  Go
23 ahead.
24     THE WITNESS:  I can't recall the

Page 38

1  follow-up conversation with Ms. Karowski.
2  Q.  (By Mr. Miles) And I take it you
3  didn't document any follow up in her personnel
4  file?
5  A.  No.
6  Q.  Did you write any memorandum to the
7  board regarding the situation after you had the
8  conversation with Mr. Morris?
9  A.  No.
10  Q.  And did you have any follow up
11  meeting with Mr. Morris about the unrelenting
12  criticism?
13  A.  No.
14  Q.  Do you know if the criticism changed
15  at any time after Mr. Morris came to you with
16  this issue?
17  A.  I'm sorry?
18  Q.  Do you know if Ms. Karowski's
19  criticism changed at any time after Mr. Morris
20  came to you with this issue?
21  MS. PELLETIER: Objection. Go
22  ahead.
23  THE WITNESS: I don't know.
24  Q.  (By Mr. Miles) Did Mr. Morris ever

Page 39

1  talk to you about Ms. Karowski representing the
2  police department without authority?
3  MS. PELLETIER: Objection. Go
4  ahead.
5  THE WITNESS: Repeat the question.
6  Q.  (By Mr. Miles) Did Mr. Morris ever
7  talk to you about Ms. Karowski representing the
8  police department inappropriately?
9  MS. PELLETIER: Objection. Go
10  ahead.
11  THE WITNESS: Yes.
12  Q.  (By Mr. Miles) And when did he talk
13  to you about that?
14  A.  I believe it was at this meeting.
15  Q.  What did he say?
16  A.  That with some of her involvement in
17  other boards she would express opinions, strong
18  opinions, about how she thought things should be
19  run and decisions should be made.
20  Q.  Did he object to that?
21  A.  Yes.
22  Q.  And what did he say?
23  A.  I believe he felt that she was
24  acting outside her scope of her job.

Page 40

1  Q.  Did he ask you to do anything about
2  it?
3  A.  I don't recall.
4  Q.  Did he provide you anything in
5  writing indicating that she -- that Ms. Karowski
6  had acted outside the scope of her employment?
7  A.  No.
8  Q.  Did he tell you that you were the
9  person to represent the police department at
10  board meetings?
11  MS. PELLETIER: Objection. Go
12  ahead.
13  THE WITNESS: I don't recall.
14  Q.  (By Mr. Morris) Did he indicate to
15  you that you were the individual -- strike that.
16  Did he indicate or say to you that
17  you were the sole individual who could represent
18  the police department?
19  MS. PELLETIER: Objection. Go
20  ahead.
21  THE WITNESS: I don't recall.
22  Q.  (By Mr. Miles) Did any of the other
23  selectmen make any statements to you about Ms.
24  Karowski's behavior at other town board

Page 41

1  meetings?
2  A.  Yes.
3  Q.  Who else talked to you about it?
4  A.  Previous board member, Bertle
5  Leander.
6  Q.  What did Mr. Leander say?
7  A.  He was concerned about the many hats
8  that Karen wore and expressing opinions outside
9  her scope.
10  Q.  When did he express concern?
11  A.  I don't recall.
12  Q.  Was he a member of the board at the
13  time he expressed this concern?
14  A.  He was.
15  Q.  And do you remember when he was a
16  member of the board of selectmen?
17  A.  I don't.
18  Can I make a point of clarification?
19  Q.  Sure.
20  A.  The conduct which was brought to my
21  attention at the meeting by Mr. Morris was
22  conduct that I understood -- I left that meeting
23  understanding that it was taking place while she
24  was in her capacity outside the four corners of

Page 42

1  my building of the police station.
2    Q.  And did you also understand it was
3  conduct that took place which was at the inner
4  capacities as a member of the finance
5  committee?
6    A.  Yes.
7    Q.  And with respect to Mr. Leander.
8  Was he talking about the same kind of conduct?
9    A.  Yes.
10   Q.  Did you take any action based upon
11 Mr. Leander's statement?
12   A.  No.
13   Q.  Did you take any action based upon
14 Mr. Morris' statement?
15   A.  No.
16   Q.  Did Ms. Karowski stay at the police
17 station after her normal hours at any time to
18 conduct business as treasurer?
19   A.  Not that I know.
20   Q.  Did anybody ever inform you that she
21 was doing that?
22   A.  No.
23   Q.  Now, did you ever receive any
24 complaint from Marge Dunfee about Ms. Karowski?

Page 43

1    A.  No.
2    Q.  Did you ever receive any complaint
3  that Ms. Karowski had disclosed confidential
4  information?
5    A.  Yes.
6    Q.  And when did you receive that
7  complaint?
8    A.  I believe that was the meeting with
9  Mr. Morris.
10   Q.  So this was all in the same
11 meeting?
12   A.  I believe so.
13   Q.  What did Mr. Morris say?
14   A.  I believe there was question about
15 confidential information being overheard at the
16 town hall.
17   Q.  Did he say what confidential
18 information had been overheard?
19       MS. PELLETIER:  Object.  And I don't
20   know if he knows details, but if he does,
21   because it was confidential details, I
22   don't want him testifying as to the
23   identity of anybody involved.  If he can
24   testify generally to the subject matter,

Page 44

1   that's fine, but I don't want to put him in
2   a position of testifying as to confidential
3   information here.
4       MR. MILES:  I'm not going to ask him
5   for the identity of the individual.
6       MR. PELLETIER:  I know you didn't
7   ask him, but that's not to say he wouldn't
8   have said depending how broad that question
9   was.
10      MR. MILES:  We're not asking you the
11  identity of the individual about whom the
12  information was allegedly disclosed.  I'm
13  talking about the circumstances of the
14  disclosure.
15      MS. PELLETIER:  Mm-hmm.
16   Q.  (By Mr. Miles)  With respect to the
17 confidential information.  Did Mr. Morris tell
18 you what information had been disclosed?
19   A.  I don't recall.
20   Q.  Did Mr. Morris tell you to whom the
21 information had been disclosed?
22   A.  I do recall that.
23   Q.  What did he say?
24   A.  The information came to me that

Page 45

1  there were two other employees of the town Maxine
2  Smith and Tess Barstow.
3    Q.  And what else did he say?
4    A.  I just remember the allegation that
5  there was police information that was
6  confidential that was shared at the town hall.  I
7  don't remember the detail.
8    Q.  Did he tell you how it came to his
9  attention?
10   A.  I don't recall.
11   Q.  Did he tell you who brought it to
12 his attention?
13   A.  I don't recall.
14   Q.  Did you document this conversation
15 with Mr. Morris in anyway?
16   A.  I didn't.
17   Q.  And did you talk to Ms. Karowski
18 about it?
19   A.  I don't recall.
20   Q.  I take it from your answer that you
21 didn't institute any disciplinary action against
22 Ms. Karowski as a result of this conversation?
23   A.  Correct.
24   Q.  And why was that?

12 (Pages 42 to 45)

Page 62

1 I'll ask you to look through that and tell me if
2 it's accurate and complete?
3    A.   Yes.
4    Q.   And is that a record that's kept in
5 the ordinary and necessary course of business at
6 the police department?
7    A.   Yes, it is.
8    Q.   Is it a record of the police
9 department?
10    A.   It is.
11    Q.   And are the entries in it made
12 contemporaneously?
13    A.   Yes.
14       MS. PELLETIER: Objection. If he
15 made it he can answer that. If she made
16 them he can't.
17    Q.   (By Mr. Miles) As a matter of
18 policy, are the entries in the personnel records
19 made contemporaneously?
20    A.   They are.
21    Q.   And are the documents inserted at/or
22 about the time they are created or received?
23       MS. PELLETIER: Objection. Go
24 ahead.

Page 63

1       THE WITNESS: They are.
2    Q.   (By Mr. Miles) Okay. Was any of
3 the -- were any of the documents here except the
4 notice of deposition and subpoena created for
5 litigation purposes?
6       MS. PELLETIER: Objection. He can't
7 answer that unless he created the document.
8       Are you asking him if he created the
9 document?
10       MR. MILES: Yes.
11       MS. PELLETIER: Then ask him if he
12 created the document.
13    Q.   (By Mr. Miles) Did you create any
14 of the documents in here for the purposes of
15 litigation?
16    A.   No.
17       MR. MILES: Mark the collective
18 folder as Exhibit 2.
19       THE WITNESS: I would just add the
20 only reason that the deposition notice is
21 in there is because I carried it in the
22 file. It's not part of the file. It just
23 wound up in there.
24    Q.   (By Mr. Miles) You want me to

Page 64

1 remove that?
2    A.   So I had the address. I think you
3 made more than one copy, too, didn't you?
4       MS. PELLETIER: I think it should
5 remain in the personnel file to show that
6 you did produce the personnel file in
7 accordance with the subpoena, but that's
8 your decision.
9       THE WITNESS: Fine. It's done.
10       MR. MILES: Okay.
11       Let's mark that as Exhibit 2.
12
13       (Exhibit 2, document, marked)
14
15       MR. MILES: Thank you.
16    Q.   (By Mr. Miles) Did you ever receive
17 any complaints from the custodian about Ms.
18 Karowski?
19    A.   We've had quite a few custodians.
20       Not that I recall.
21    Q.   Did you ever receive any complaints
22 from anybody that Ms. Karowski was not working
23 well with any member of the custodial staff?
24    A.   Could you repeat the question?

Page 65

1    Q.   Did you ever have any discussions
2 with anybody or communications with anybody
3 regarding Ms. Karowski's relationship with any
4 member of the custodial staff?
5    A.   No.
6    Q.   Did you receive any complaints from
7 the select board from the way Ms. Karowski
8 related to any member of the custodial staff?
9    A.   Yes.
10    Q.   Tell me about what you received?
11    A.   My best recollection is that it may
12 have been part of the conversation that I had
13 with Chris Morris.
14    Q.   What do you recall?
15    A.   I don't recall his last name. His
16 first name was Russ. I don't recall the details.
17 But I think at the time there was a transition
18 between him working -- he worked part-time for
19 us, just a few hours a week, if that. I don't
20 even recall how many hours a week. He was doing
21 work over at the town hall. I think Karen was
22 also working over there. There might have been
23 some issues between -- I think it was Chris
24 Morris who brought it to my attention.

17 (Pages 62 to 65)

PATRICK ARCHBALD
November 19, 2004

Page 82

1  of Mr. Beady?
2     A.  Yes.
3     Q.  Is there an officer by the name of
4  Chapman who is currently employed by the
5  Williamsburg police?
6     A.  Yes.
7     Q.  And is he leaving at the end of this
8  month?
9     A.  Yes.
10    Q.  Is he being terminated?
11    A.  No.
12    Q.  Did he resign?
13    A.  Yes.
14    Q.  And under what circumstances is he
15 resigning?
16        MS. PELLETIER: Objection. To the
17    extent that it doesn't involve protected
18    information contained in his personnel
19    file.
20        MR. MILES: Well, let me withdraw
21    that because I don't think he can fairly
22    answer that without possibly violating the
23    statute. So I'll withdraw that question.
24    Q.  (By Mr. Miles) Did Mr. Chapman ever

Page 83

1  make any complaint about Ms. Karowski to you?
2     A.  No.
3     Q.  Did Mr. Chapman ever make any
4  complaint to you about Ms. Karowski's behavior to
5  any of the custodial staff to you?
6     A.  No.
7     Q.  Did Mr. Chapman ever bring to your
8  attention any problem between Ms. Karowski and
9  any member of the public?
10    A.  When you say complaint. Let me
11 clarify 'cause the last two questions said
12 complaint.
13    Q.  Sure.
14    A.  No complaint in terms of anything in
15 writing.
16    Q.  Okay.
17    A.  Not to say he hasn't had
18 conversation with me over the last two years. So
19 the answer to that last question is no.
20    Q.  Okay. And the next question was
21 going to be. Has Mr. Chapman had any
22 conversation with you about Ms. Karowski at any
23 time?
24    A.  Yes.

Page 84

1     Q.  And when has he had conversations
2  about Ms. Karowski?
3     A.  Normal course of business. I don't
4  recall the dates.
5     Q.  Has he had any conversations with
6  you about Ms. Karowski in which he was critical
7  about the way she performed any aspect of her
8  job?
9     A.  Not that I recall.
10    Q.  In the last year has any other
11 officer had any conversation with you in which
12 that officer was critical about the manner in
13 which Ms. Karowski performed any aspect of her
14 job?
15    A.  Yes.
16    Q.  Okay. Who talked to you?
17    A.  Without being able to give dates I
18 think every officer in the department.
19    Q.  I'm saying within the last year?
20    A.  Oh, within the last year. It would
21 just be a guess.
22    Q.  Okay. Do you have any specific
23 memory of any particular criticism that any
24 officer has brought to your attention about the

Page 85

1  manner in which Ms. Karowski performed her job in
2  the last year?
3     A.  Can you repeat the question?
4     Q.  Sure.
5        Do you have any specific
6  recollection of any conversation with any officer
7  in which the officer criticized any aspect of the
8  manner in which Ms. Karowski performed her job in
9  the last year?
10    A.  Yes.
11    Q.  What is your memory?
12    A.  Corporal Skobal and Sergeant Graham
13 spoke to me about, a few months ago, about filing
14 paperwork.
15    Q.  And what did they say?
16    A.  They thought that the paperwork
17 should take priority and should be filed first
18 thing in the morning and that they did not think
19 it was happening and wanted me to talk to her.
20    Q.  Did you?
21    A.  I did.
22    Q.  What was the response?
23    A.  It's been corrected.
24    Q.  Now, in the year before Ms. Karowski

Page 86

1  was reappointed or not reappointed. Okay?
2   A.   Mm-hmm.
3   Q.   Just to get that time frame right.
4   A.   Okay.
5   Q.   Do you remember any specific
6  complaints -- strike that.
7       Do you remember any specific
8  communications in which any officer criticized
9  the way in which Ms. Karowski was performing her
10 job?
11  A.   Not specifically.
12  Q.   And do you recall any communications
13 with Officer Chapman during that interval about
14 the manner in which Ms. Karowski was performing
15 her job?
16  A.   No.
17  Q.   Let me flip the coin now.
18      Do you have any specific
19 recollection in the interval of the year before
20 Ms. Karowski's non reappointment in which any
21 officer complimented or praised the manner in
22 which Ms. Karowski was performing her job?
23  A.   I don't recall.
24  Q.   Do you have any recollection of any

Page 87

1  member of the public praising the manner in which
2  Ms. Karowski performed her job?
3   A.   What's the time frame?
4   Q.   The year before she was not
5  reappointed.
6   A.   I don't recall.
7   Q.   Do you have any recollection of any
8  of the selectmen praising the manner in which Ms.
9  Karowski performed her job in that year?
10  A.   Maybe in the evaluation a brief
11 statement, but, no.
12  Q.   Okay. Did you have any
13 conversations with any other selectmen besides
14 Mr. Morris about the quote/unquote relentless
15 criticism that Ms. Karowski subjected the board
16 to?
17  A.   Yes.
18  Q.   Who did you talk to?
19  A.   David Haskell.
20  Q.   When did you talk with Mr.
21 Haskell?
22  A.   I don't recall.
23  Q.   Do you recall when it was in
24 relation to the non reappointment?

Page 88

1   A.   I don't.
2   Q.   And what did you say to Mr. Haskell
3  and what did he say to you?
4   A.   I don't know the specifics. Just a
5  general recollection that he took issue with her
6  criticism of the board.
7   Q.   Did he say anything specific about
8  it?
9   A.   Not that I recall.
10  Q.   Do you have any recollection of
11 speaking with Mr. Cerreta about Ms. Karowski's
12 criticism of the board?
13  A.   No.
14  Q.   During the conversation with
15 Mr. Haskell did the issue of freedom of speech
16 come up at all?
17  A.   I don't recall.
18  Q.   During the conversation with
19 Mr. Morris did the -- about Ms. Karowski's
20 criticism of the board, did the issue of freedom
21 of speech come up at all?
22  A.   In my mind it did, but I don't
23 recall saying it to him.
24  Q.   Did he say anything to you about

Page 89

1  it?
2   A.   No.
3       MR. MILES:  Okay. Can I have a
4   minute to talk to Ms. Karowski?
5       MS. PELLETIER:  Sure.
6
7       (Break taken)
8
9       MR. MILES:  Back on the record.
10  Q.   (By Mr. Miles) I may have asked you
11 this. If I did I apologize.
12      Did you talk to any of the selectmen
13 about your evaluations of Ms. Karowski before her
14 non reappointment?
15      MS. PELLETIER:  You did ask him the
16  question, but you can ask him again.
17      THE WITNESS:  No.
18  Q.   (By Mr. Miles) Have you talked with
19 any of the selectmen since Ms. Karowski was
20 reappointed about your evaluations of her?
21  A.   Not that I recall.
22  Q.   Okay. And did any of the selectmen
23 approach you or talk to you about your
24 evaluations of Ms. Karowski?

23 (Pages 86 to 89)

PATRICK ARCHBALD
November 19, 2004

Page 98

1  why I remember that. You can see the first
2  evaluations were typed by me. And then we moved
3  into trying to do them on the computer using word
4  and spread sheets and it just took a while for
5  us, a few years, to get it squared away.
6      Q.  So do you have her evaluations from
7  that time frame in her personnel file?
8      A.  I think there's one that is typed
9  and then we moved into computers, but I did all
10 the typing.
11     Q.  That would have pre-dated the mid
12 '90s according to you?
13     A.  What predated the 1990s?
14     Q.  Well, you had letterhead of these
15 other documents that you indicated were in the
16 mid '90s, correct?
17     A.  '97, '98. I mean, I'm chief here.
18 So it's after '97.
19     Q.  Okay. In the third document that I
20 showed you that says, Karen, the evaluation forms
21 look great. Is that before or after the other
22 two documents of which we don't know what they're
23 doing in the personnel file?
24         MR. MILES: Objection to the form of

Page 99

1  the question.
2          MS. PELLETIER: You can answer.
3          THE WITNESS: I think this is after
4  these two documents. The ones that say
5  Linda Hammond on them. We're still using
6  old, old letterhead. This, at least, the
7  Hammond letterhead has been removed. I
8  think this is after.
9          MS. PELLETIER: Okay.
10         MR. MILES: Can we mark those so we
11 can have some idea of which goes where?
12         MS. PELLETIER: I've referred to
13 them the way I care to. If you'd like to
14 mark them after. They are part of the
15 personal file. If you want to mark it as
16 an exhibit separately you can do that.
17     Q.  (By Ms. Pelletier) You've testified,
18 chief, that you've had at least one conversation
19 in which there were several problems identified
20 by Mr. Morris with regard to Ms. Karowski; is
21 that correct?
22     A.  Yes.
23     Q.  And you did not include any of those
24 in Ms. Karowski's personnel file; is that

Page 100

1  correct?
2      A.  That's right.
3      Q.  That includes the scenario where you
4  were advised --
5      A.  I'm sorry. Can I look at the
6  evaluation?
7      Q.  Sure.
8      A.  Do we know the date of that
9  conversation? Does anyone know the date of that
10 conversation?
11     Q.  You're the only one who can answer
12 the questions today.
13     A.  In one evaluation I do talk to her
14 or I do make reference to issues around that
15 matter. And I'm not sure if that is following
16 that meeting or before that meeting.
17         Does that answer your question?
18 Without knowing the date of the meeting with
19 Mr. Morris I can't say whether it preceded it or
20 followed it, but I did make mention of that
21 issue. The issue you're bringing up.
22     Q.  Well, there was more than one issue,
23 correct, that Mr. Morris talked to you about?
24     A.  Yes.

Page 101

1      Q.  Were all of the issues mentioned in
2  whatever evaluation you're talking about?
3      A.  I make a general reference in the
4  2000, evaluation about Ms. Karowski being
5  involved in inner political wranglings of the
6  town and persons to whom she does not agree.
7      Q.  Okay. That was in 2000. So it
8  would have been for the prior year?
9      A.  1999. I'm sorry. Let's see when I
10 dated this. The evaluation is for July 1st,
11 1999, to June. The end of June, 2000.
12     Q.  What's the date on the one in your
13 hand, 1997?
14     A.  That's when she was hired.
15     Q.  Okay. So 1999 to 2000, correct?
16     A.  Yes.
17     Q.  Okay. Is it your recollection that
18 the conversation you had with Mr. Morris was in
19 calendar year 1999?
20     A.  I don't recall the date of that
21 meeting.
22         What I'm saying is. I'm not sure if
23 these comments in here are as a result of my
24 conversation with Mr. Morris or concerns within

26 (Pages 98 to 101)

Page 102

1  the office about Karen being involved with inner
2  wranglings of the town.
3      Q.   Okay. That was a concern of yours
4  and you put it in your evaluation?
5      A.   Yes.
6      Q.   The other items, the specific items
7  that you testified to with regard to the
8  conversation with Mr. Morris including, but not
9  limited to, a representation to you that Ms.
10 Karowski had breached confidentiality are not
11 contained in her personnel file; is that
12 correct?
13     A.   Right.
14     Q.   You also testified that you did not
15 have communications with Ms. Karowski about that,
16 correct?
17     A.   That's right.
18     Q.   So members of the board raised
19 concerns about Ms. Karowski to you as their
20 direct supervisor, correct?
21     A.   Yes.
22     Q.   But you didn't bring them up to
23 her?
24     A.   That's right. I did not agree with

Page 103

1  it. I was not satisfied that those problems were
2  in her performance while police secretary.
3      Q.   What about the communication of
4  police information to the public and breech of
5  confidentiality?
6      A.   That would be excluded, yes.
7      Q.   And you still didn't talk to her
8  about it?
9      A.   That's right.
10     Q.   And you can't tell us why?
11     A.   No.
12     Q.   But when a couple of police officers
13 talk to you about filing. You did talk to her?
14     A.   That's right.
15     Q.   Okay. You can't tell us why you
16 would have done that, but not talked to her about
17 the breached confidentiality of the police
18 department?
19     A.   Could you repeat that?
20     Q.   You felt it necessary to talk to Ms.
21 Karowski about the filing, but not about
22 breaching the confidentiality of the police
23 department?
24     A.   That's right.

Page 104

1      Q.   And you have absolutely no idea
2  why?
3      A.   None.
4      Q.   And you made no effort to verify
5  anything that was told to you by Mr. Morris?
6      A.   Well, I don't recall specific
7  conversations with Ms. Karowski about the
8  confidentiality. I'm not saying it didn't
9  happen. I just don't recall specific
10 conversations around the issue that Mr. Morris
11 brought to my attention and the incident that
12 happened over at the town hall.
13     Q.   So your testimony, sir, is that you
14 may have had conversations with Ms. Karowski
15 about the issues raised by Mr. Morris, but you
16 don't have a specific recollection?
17     A.   I would be hard pressed to think
18 that I didn't address it in some way.
19     Q.   Regardless, you certainly didn't put
20 it in her personnel file?
21     A.   That's right.
22     Q.   Any reason for that?
23     A.   No.
24     MS. PELLETIER: I don't have any

Page 105

1  further questions. Thank you.
2
3  REDIRECT EXAMINATION BY MR. MILES:
4
5      Q.   Would one of the reasons you
6  wouldn't put it in her personnel file is that you
7  were satisfied that it didn't occur?
8      MS. PELLETIER: Objection.
9      THE WITNESS: Occur the way it was
10 reported to me by Mr. Morris, correct.
11     MR. MILES: I don't have any further
12 questions.
13
14 RECROSS EXAMINATION BY MS. PELLETIER:
15
16     Q.   On what basis do you have to make
17 the statement that you wouldn't put it in her
18 personnel file because you were satisfied that it
19 didn't occur the way it was reported to you by
20 Mr. Morris?
21     A.   I'm sorry. Was that a question?
22     Q.   Yeah, it was a question.
23     A.   Sorry.
24     MS. PELLETIER: Can you read it