CHRISTOPHER MORRIS
November 19, 2004

Page 1

```
 1              COMMONWEALTH OF MASSACHUSETTS
 2               Department of the Trial Court
 3
 4    Western Division        C.A NO.:  03-CV-30314-MAP
 5
 6    * * * * * * * * * * * * * * * * *
 7    KAREN KAROWSKI,                          *
 8              Plaintiff                      *
 9    v.                                       *
10    ERIC CERRETA, DAVID HASKELL,             *
11    CHRISTOPHER MORRIS, AND THE              *
12    INHABITANTS OF THE TOWN OF               *
13    WILLIAMSBURG,                            *
14              Defendants                     *
15    * * * * * * * * * * * * * * * * *
16
17         DEPOSITION OF:  CHRISTOPHER MORRIS
18              Green, Miles & Fitz-Gibbon
19                    77 Pleasant Street
20              Northampton, Massachusetts
21                    November 19, 2004
22
23                 Jessica M. DeSantis
24                    Court Reporter
```

Page 10

1  Oregon where did you go?
2      A.  I came here.
3      Q.  And did you take the bar exam here
4  in Massachusetts?
5      A.  Yes, I did.
6      Q.  And do you have a particular
7  practice?  Do you have a practice now?
8      A.  I would describe it as a part-time
9  practice.  Mostly wills, closings, leases.
10  I've -- over the years I've done a little bit of
11  litigation.
12     Q.  What kind of litigation have you
13  done?
14     A.  Custody dispute.
15     Q.  Family?
16     A.  Family law.  And some land use
17  appeals.
18     Q.  Have you represented Mr. Cerreta at
19  any time?
20     A.  No.
21     Q.  Have you represented Mr. Haskell at
22  any time?
23         MS. PELLETIER:  If the question is
24     yes or no you can answer.  After that it's

Page 11

1  privileged.  If you're uncomfortable then
2  I'll instruct him not to answer.
3         THE WITNESS:  I'm uncomfortable.
4         MS. PELLETIER:  What's the
5  relevance?
6         MR. MILES:  I want to know what the
7  relationship is among the selectmen.
8         MS. PELLETIER:  You'll have to ask
9  Mr. Haskell and if he wants to answer the
10 question he won't be --
11        MR. MILES:  I'll reserve my right on
12 it.  I won't press it at the moment.
13    Q.  (By Mr. Miles) Have you ever
14 represented the Town of Williamsburg?
15    A.  No.
16    Q.  How long have you -- are you a
17 selectman for the Town of Williamsburg?
18    A.  Yes, I am.
19    Q.  How long have you been a
20 selectman?
21    A.  I think it's five and a half
22 years.
23    Q.  So this is your second term?
24    A.  Yes.  I'm in the third year of my

Page 12

1  second term, correct.
2      Q.  When did you stand for
3  re-election?
4      A.  In May.
5      Q.  From what sources or what job do you
6  get your primary income?
7      A.  I'd say my wife probably provides
8  more income than I do.
9      Q.  What is her occupation?
10     A.  She is a first-time home buyer
11 counselor for Valley CDC.
12     Q.  How long has she held that
13 position?
14     A.  Two, three years.
15     Q.  Now, in the course of your tenor as
16 a selectman have you served as police liaison?
17     A.  Yes, I have.
18     Q.  When did you first assume that
19 position?
20     A.  Oh, boy.  I'm not sure.
21     Q.  Have you served as police liaison
22 more than once?
23     A.  I think so.
24     Q.  When was the last time you served as

Page 13

1  police liaison?
2      A.  I believe it would be the year from
3  May -- from May or June.  Depending on when we
4  voted, probably May, 2002, to May, 2003.
5      Q.  What are the duties of police
6  liaison?
7      A.  Generally, I think the liaison's job
8  is to be the contact point for the chief so, if
9  need be, in between meetings need to communicate
10 with the board there's one person to go to.  And
11 at the same time sometimes when the board has
12 concerns and they want to bring it to the
13 department's attention.  So that's the liaison's
14 job to take those concerns to the chief.
15    Q.  Now, in terms of your education and
16 training.  Have you had any specific education or
17 training related to your duties as a selectman?
18    A.  I studied municipal law in law
19 school.  And I've gone to, you know, a number of
20 MMA seminars.  I'd say some of them were -- some
21 of them were educational.  Some of them were, I
22 would say, more informative dealing with some
23 recent legislation that has been enacted and that
24 sort of thing.

CHRISTOPHER MORRIS
November 19, 2004

Page 18

1  Karowski would not be reappointed?
2     A.   When we took the vote.
3     Q.   Okay. So if I understand the
4  sequence correctly, please tell me if I'm wrong.
5  You took it upon yourself to create a draft
6  letter of non reappointment; is that correct?
7     A.   Yes.
8     Q.   And that took place before the vote
9  not to reappoint Karen Karowski?
10    A.   Yes, it did.
11    Q.   Okay. And if I understand your
12 testimony correctly. You had no discussion with
13 any of the other selectmen about not reappointing
14 her before you worked on the draft?
15    A.   Correct.
16    Q.   How did you know she wasn't going to
17 be reappointed?
18    A.   I didn't know it. I anticipated it,
19 but I did not know it.
20    Q.   Why did you anticipate it?
21    A.   Well, first speaking for myself, I
22 was pretty sure that that's how I was going to
23 vote. I can't say that I was a hundred percent
24 sure, but I was leaning that way.

Page 19

1  I would say that based on the fact
2  that the other selectmen had sat through some of
3  the same meetings I had. I had the impression --
4  I had the impression that one or the other, at
5  least one of them, would be likely to not wish to
6  re-appoint Ms. Karowski.
7     Q.   And do you remember anything
8  specifically that gave you that understanding?
9          Sorry. Let me withdraw.
10         Do you remember anything
11 specifically that gave you that impression?
12    A.   Specifically I can't recall anything
13 in particular.
14    Q.   Did you talk with Mr. Cerreta about
15 writing that draft letter before you wrote it?
16    A.   No.
17    Q.   Did you talk with Mr. Cerreta about
18 not reappointing Ms. Karowski before you wrote
19 the draft?
20    A.   I don't think so.
21    Q.   Did you talk with Mr. Haskell about
22 not reappointing Karen Karowski before you wrote
23 the draft?
24    A.   I can't recall.

Page 20

1     Q.   Did you talk with Bonnie Roberge
2  about not reappointing Karen Karowski before you
3  wrote the draft?
4     A.   Hmm. I have no recollection of
5  having done so.
6     Q.   Did you speak with Chief Patrick
7  Archbald about not reappointing Karen Karowski
8  before you wrote the draft?
9     A.   No.
10    Q.   Had you looked at Karen Karowski's
11 evaluations by Chief Archbald before you wrote
12 the draft?
13    A.   I can say that I had seen Ms.
14 Karowski's evaluations over a couple of years.
15         And I don't know whether we had yet
16 seen the evaluations -- whether Pat -- I can't
17 tell you if Pat had presented to us. He had the
18 evaluations for the year preceding. We were just
19 ending.
20    Q.   Was there anything in particular in
21 any of the evaluations that you had seen which
22 contributed to your decision not to reappoint Ms.
23 Karowski?
24         MS. PELLETIER: Just to clarify.

Page 21

1  When you say you, you're speaking of him
2  personally.
3          MR. MILES: That is correct.
4          MS. PELLETIER: Thank you.
5          THE WITNESS: The only thing I could
6  think of was the -- I believe in one of the
7  evaluations there was some discussion of
8  Ms. Karowski conducting non -- I should
9  say. Discussing, I would say, political
10 issues at the police station, not so much
11 town business, if you will. And, I guess,
12 in a sense, this is a problem that had been
13 ongoing for a while and that wasn't being
14 taken care of.
15    Q.   (By Mr. Miles) Do you know what
16 political issues Ms. Karowski was allegedly
17 discussing at the police station?
18    A.   I can't remember anything
19 specifically, no.
20    Q.   Did you speak to chief Archbald
21 about the political issues that Ms. Karowski
22 allegedly discussed at the police station?
23    A.   Could you repeat that?
24         MR. MILES: Read it back, please.

6 (Pages 18 to 21)

CHRISTOPHER MORRIS
November 19, 2004

Page 22

(Last question read)

THE WITNESS: I don't think -- I can't recall any particular issues that I would have -- that were discussed with the chief. I think a broader -- I think I discussed something in a broad sense rather than any particular issues.

Q. (By Mr. Miles) Okay. Now, again, we're confining ourselves to the moment to before the draft of the July 10th letter was composed?

A. Yes.

Q. So what conversations did you have with the chief about Ms. Karowski before July -- before the draft that lead to the July 10th letter was composed?

MS. PELLETIER: Objection. Go ahead.

THE WITNESS: I recall at least two conversations. One conversation I had with the chief at the station during his office hours. And another that I had over the phone with him.

Page 23

I would say this was maybe a couple months beforehand, maybe two or three months beforehand, before the drafting of this letter.

Q. (By Mr. Miles) What did you say to the chief and what did he say to you during the first conversation?

A. Well, I can't honestly remember which was first. But I'll address the conversation I had with him when I was -- when I went to meet with him.

I think what I recall is expressing concern about the secretary raising issues involving the police department at finance committee meetings. And issues that I had thought we had already discussed and resolved with the chief.

And I think I expressed frustration that -- or I can recall expressing to him that I felt that it was the chief's job to speak for the department and if there were issues that he wanted to raise that he should be raising them and that if there weren't issues that he wanted to be raised then it wasn't appropriate for the

Page 24

secretary to raise them because she was not the spokesperson for the department.

Q. Was it your understanding that Ms. Karowski was an elected member of the finance committee at that time?

A. Yes.

Q. Was she also an elected town treasurer at that time?

A. Yes, she was.

Q. Did you ask the chief to do anything?

A. I don't recall if I asked him to do anything or not. I can say that it was my expectation that having been approached by a member of the select board that, and he being the secretary's immediate supervisor, I just assumed that he would talk to her about it.

Q. Did you ever follow up to see if he had talked with Ms. Karowski about that issue?

A. As I said, there was a second conversation. And I can't -- I don't know -- I think I raised some of the same issues. I don't know if I asked him what he had done about it. I can't recall that.

Page 25

Q. Did you finish your answer?

A. Yes, I did.

Q. Do you recall the interval between the first and second conversations?

A. I -- I'm reluctant to guess.

MS. PELLETIER: Do not guess. If you know you know.

THE WITNESS: Thank you.

Q. (By Mr. Miles) What's your best estimate of the interval if you have one?

A. Month.

Q. Okay. Now, in this July 10, 2003, letter. The phrase was used, despite being our appointee you constantly criticize our board's decisions regarding police business.

Did you -- were you the one who inserted the phrase constantly criticize?

A. I can't state that for a fact.

Q. Do you remember any of the other selectmen asking that that phrase be inserted?

A. No.

Q. Okay. And what criticism did you refer to when you put in the sentence, despite being our appointee you constantly criticize our

CHRISTOPHER MORRIS
November 19, 2004

**Page 26**

1  board's decisions regarding police business?
2      MS. PELLETIER: Objection. Go
3  ahead.
4      THE WITNESS: I think there was --
5  my recollection. It's been a while. My
6  recollection is our decision to put off the
7  purchase of a police cruiser, the Quinn
8  bill, our decision not to support the Quinn
9  bill. Those -- I believe there were some
10 others, but those are the ones that come to
11 mind.
12     Q.  (By Mr. Miles) Did Ms. Karowski's
13 criticism of the board's decision to delay
14 purchase of a police cruiser occur during finance
15 committee meetings?
16     A.  Yes. That's my recollection.
17     Q.  And do you have a recollection of
18 her criticism of the board's decision to delay
19 purchase of the police cruiser occurring
20 elsewhere?
21     A.  No.
22     Q.  Did anybody ever bring to your
23 attention that Ms. Karowski had criticized the
24 board's decision to delay purchase of a police

**Page 27**

1  cruiser in private conversation unrelated to her
2  finance committee duties?
3      MS. PELLETIER: Objection. Go
4  ahead.
5      THE WITNESS: No. And I couldn't
6  have cared less what Ms. Karowski said in
7  private conversations.
8      Q.  (By Mr. Miles) Now, with respect to
9  the Quinn bill.
10     Did the criticism to which you
11 objected also occur during her performance of her
12 duties as a finance committee member?
13     MS. PELLETIER: Objection. Go
14 ahead.
15     THE WITNESS: I think that your
16 question expresses my concern, which is
17 that it is unclear at times whether Ms.
18 Karowski was speaking as a member of the
19 finance committee or whether she was
20 speaking as an employee of the police
21 department.
22     Q.  (By Mr. Miles) Were you at any of
23 the finance committee meetings at which Ms.
24 Karowski expressed the criticism?

**Page 28**

1      A.  Yes.
2      Q.  What made it unclear to you whether
3  she was speaking as a finance committee member or
4  a representative of the police department?
5      MS. PELLETIER: Objection. Go
6  ahead.
7      THE WITNESS: I can't recall that
8  Ms. Karowski ever made it clear that she
9  was not speaking -- I can't recall her ever
10 saying she was not speaking for the police
11 department.
12     Q.  (By Mr. Miles) Did she ever say
13 that she was speaking for the police
14 department?
15     A.  I can't recall that.
16     Q.  Did she ever say that she was
17 speaking as a representative of the police
18 department?
19     A.  I can't recall that.
20     Q.  Did she ever say that she was
21 speaking at the direction of the chief for the
22 police department?
23     A.  No.
24     Q.  Did you ever approach Ms. Karowski

**Page 29**

1  after any of these meetings to talk to her as a
2  member of the finance committee about her
3  criticism of the board's decisions about the
4  police department?
5      MS. PELLETIER: Objection. Go
6  ahead.
7      THE WITNESS: I don't recall having
8  done so.
9      Q.  (By Mr. Miles) Did you ever tell
10 Ms. Karowski personally that you felt that her
11 position -- strike that.
12     Did you ever tell Ms. Karowski
13 personally that it was unclear to you in which
14 capacity she was speaking when she criticized the
15 board's decisions about police matters?
16     A.  I don't recall having done so.
17     Q.  Did you ask anybody else to do that
18 on your behalf?
19     MS. PELLETIER: Objection. Go
20 ahead.
21     THE WITNESS: I guess I felt on the
22 two occasions I talked to the chief it was
23 my assumption that he was going to do that
24 as her immediate supervisor.

8 (Pages 26 to 29)

CHRISTOPHER MORRIS
November 19, 2004

Page 30

1  Q. (By Mr. Miles) Did any finance
2  committees occur after you talked to the chief at
3  which Ms. Karowski criticized the board's
4  decisions concerning the police department?
5      MS. PELLETIER: Objection.
6      THE WITNESS: Could you repeat that?
7      MR. MILES: Sure.
8  Q. (By Mr. Miles) Did any finance
9  committee meetings occur after you spoke to the
10 chief at which Ms. Karowski criticized the
11 board's decisions concerning the police
12 department?
13     MS. PELLETIER: Objection. Go
14     ahead.
15     THE WITNESS: I believe so.
16 Q. (By Mr. Miles) All right. Did you
17 go back to the chief to reiterate your request
18 that he speak to Ms. Karowski after any of those
19 meetings?
20     MS. PELLETIER: Objection to the
21     form of the question.
22     But, again, for clarification he's
23     indicated that there were two conversations
24     and he's not clear of the timing of them.

Page 31

1  So he's only testifying as to part of one
2  of the conversations so far.
3      So with that said you can answer.
4      THE WITNESS: I need it repeated
5  now.
6      MR. MILES: I'm sorry?
7      THE WITNESS: I'm sorry. I need the
8  question repeated.
9      MR. MILES: Sure.
10 Q. (By Mr. Miles) You talked, just to
11 put it in context. You talked to the chief
12 twice; is that correct?
13 A. Yes.
14 Q. Okay. My question is. After you
15 talked to the chief twice were there any finance
16 committee meetings at which Ms. Karowski
17 criticized the board's decisions concerning the
18 police department?
19     MS. PELLETIER: Objection. Go
20     ahead.
21     THE WITNESS: I can't recall at this
22     point.
23 Q. (By Mr. Miles) Okay. Do you have
24 any further recollection of what you said to the

Page 32

1  chief and what he said to you during the first
2  conversation with him about Ms. Karowski?
3      MS. PELLETIER: Objection. Just for
4      clarification. I think he's testified that
5      he's not sure that the conversation he
6      first testified to is the first in time.
7      MR. MILES: Let me withdraw and
8      rephrase.
9      MS. PELLETIER: He can answer the
10     question.
11     MR. MILES: Let me be clear on the
12     record.
13 Q. (By Mr. Miles) You testified that
14 one conversation was at the police station with
15 the chief; is that correct?
16 A. Yes.
17 Q. And that's the meeting to which you
18 testified previously during this deposition; is
19 that correct?
20 A. Yes.
21 Q. Okay. What else did you say to the
22 chief and did he say to you during that meeting
23 to the best of your recollection?
24 A. Again, I'm trying to remember what I

Page 33

1  brought up. The two conversations I had are
2  somewhat blurred and it's hard for me to really
3  distinguish what I said in one and what I said in
4  the other.
5  Q. Let's try to make it a little bit
6  easier for you and do it this way.
7      At either of the two meetings that
8  you had with the chief, tell me, to the best of
9  your recollection, what was said by you to him
10 and by him to you?
11 A. I've said, I know I discussed what I
12 thought was an issue with Ms. Karowski appearing
13 to members of the committee to be expressing a
14 point of view that I thought was likely being
15 interpreted as being the view of the police
16 department. And that the chief ought to be the
17 spokesman not the secretary. I recall that the
18 chief agreed with me that he was the spokesman
19 and it was not appropriate for the secretary to
20 appear to be speaking for the police
21 department.
22 Q. Okay. Now, after -- sorry.
23     Have you finished relating what you
24 talked to the chief about?

9 (Pages 30 to 33)

Page 34

1   A.   No, I have not.
2   Q.   Go ahead, please.
3   A.   I know I recall when I was talking
4   to him on the phone I raised the issue about the
5   custodian. And I know that I had said that -- I
6   informed him that the custodian was no longer
7   going to work at the police station. And that
8   the reason that I was given was that the
9   custodian found that the police station to be an
10  unpleasant work environment and specifically had
11  some issues with the secretary.
12       We had -- I expressed that I believe
13  we had started to pay for custodial services at
14  the police station. I don't know if it was that
15  fiscal year. It might have been the fiscal year
16  previous. I'm not sure exactly. Partly, the
17  secretary had expressed to me the need for
18  custodial services over at the police station.
19  And, in response, I had agreed that we would
20  provide those and they were coming out of the
21  custodial line in the budget.
22       I advised him because of these
23  problems, and because this gentleman was no
24  longer willing to work over there, that I thought

Page 35

1   it would be better if the police department took
2   care of its own custodial services as -- frankly,
3   we weren't providing -- the only other building
4   that we were providing custodial services to was
5   the town offices.
6        And I also indicated at that time
7   that I would support him on every effort to
8   secure additional funding in his expense budget
9   to cover this new expense for the police
10  department. And I guess I expressed my
11  frustration that this hadn't worked out to
12  provide custodial services for the police
13  department.
14       I know at the -- I believe in both
15  conversations I expressed that my concern that
16  tensions with the secretary were contributing to
17  some tension between the select board and the
18  police department. And part of it was this
19  problem that some people I think were -- and I
20  can't remember who. I know people expressed to
21  me the view that, well, if the chief knows that
22  the secretary is expressing these views about the
23  police department and the select board's policies
24  relating thereto, then this must be what he

Page 36

1   wants.
2        And I expressed that to the chief
3   and I thought -- I said that I felt this wasn't
4   good, the situation was not good for the
5   relationship between the select board and the
6   police department.
7   Q.   Now, did Ms. Karowski --
8        MS. PELLETIER: Are you done with
9   the answer as to the subject of the
10  conversations with the chief on the two
11  occasions?
12       MR. MILES: Oh, I'm sorry. Let me
13  just suggest something. You have a
14  tendency, I'm not saying to be critical, to
15  pause and it makes me think that you've
16  finished the question. So if you could
17  kind of tell me or signal me that you're
18  not done so --
19       MS. PELLETIER: I'll jump in, don't
20  you worry.
21       THE WITNESS: To tell you the truth
22  I finished that line of thought and
23  forgotten the original question, which was
24  the substance of these conversations.

Page 37

1        I think I also raised the question
2   of the appearance of conflict of interest
3   in terms of the secretary voting on any
4   motions at finance committee that related
5   to the police department.
6   Q.   (By Mr. Miles) Were you aware of
7   Ms. Karowski voting on any motions that related
8   to the police department at the finance
9   committee?
10  A.   I cannot recall with any specificity
11  any particular incidents, but it was certainly
12  my -- I can recall being aware or believing that
13  this was a problem at the time.
14  Q.   Okay. And from what source did you
15  get that information?
16  A.   Sitting in on meetings of the
17  finance committee, which, at the time, we could
18  be during the budget season we sit in on almost,
19  at lease at that time, we sat in on every meeting
20  of the finance committee.
21  Q.   Do all three selectmen sit in on the
22  meetings?
23  A.   Often. If we do we post it.
24  Q.   Did you have a problem with sitting

10 (Pages 34 to 37)

Page 46

1  Exhibit 1?
2    A.  No, we did not.
3    Q.  Did you act as an attorney in any of
4  your dealings with the board in terms of Exhibit
5  1?
6    A.  No. In the sense that I gave other
7  members of the board any kind of legal advise.
8  No, I did not.
9    Q.  In what manner did you understand,
10 you individually, understand Ms. Karowski to
11 attempt to undermine the authority of the
12 board?
13   A.  I think that in the sense that we're
14 the police commissioners. We're elected to make
15 decisions regarding the police department. And
16 for good or ill these are the decisions that we
17 make. I think people are entitled to criticize
18 them, but I don't -- in Ms. Karowski's capacity
19 as police secretary I didn't feel that that was
20 appropriate because she is not the spokesman for
21 the department.
22       And I think it -- I was concerned
23 that it lent the impression to people that
24 there's dissension within the police department

Page 47

1  that the chief is upset with our decisions and
2  that the ranking file officers may be unhappy
3  with our decisions, also.
4    Q.  Did you, you individually, speak
5  with any of the ranking file officers to see if
6  there was dissension in the department?
7    A.  No, I did not.
8       MS. PELLETIER: Objection. Go
9  ahead.
10      THE WITNESS: No, I did not.
11   Q.  (By Mr. Miles) Did you individually
12 speak with any of the ranking file officers to
13 determine whether they perceived that people
14 thought there was dissension in the department?
15      MS. PELLETIER: Objection. Go
16 ahead.
17      THE WITNESS: No.
18   Q.  (By Mr. Miles) Did you speak with
19 any of the ranking file officers about any of the
20 complaints about Ms. Karowski that you had spoken
21 to the chief about?
22   A.  No, I did not.
23   Q.  Do you know if any of the other
24 selectmen did?

Page 48

1    A.  I don't recall.
2    Q.  Let me show you Exhibit 2 and let
3  you read it to yourself.
4       MR. MILES: I've already given
5  you copies of these, Nancy, so if you want
6  to show these to him it might be easier.
7       Tell me when you've finished reading
8  it.
9       MS. PELLETIER: Do you want him to
10 read the whole article?
11      MR. MILES: Yes. He's a PELLETIER.
12 He reads quick.
13      MS. PELLETIER: If he's a PELLETIER
14 he'll read it carefully.
15      MR. MILES: That's even better.
16      THE WITNESS: Be here a long time.
17 Um --
18      MS. PELLETIER: There's not a
19 question before you.
20      MR. MILES: There is a question
21 before you.
22   Q.  (By Mr. Miles) That is, have you
23 finished reading the article?
24   A.  No.

Page 49

1    Q.  Do you want to talk to counsel?
2    A.  No, I'm sorry. I apologize, but you
3  asked me a question earlier about my conversation
4  with chief Archbald and --
5       MS. PELLETIER: The ones that I said
6  you didn't complete. That question?
7       THE WITNESS: Yes. I'm sorry. I'll
8  focus on this for now.
9       Yes, I have read it.
10   Q.  (By Mr. Miles) Can I have it back,
11 please?
12   A.  (Witness complies.)
13   Q.  Now, before I get into this article
14 do you want to add something to your previous
15 testimony?
16   A.  I lost my train of thought. I
17 apologize.
18   Q.  Did you speak with Shawn Reagan of
19 the Daily Hampshire Gazette after July 10th,
20 2003?
21   A.  I don't recall.
22   Q.  Do you recall saying to anyone,
23 quote, it's one thing to appoint someone that you
24 have disagreements with from time to time, but

### Page 50

1  that's not what we're talking about here,
2  unquote?
3     A.   I don't recall making the statement,
4  no.
5     Q.   Do you recall making the statement
6  quote, this is relentless criticism. We need
7  someone in this position that we can work with
8  constructively, unquote?
9     A.   I can't recall making that
10 statement.
11    Q.   Do you recall telling a newspaper
12 reporter that there was a possible conflict of
13 interest because of Karowski's roles as police
14 secretary, town treasurer, and finance committee
15 member?
16    A.   No, I don't recall it.
17    Q.   Do you recall saying, quote, I have
18 concerns about how vocal she's been when we're
19 acting as police commissioners, unquote?
20    A.   No, I don't recall saying it.
21    Q.   Do you recall saying, I think other
22 business is fair game, but there's been constant
23 criticisms of decisions we've made at the police
24 department, unquote?

### Page 51

1     A.   I don't recall making the statement,
2  no.
3     Q.   Did you know whether or not Ms.
4  Karowski recused herself from votes involving
5  police budget or police-related issues as a
6  member of the finance committee?
7     A.   Sorry. Was the question did you
8  know or do you know?
9     Q.   No. Did you know.
10    A.   At the time my belief was there were
11 occasions -- I think there were some occasions
12 she did and others in which she did not.
13    Q.   What information did you have about
14 specific occasions when she did not recuse
15 herself?
16    A.   My recollection is because I was
17 either present at the meeting or I read the
18 minutes.
19    Q.   Do you have any specific
20 recollection of a particular meeting of which
21 that occurred?
22    A.   No.
23    Q.   Do you have a specific recollection
24 of a particular issue over which that occurred?

### Page 52

1     A.   No.
2     Q.   Okay. And the document you were
3  looking at was Exhibit 2 in the Cerreta
4  deposition just for the record.
5     A.   Sorry. I recall an issue I recall
6  with the chief.
7     Q.   Go ahead.
8     A.   I discussed with the chief that
9  someone -- that someone had approached me about
10 concern because Ms. Karowski was talking to Tess
11 Barstow, the collector in the collector's office,
12 in a voice that could be heard easily in the
13 hallway where the public can be at any time
14 during regular business hours, about the details
15 of a recent arrest.
16    Q.   Was the individual who told you that
17 Marge Dunfee?
18    A.   Yes.
19    Q.   And was Marge Dunfee a town official
20 at that time?
21    A.   Yeah, she's on the board of
22 assessors.
23    Q.   Is the area in which she worked next
24 to the area where Ms. Karowski was working?

### Page 53

1     A.   Yes, immediately adjacent to that
2  area. I should clarify. I don't think Ms.
3  Karowski -- she's adjacent to the collectors
4  office. And I'm -- I think, at that time, the
5  collector was providing Karen with a space to
6  work in her office.
7     Q.   Is it accurate to say that there's a
8  three-quarter wall that divides the collector's
9  area from the assessor's area?
10    A.   It's accurate to say, yeah. They're
11 not separated by a full wall. It's more like a
12 cubical. The wall does not reach the ceiling.
13    Q.   And did Ms. Dunfee tell you whether
14 or not she had made her presence known to Ms.
15 Karowski?
16    A.   I don't recall.
17    Q.   Did you talk to Ms. Karowski
18 directly about Ms. Dunfee's report?
19    A.   No.
20    Q.   Did you talk to Ms. Dunfee about any
21 of the details of what had been disclosed?
22    A.   No, I didn't want to know what the
23 details were.
24    Q.   Do you know if any of the other

14 (Pages 50 to 53)

**Page 54**

1  select board members talked to Ms. Dunfee about
2  the details of what had been disclosed?
3      A.   Not to my knowledge.
4      Q.   Do you know that anything was
5  disclosed that had not already appeared in the
6  newspapers?
7      A.   It was my impression that this was
8  information that was not in the newspapers.
9      Q.   From what source did you get that
10 impression?
11     A.   From Margie.
12     Q.   Margie said that this was
13 information that had not been in the newspapers?
14          MS. PELLETIER:  Objection.  Go
15     ahead.
16          MR. MILES:  Or words to that effect.
17          MS. PELLETIER:  Objection.  Go
18     ahead.
19          THE WITNESS:  My recollection is
20     that, yes, she did say that these were --
21     this was information that was not in the
22     newspaper.
23     Q.   (By Mr. Miles)  She didn't specify
24 what the information was?

**Page 55**

1      A.   I'm sure -- I'm confidant that I
2  would have told her that I didn't want to
3  compound the issue by now having her standing in
4  the town office expressing this, which is where
5  Margie's conversation with me took place, was in,
6  what was then, our office.  If it was
7  inappropriate in the first instance I can't
8  imagine that it -- it seemed ludicrous to be
9  talking about it again.
10     Q.   Did you ask Margie Dunfee to
11 describe the nature of the details that were
12 stated without identifying the individuals
13 concerned?
14          MS. PELLETIER:  Objection.  Go
15     ahead.
16          THE WITNESS:  I'm sorry.  Could you
17     repeat that?
18          MR. MILES:  Sure.
19     Q.   (By Mr. Miles)  Did you ask Ms.
20 Dunfee to state the nature of the details that
21 had been disclosed without identifying the
22 individuals about whom the conversation took
23 place?
24     A.   I believe Ms. Dunfee had given me

**Page 56**

1  the gist of it without my having to ask her.
2      Q.   What did she say?
3      A.   She came into our office and
4  approached me and said -- expressed that she had
5  a concern.  And her concern was that she had
6  overheard, without making any effort to listen to
7  the conversation, that she could hear a
8  discussion of a police matter that Ms. Karowski
9  was relating to Tess Barstow, the collector, in
10 a, again, in a loud voice or certainly a voice
11 that was carrying easily into the assessor's
12 office as well as the hallway that's open to the
13 public.  And that what she heard were details to
14 a recent arrest and she related the name of the
15 individual, which I don't think is probably
16 appropriate for me to say.
17          MS. PELLETIER:  And I would instruct
18     you not to.  Go ahead.
19          THE WITNESS:  Thank you.
20          And she asked me what should I do.
21     And I said I think it would be appropriate
22     for you to relay your concerns to the
23     chief.  And she indicated that she would
24     not -- that is what she would do.

**Page 57**

1          MR. MILES:  I'm sorry.
2          THE WITNESS:  That that's what she
3      would do, relate her concerns about what
4      she heard to the chief.
5      Q.   (By Mr. Miles)  Do you know if she
6  ever talked to the chief?
7      A.   She -- my recollection is that she
8  informed me on some other date -- I cannot tell
9  you when -- she had spoken to the chief about
10 it.
11     Q.   Do you know what relationship, if
12 any, Ms. Dunfee had with Ms. Karowski at that
13 time?
14     A.   Not really.
15     Q.   Do you know if Ms. Dunfee submitted
16 a written complaint to the chief?
17     A.   Not to my knowledge.
18     Q.   Did Ms. Dunfee submit a written
19 complaint to the select board?
20     A.   No.
21     Q.   Did you document, in witting, your
22 conversation with Ms. Dunfee?
23     A.   No.
24     Q.   Did you take any notes or make any

CHRISTOPHER MORRIS
November 19, 2004

Page 86

1  MS. PELLETIER: The question is, did
2  you specifically discuss, by statute
3  number, Chapter 260 8A?
4      MR. MILES: That's correct.
5      MS. PELLETIER: And your answer was
6  that you don't know what the statute is,
7  but you discussed the subject matter. And
8  he just changed the question again. And
9  you can answer the second question again,
10 which is, when did you discuss that
11 statute. That wasn't the answer to the
12 previous question. That presumes that you
13 did and I don't think you answered that you
14 did.
15      THE WITNESS: I never discussed the
16 statute with the chief.
17  Q. (By Mr. Miles) Without using the
18 numbers did you ever discuss with the chief that
19 Karowski had violated any specific statute of the
20 Commonwealth by her statements?
21  A. If you're asking did I ever site a
22 particular statute, no.
23  Q. Did you tell the chief that Ms.
24 Karowski had violated some statute even if you

Page 87

1  didn't specify the number?
2      MS. PELLETIER: Objection. Go
3  ahead.
4      THE WITNESS: I think, as I
5  previously stated, I think my recollection
6  is that I did discuss with the chief my
7  concern that by failing to recuse herself
8  from votes relating to the budget of the
9  police department or other articles
10 relating to the police department that she
11 may have violated conflict of interest
12 laws. But, again, I made no particular
13 citing in the general sense of any chapter
14 or verse in the statute.
15  Q. (By Mr. Miles) Did you make any
16 complaint, you individually, did you make any
17 complaint to the state ethics commission about
18 any action that Ms. Karowski had taken?
19  A. No.
20  Q. Did the Board of Selectmen discuss
21 making any complaint to the state ethics
22 commission about any action Ms. Karowski had
23 taken?
24  A. I don't have a recollection of that,

Page 88

1  no.
2  Q. Now, in a letter of November 3rd,
3  it's noted in paragraph four or stated in
4  paragraph four as follows. During your office
5  hours at the police station please conduct only
6  police business.
7      Do you recall that statement?
8  A. Yes.
9  Q. Okay. And in what way did Ms.
10 Karowski conduct non police business at her
11 office -- during her office hours at the police
12 station?
13     MS. PELLETIER: Objection. First of
14 all, there's a presumption that's the case.
15 This is the same discussion that we had
16 yesterday.
17     MR. MILES: All right. Let me
18 rephrase the question.
19  Q. (By Mr. Miles) Before you voted to
20 reappoint Ms. Karowski were you aware that she
21 conducted non police business during her office
22 hours at the police station?
23     MS. PELLETIER: Objection. Go
24 ahead.

Page 89

1      THE WITNESS: Yes.
2  Q. (By Mr. Miles) And how did you
3  become aware of that?
4  A. I was aware either from people
5  conducting business there and going there
6  myself.
7  Q. Okay. And so you conducted non
8  police business at the police station with Ms.
9  Karowski?
10 A. Yes, on quite a number of occasions.
11 Q. Did she ever ask you not to conduct
12 non police business during her office hours at
13 the police station?
14 A. No.
15 Q. Did you ever suggest to her during
16 those numerous visits that it was inappropriate
17 for her to conduct non police business during her
18 office hours at the police station?
19     MS. PELLETIER: Objection. Go
20 ahead.
21     THE WITNESS: No.
22 Q. (By Mr. Miles) And what caused you
23 to, at this point, tell her that it would be
24 inappropriate for her to conduct non police

23 (Pages 86 to 89)

CHRISTOPHER MORRIS
November 19, 2004

Page 94

1  3rd.
2      THE WITNESS: After November 3rd.
3  This time our expectation would be that,
4  from that point forward, that when during
5  her regular office hours at the police
6  station Ms. Karowski would perform work for
7  the police department.
8      MR. MILES: Okay.
9      THE WITNESS: And not for conducting
10 town business, you know, related to her
11 other jobs.
12    Q.   (By Mr. Miles) Okay. Now, let's go
13 back to July 10th, 2003. The letter not to
14 reappoint her. Okay.
15     At that time was it your position
16 that it was inappropriate for Ms. Karowski to
17 conduct non police town business during her
18 regular office hours at the police station?
19    A.   No.
20    Q.   Did you tell Chief Archbald before
21 July 10th, 2003, that you thought it was
22 inappropriate for Ms. Karowski to conduct non
23 police town business during her office hours at
24 the police station?

Page 95

1  A.  I don't think so.
2  Q.  Now, going from November 3rd into
3  the future.
4      Was it your position that while Ms.
5  Karowski was working at the police station she
6  should refrain from contacting other town
7  employees to discuss non police business?
8  A.  Sorry. Could you repeat that?
9  Q.  From November --
10     MS. PELLETIER: Could you show him
11 the letter?
12     MR. MILES: I was paraphrasing.
13 Q.  (By Mr. Miles) From November 3rd,
14 2003, forward, was it your position that while
15 Ms. Karowski was working at the police station
16 she should refrain from contacting other town
17 employees to discuss non police business?
18 A.  Yes.
19 Q.  Before July 10th, 2003, was it your
20 position that while Ms. Karowski was working at
21 the police station it was inappropriate for her
22 to contact other town employees to discuss non
23 police business?
24 A.  I'm thinking. I'd like to draw a

Page 96

1  distinction between discussing non police
2  business and discussing town business.
3  Q.  Feel free.
4  A.  'Cause it's not the same thing.
5  Q.  Then let me break the question down.
6      Before July 10th --
7      MS. PELLETIER: Hang on a second.
8  You just said feel free.
9      THE WITNESS: Maybe if you can just
10 clarify it.
11     MR. MILES: Sure.
12     THE WITNESS: Prior to our non
13 reappointment the issue was not -- I did
14 not have an issue with Ms. Karowski
15 performing town business at the station.
16 The issue was, I would say, I'm drawing a
17 distinction between conducting town
18 business, which would be someone calling
19 Karen with a payroll issue with discussing
20 town politics, which is, you know,
21 complaining about something we did at the
22 finance committee meeting last night.
23     And my sense is that Karen has every
24 right to her opinion and to express it, but

Page 97

1  not in the police station during regular
2  office hours when she's supposed to be
3  doing police work. That's the issue. And
4  on her own she can say whatever she wants.
5  She has every right to her opinion. It's
6  more -- it's time, place, and manner is
7  what I'm thinking.
8  Q.  (By Mr. Miles) Okay. Next
9  question.
10     When before July 10th, 2003, did Ms.
11 Karowski express her political opinions during
12 the time that she was working at the police
13 station?
14     MS. PELLETIER: Objection. Go
15 ahead.
16     THE WITNESS: I know of it partly
17 because of what is in, I believe, one of
18 the evaluations where Chief Archbald raised
19 the issue. That Karen was discussing
20 political goings on at the station.
21     There's -- I understand at times it's
22 a difficult distinction to make because in
23 some instances it would really relate to --
24 as it would relate directly to, I mean, the

25 (Pages 94 to 97)