

**ERIC CERRETA**
**November 18, 2004**

Page 1



1          COMMONWEALTH OF MASSACHUSETTS

2          Department of the Trial Court

3    Western Division      C.A NO.:  03-CV-30314-MAP

4

5

6    * * * * * * * * * * * * * * * *

7    KAREN KAROWSKI,                    *

8              Plaintiff                 *

9    v.                                 *

10   ERIC CERRETA, DAVID HASKELL,       *

11   CHRISTOPHER MORRIS, AND THE        *

12   INHABITANTS OF THE TOWN OF         *

13   WILLIAMSBURG,                      *

14             Defendants                *

15   * * * * * * * * * * * * * * * *

16

17          DEPOSITION OF:  ERIC CERRETA

18          Green, Miles & Fitz-Gibbon

19             77 Pleasant Street

20          Northampton, Massachusetts

21             November 18, 2004

22

23          Jessica M. DeSantis

24             Court Reporter



ERIC CERRETA
November 18, 2004

Page 11

1          Q.      (By Mr. Miles)  Do you have any

2    other employment besides employment through the

3    Town of Williamsburg?

4          A.      No.

5          Q.      Okay.  And do you hold any positions

6    with the Town of Williamsburg?

7          A.      Besides selectman?

8          Q.      Do you hold any positions?

9          A.      Yes.

10          Q.      What positions do you hold?

11          A.      I'm selectman and I'm on the fire

12    department.

13          Q.      Are you a member of the Personnel

14    Committee?

15          A.      I was when it existed.

16          Q.      And when did that end?

17          A.      I don't recall.

18          Q.      How long have you been a

19    selectman?

20          A.      Three and a half years.

21          Q.      When do you go up for election

22    next?

23          A.      2007.

24          Q.      Do you have any position within the

**ERIC CERRETA**
**November 18, 2004**

Page 12

1   Board of Selectmen at this time?

2        A.     I'm currently chairman.

3        Q.     How long have you been chair?

4        A.     I became chairman in May of 2003.

5        Q.     Okay.  And did you hold any other

6   position with the Board of Selectmen before

7   that?

8        A.     I was the clerk from May, 2002,

9   until May, 2003.

10        Q.     Who is the current clerk?

11        A.     Chris Morris.

12        Q.     Who preceded you as chair of the

13   Board of Selectmen?

14        A.     Chris Morris.

15        Q.     Is David Haskell the third member of

16   the board at present?

17        A.     Correct.

18        Q.     Does he have any position with the

19   board other than as a selectman?

20        A.     No.

21        Q.     Do you know how long he's been a

22   selectman?

23        A.     A year longer than I have.

24        Q.     And has he held any other position

**ERIC CERRETA**
**November 18, 2004**

Page 23

1        ahead.

2                THE WITNESS:  Yeah, yes.

3        Q.      (By Mr. Miles)  Okay.  In other

4   words, it's not delegated to a sub committee of

5   the select board?

6        A.      No.

7        Q.      Okay.  Are the police normally --

8   police officers normally reappointed annually?

9        A.      Yes.

10       Q.      Are police officers normally

11  reappointed in June of each year?

12       A.      On/or about June.  It could be in

13  May or July.  It could be around that time.

14       Q.      In 2002, was Patrick Archbald

15  reappointed as police chief.  William Graham as

16  police Sergeant.  Ray Vandaloski, David Martin,

17  Denise Lauren, Peter Scoble, David West, Victor

18  Caputto, (phonetic) III, Scott Brison, and Bill

19  Chapman all appointed police officers for one

20  year?

21       A.      Yes, I believe so.

22       Q.      Okay.  Now, Karen Karowski was not

23  reappointed in June of 2002, to a position as

24  police secretary; is that correct?

**ERIC CERRETA**
**November 18, 2004**

Page 24

1          A.       I don't know.

2          Q.       **Do you know when the police**

3   **secretary became a position appointed by the**

4   **Board of Selectmen?**

5          A.       I believe it always was.

6          Q.       **Are there any town employees who are**

7   **not directly appointed by the Board of**

8   **Selectmen?**

9          A.       Yes.

10         Q.       **What jobs are those?**

11         A.       There are several.

12         Q.       **What are they?**

13         A.       I can't name all of them off the top

14   of my head.

15         Q.       **Name those which you can, please.**

16         A.       The assessors are elected.  The town

17   clerk is elected.

18         Q.       **I'm sorry.  Let me withdraw and**

19   **rephrase the question.**

20                  **Except for those people who are**

21   **elected, are there any individuals employed by**

22   **the town who are not appointed by the Board of**

23   **Selectmen; in other words, hired by department**

24   **heads or things of that nature?**

ERIC CERRETA
November 18, 2004

Page 34

1           THE WITNESS:  No.

2      Q.      (By Mr. Miles)  Was it the plan of

3  the selectmen to make it an appointed position so

4  they could refuse to appoint her at a later date?

5              MS. PELLETIER:  Objection.  Go

6       ahead.

7              THE WITNESS:  No.

8      Q.      (By Mr. Miles)  Now, she was

9  reappointed on July 11, 2002; is that correct?

10     A.      I don't recall without looking at a

11  record.

12     Q.      Let me show you a document entitled

13  minutes.  Williamsburg Board of Selectmen.  July

14  11, 2002.

15             I'll ask if that refreshes your

16  memory?

17     A.      Yes.

18     Q.      Okay.  So would it be accurate to

19  say that the selectmen reappointed her on July

20  11, 2002, for a term of one year?

21     A.      Yes.

22     Q.      Okay.  Is there any particular

23  reason why her appointment had a duration of a

24  year?

**ERIC CERRETA**
**November 18, 2004**

Page 35

1          MS. PELLETIER:  Objection.  Go

2     ahead.

3          THE WITNESS:  Most, if not -- I

4     would say most of our appointments are for

5     one year.

6     **Q.     (By Mr. Miles)  Is there any policy**

7     **of the selectmen to reappoint people as long as**

8     **they are doing a good job?**

9          MS. PELLETIER:  Objection.  Go

10    ahead.

11         THE WITNESS:  Could you rephrase the

12    question?

13         MR. MILES:  Sure.

14    **Q.     (By Mr. Miles)  Is it the custom and**

15    **practice of the Board of Selectmen to reappoint**

16    **people to a position as long as they are doing a**

17    **good job in that position?**

18         MS. PELLETIER:  Objection.  Go

19    ahead.

20         THE WITNESS:  Generally, yes.

21    **Q.     (By Mr. Miles)  Okay.  Now, on July**

22    **10th, 2003, did the Board of Selectmen send a**

23    **letter, executed by each of the members, send a**

24    **letter to Ms. Karowski indicating that they were**

ERIC CERRETA
November 18, 2004

Page 54

1    necessary, for the police department.

2        Q.    Do the selectmen, as police

3    commissioners, discipline any employee of the

4    police department?

5                MS. PELLETIER:  Objection.  Go

6        ahead.

7                THE WITNESS:  We have the right

8        to.

9        Q.    (By Mr. Miles)  Okay.  And how is

10   that right exercised, if it is?

11       A.    Through --

12               MS. PELLETIER:  Objection.  Go

13       ahead.

14               THE WITNESS:  Through the chief.

15       Q.    (By Mr. Miles)  Okay.  Before this

16   letter was sent to Ms. Karowski did the

17   selectmen, to your knowledge, have any discussion

18   with the chief about her constant criticism of

19   the board's decisions regarding police business?

20               MS. PELLETIER:  Objection.

21               THE WITNESS:  I believe so.

22       Q.    (By Mr. Miles)  And what

23   conversations were had with the chief if you

24   know?

**ERIC CERRETA**
**November 18, 2004**

Page 55

1    A.    I recall one -- I recall speaking

2 about it with the chief on one occasion.  I don't

3 recall the exact language of the discussion.

4    **Q.    Do you recall the substance of the**

5 **discussion?**

6    A.    Vaguely.

7    **Q.    What is it?**

8    A.    That it was his job to speak with us

9 about any decision that we made that he wasn't

10 comfortable with or that he didn't like.

11    **Q.    Was Ms. Karowski mentioned during**

12 **that conversation?**

13    A.    I believe so.

14    **Q.    What was said to the best of your**

15 **memory?**

16    A.    Just that he should be speaking on

17 behalf of the police department at the Finance

18 Committee meetings and not the administrative

19 assistant.

20    **Q.    What was his response?**

21    A.    I believe he acknowledged that it

22 had been a problem in the past, and he gave me

23 the impression that he would look into it.

24    **Q.    Did he report back to you with any**

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH**

**ERIC CERRETA**
**November 18, 2004**

Page 56

1    results of his looking into it?

2    A.    I don't remember.

3    Q.    Do you remember when this

4    conversation occurred?

5    A.    Not exactly.

6    Q.    Do you have any memory of any

7    interval which it occurred?

8    A.    I can probably say that it was

9    between January and May of 2003.

10    Q.    Is that the only conversation you

11    recall having with the chief on this issue?

12    A.    I believe there might have been

13    another one, but I can't recall it enough to say

14    to it one way or the other.

15    Q.    Did any of the other selectmen tell

16    you that any -- either of them had had

17    conversations with the chief about Ms. Karowski's

18    criticism of the board regarding police business?

19    MS. PELLETIER:  Objection.  Go

20    ahead.

21    THE WITNESS:  You'd have to ask

22    him.

23    Q.    (By Mr. Miles)  I'm asking you if

24    you have any memory of that?

**ERIC CERRETA**
**November 18, 2004**

Page 66

1    of July 10th, 2003, you didn't mention any

2    misconduct in which Ms. Karowski had engaged in

3    terms of her job performance; is that correct?

4            MS. PELLETIER:  Objection.  Go

5        ahead.

6            THE WITNESS:  I don't believe it

7        says anything in the letter.

8        Q.    (By Mr. Miles)  You didn't say that

9    she had done something wrong as an assistant; is

10   that correct?

11           MS. PELLETIER:  Objection.

12           THE WITNESS:  We did not in this

13       letter.

14       Q.    (By Mr. Miles)  Okay.  Had you had

15   any information at the time that you authored

16   this letter that indicated that Ms. Karowski had

17   not performed her duties as police secretary or

18   administrative assistant?

19           MS. PELLETIER:  He didn't author the

20       letter.

21           MR. MILES:  I'll rephrase the

22       question.

23       Q.    (By Mr. Miles)  At the time that

24   this letter was discussed by the Board of

**ERIC CERRETA**
**November 18, 2004**

Page 67

1    Selectmen, were you aware of any incidents of

2    inadequate performance as a police secretary or

3    administrative assistant in which Ms. Karowski

4    had engaged?

5            A.    Yes.

6            Q.    **What were they?**

7            A.    She was telling someone in the town

8    office the details of an arrest.

9            Q.    **What did she say?**

10           A.    From what was told to me she gave

11   pretty much all of the details of the arrest.

12           Q.    **And what were they?**

13           A.    I mean, I don't know.

14                 MS. PELLETIER:  Objection.  Go

15           ahead.

16                 THE WITNESS:  I don't know the

17           details of the arrest.  I didn't hear it.

18           Q.    **(By Mr. Miles)  Who is the**

19   **individual that reported this to you?**

20           A.    Marge Dunfee reported that to me.

21           Q.    **Was she the only one?**

22           A.    She's the only one that reported it

23   to me.

24           Q.    **Okay.  Did Marge Dunfee indicate**

**ERIC CERRETA**
**November 18, 2004**

Page 68

1    that other people overheard the remarks?

2         A.    I don't recall.

3         Q.    Okay.  Did Marge Dunfee relate the

4    circumstances of the conversation to you?

5         A.    Yes.

6         Q.    What did she say?

7         A.    That they were -- that Karen was

8    talking to the town collector in a loud enough

9    voice that she believed anyone within earshot

10   could hear it.  And that she heard all of it

11   herself.

12        Q.    Did Ms. Dunfee tell you she had told

13   Ms. Karowski that her tone was loud?

14        A.    I don't know that she did.

15        Q.    How far away from Ms. Karowski was

16   Ms. Dunfee at the time?

17        A.    I don't know where Ms. Dunfee was

18   standing or sitting.  I think she was in the

19   assessor's office, which is adjacent to their

20   office.

21        Q.    Are those offices divided by

22   cubicles or walls?

23        A.    Somewhat walls.

24        Q.    Thin walls, right?

**ERIC CERRETA**
**November 18, 2004**

Page 71

1    followed up at all?

2         A.    I don't know what he did.

3         Q.    **Was anything sent, in writing, to**

4    **Ms. Karowski about this incident?**

5              MS. PELLETIER:  From the board?

6              MR. MILES:  From the board.

7              THE WITNESS:  From our board?

8              MR. MILES:  Yes.

9              THE WITNESS:  I don't remember

10   any.

11        Q.    **(By Mr. Miles)  And do you know if**

12   **anything was sent by the chief to Ms. Karowski**

13   **about this incident?**

14        A.    I don't know what the chief did.

15        Q.    **Okay.  Do you know whether the chief**

16   **evaluated Ms. Karowski's performance annually?**

17        A.    He does all his employees.

18        Q.    **And he does it in writing, doesn't**

19   **he?**

20        A.    Yes.

21        Q.    **Did you read any of his evaluations**

22   **of Ms. Karowski?**

23        A.    Yes.

24        Q.    **How many of those did you read?**

**ERIC CERRETA**
**November 18, 2004**

Page 72

1      A.      I think I've read them all since

2  I've been on the board.

3      Q.      Okay.  In any of those evaluations

4  is there any mention of this incident?

5      A.      No.

6      Q.      Did you take that up with the chief

7  and point out that the evaluations were

8  incomplete?

9              MS. PELLETIER:  Objection.  Presumes

10         they are.  Go ahead.

11             THE WITNESS:  I didn't have any

12         conversations with him because I wasn't

13         dealing with the police chief at that time.

14         I had other boards that I was liaison to.

15     Q.      (By Mr. Miles)  Mr. Morris was the

16  one dealing with the chief?

17     A.      At that time, yes.

18     Q.      Do you know if Mr. Morris told the

19  chief or asked the chief why there was no mention

20  of this incident in Ms. Karowski's evaluations?

21     A.      I don't know whether he did or

22  didn't.

23             MS. PELLETIER:  Objection.  Go

24         ahead.

**ERIC CERRETA**
**November 18, 2004**

Page 73

1      Q.      (By Mr. Miles)   Were there any other

2  instances of poor performance or improper

3  performance of duties that you're aware of before

4  July 10th, 2003?

5      A.      No specifics.

6      Q.      **Sorry?**

7      A.      Nothing specific.

8      Q.      **Okay.  Were there any general**

9  **aspects of poor performance which you were aware**

10  **of before July 10th, 2003?**

11      A.      No.

12              Oh, wait a minute.  I do recall

13  one.

14      Q.      **Go ahead.**

15      A.      Right.  There was an issue with the

16  custodian at the police station not wanting to

17  work there anymore because -- I guess he said it

18  was hard to work over there.

19      Q.      **And when did he say that?**

20      A.      Somewhere, I believe, in the spring

21  of '03.  Winter or spring of '03.

22      Q.      **To whom did he say it?**

23      A.      I think he talked to Chris.

24      Q.      **Did Mr. Morris tell you what the**

**ERIC CERRETA**
**November 18, 2004**

Page 74

1    custodian had said to him?

2        A.    At the time I believe he did.

3        Q.    **What did he say?**

4        A.    I don't remember exactly, but the

5    general conversation was that Karen was hard to

6    work for.

7        Q.    **Was the custodian working for Ms.**

8    **Karowski?**

9        A.    He was cleaning the police station

10   as well as the town office.

11       Q.    **But was he working for Ms. Karowski;**

12   **was he working under her supervision?**

13       A.    I don't know.

14       Q.    **Did the custodian specify what was**

15   **difficult about working for Ms. Karowski?**

16       A.    He probably did to Chris.

17       Q.    **Did Mr. Morris tell you what the**

18   **specific problem was?**

19       A.    I don't remember.  No.

20       Q.    **Again, was anything in writing sent**

21   **from the Board of Selectmen to Ms. Karowski about**

22   **this aspect of her performance?**

23       A.    I don't recall.

24       Q.    **Okay.  Was anything said to the**

ERIC CERRETA
November 18, 2004

Page 76

1          THE WITNESS:  To my knowledge.  I

2     don't know that person.  I don't know who

3     he was or anything.

4          Q.     (By Mr. Miles)  Have you received

5     any complaints from anyone at the police

6     department, other than those you've already

7     testified to, regarding Ms. Karowski's

8     performance?

9          A.     Nothing to me personally.

10          Q.     Have you heard of any complaints by

11     any member of the police department about Ms.

12     Karowski's performance other than what you've

13     already testified to?

14          A.     At that time I didn't.

15          Q.     Have you --

16          A.     I didn't have any direct

17     conversations with any of the police.

18          Q.     Have you, since that time, heard of

19     any complaints about Ms. Karowski's

20     performance?

21          A.     Generally.

22          Q.     What have you heard?

23          A.     That if they didn't want anything to

24     be talked about they weren't to talk about it in

**ERIC CERRETA**
**November 18, 2004**

Page 77

1   front of her.

2       Q.      **And who told you that?**

3       A.      One of the officers.

4       Q.      **Which one?**

5       A.      Officer Chapman.

6       Q.      **Is he still an officer?**

7       A.      He has until the end of the month.

8       Q.      **And is he being terminated?**

9               MS. PELLETIER:  Objection.  Go

10      ahead.

11              THE WITNESS:  He resigned.

12      Q.      **(By Mr. Miles)  Did he resign under**

13  **pressure?**

14      A.      I don't know.

15      Q.      **What was the reason for his**

16  **resignation?**

17      A.      I don't know.

18      Q.      **Do you know where he is going?**

19      A.      It was a part-time job.

20      Q.      **Okay.  Do you know if he was asked**

21  **to resign?**

22      A.      I don't know.

23      Q.      **Who is the current police liaison?**

24      A.      David Haskell.

ERIC CERRETA
November 18, 2004

Page 83

1      A.      I was aware of that.

2      Q.      **And you were also aware that she was**

3   **an elected member of the Finance Committee?**

4      A.      Yes.

5      Q.      **Okay.  Is it accurate to say that**

6   **Ms. Karowski never received any oral or written**

7   **warnings regarding her criticism of the selectmen**

8   **from the board?**

9      A.      No, we told the chief.

10     Q.      **And did you do that before July**

11  **10th?**

12     A.      As I've indicated before to the time

13  that I did.

14     Q.      **And was that regarding her criticism**

15  **of the selectmen?**

16     A.      It was a general comment that I

17  thought it was his job to represent the police

18  department and not hers.

19     Q.      **Okay.  And what I'm asking you is.**

20             **Did you specifically refer to her**

21  **criticism of the Board of Selectmen when you had**

22  **that conversation with the chief?**

23     A.      Oh, I don't remember exactly.

24     Q.      **Okay.  Do you recall Mr. Morris**

ERIC CERRETA
November 18, 2004

Page 92

1           MS. PELLETIER:  Say that exact

2      quote?

3           MR. MILES:  Yes.  Say those words.

4           MS. PELLETIER:  Objection.  Go

5      ahead.

6           THE WITNESS:  I don't remember him

7      saying that.

8      **Q.     (By Mr. Miles)  Did he ever say**

9 **that, in substance, before July 10th?**

10          MS. PELLETIER:  Objection.  Go

11     ahead.

12          THE WITNESS:  I don't remember.

13     **Q.     (By Mr. Miles)  Let me show you a**

14 **document, which is entitled minutes.**

15 **Williamsburg Board of Selectmen meeting dated**

16 **July 24th, 2003.**

17          **Ask you to look at that.**

18     A.     Yup.

19          MR. MILES:  And would this be an

20     appropriate place to take a short recess?

21     It's 11.35.

22          MS. PELLETIER:  Sure.

23          MR. MILES:  Okay.  After you've

24     finished looking at that we'll take a short

**ERIC CERRETA**
**November 18, 2004**

Page 93

1    recess.

2          THE WITNESS:  Look at the part with

3    the arrow?

4          MR. MILES:  Look at the whole thing,

5    particularly the part with the arrow.  I'm

6    sorry.  Actually that's page one of that.

7    I believe this is the page that follows

8    it.

9          THE WITNESS:  Okay.

10          MR. MILES:  Before I start asking

11    you questions about that why don't we just

12    take a short five-minute recess.  If you

13    need to speak with counsel you can do it.

14

15          (Break taken)

16

17          MR. MILES:  Back on the record.

18          Where were we?

19          MS. PELLETIER:  Minutes.

20          MR. MILES:  Minutes of July 24th,

21    2003.

22          Can we mark that as Exhibit 4?

23

24          (Exhibit 4, document, marked)

**ERIC CERRETA**
**November 18, 2004**

Page 94

1      Q.      (By Mr. Miles)  Okay.  If I could

2 direct your attention to subparagraph three of

3 Exhibit 4.

4      A.      Mm-hmm.  Yes.

5      Q.      Does that refresh your memory as to

6 whether or not the board received -- strike that.

7              Did the board receive a petition

8 regarding the reappointment of Karen Karowski to

9 the position of police secretary?

10     A.      It appears that we got a petition

11 based on that.

12     Q.      Do you recall receiving it?

13     A.      I don't remember getting it, but

14 evidently we did.  So I'm not disputing that we

15 got one.

16     Q.      Now, subparagraph three indicates

17 that Ralmon Black stated there was no discussion

18 with the chief of police or Karowski before

19 making the non reappointment; is that statement

20 accurate?

21              MS. PELLETIER:  Objection.  Go

22     ahead.

23              THE WITNESS:  He may have said

24     that.

ERIC CERRETA
November 18, 2004

Page 107

1

2          Q.      (By Mr. Miles)  All right.  Now, on

3    November 3rd, the board sent Ms. Karowski a

4    letter informing her that they voted to reappoint

5    her to fill the police secretary position for the

6    remainder of the fiscal year; is that accurate?

7          A.      Yes.

8          Q.      Is this a copy of -- let me give you

9    both pages.

10                 Is this a copy of the letter?

11         A.      Yes, it is.

12         Q.      Okay.  Now, before you sent out this

13   letter of November 3rd, did you afford Ms.

14   Karowski the opportunity to have a hearing about

15   her performance of her job duties as police

16   secretary?

17         A.      She could have asked us for one at

18   any time.

19         Q.      Did you -- did the select board

20   offer it?

21         A.      I don't remember offering her one.

22         Q.      Did you ever -- did the select board

23   ever send her, in writing, the supposed breach of

24   confidentiality complaint?

**ERIC CERRETA**
**November 18, 2004**

Page 108

1              MS. PELLETIER:  Objection.  Go

2       ahead.

3              THE WITNESS:  I don't remember doing

4       it.

5         Q.      (By Mr. Miles)  Okay.  Did the

6    select board ever ask the chief or direct the

7    chief to obtain for Ms. Karowski her version of

8    the supposed breach of confidentiality?

9         A.      Did we ever ask the chief?

10        Q.      Yes.

11        A.      No.

12        Q.      And subparagraph two you noted that

13   it is important to avoid conflicts of interest or

14   appearance, vis-a-vis, your position as police

15   secretary and the performance of the other town

16   duties.  Specifically you should recuse yourself

17   from voting on and/or discussing any issues that

18   would violate the provisions of General Laws

19   chapter 260 8A?

20              Do you see that?

21        A.      I do.

22        Q.      Okay.  Now, do you know who authored

23   this particular letter?

24        A.      I believe --

**ERIC CERRETA**
**November 18, 2004**

Page 111

1      A.      I don't know if anybody else did.

2      Q.      Okay.  Now, in paragraph three it is

3  said Chief Archbald is the spokesman for the

4  police department.  If you speak on police

5  matters at public meetings it must be clear that

6  you're speaking for yourself, not for the

7  department.

8          Are you aware of any specific time

9  before November 3rd, 2003, during which Ms.

10  Karowski spoke about police matters at a public

11  meeting and did not make it clear that she was

12  speaking for herself and not for the department?

13          MS. PELLETIER:  Objection.  Other

14      than those to which you've already

15      testified, go ahead.

16          MR. MILES:  Right.

17          THE WITNESS:  You guys are spinning

18      me around.

19          Other than what I've already said,

20      no.

21      Q.      (By Mr. Miles)  Okay.  Is there any

22  specific incident that you have in mind at which

23  Ms. Karowski spoke at a public meeting and left

24  the impression that she was speaking for the

**ERIC CERRETA**
**November 18, 2004**

Page 112

1    police department?

2                    MS. PELLETIER:  Objection.  Go

3        ahead.

4                    THE WITNESS:  I believe virtually

5        all of them were.  She referred to "we,"

6        when she was discussing the police

7        department.  "We" want to do this.  "We"

8        want to do that.  So when she used the word

9        "we," I assumed she was speaking for the

10       police department.

11           Q.     (By Mr. Miles)  At any of these

12   public meetings did you ever challenge her on

13   that?

14           A.     I don't believe I did.

15           Q.     Okay.  Did any of the other

16   selectmen?

17           A.     I think Rabbit might have at some

18   point.  Mr. Haskell.  I don't remember

19   specifically.

20           Q.     Did you -- do you recall anybody

21   raising a point of personal privilege or point of

22   order when she said "we" want to do this or "we"

23   want to do that?

24           A.     I don't recall it.

ERIC CERRETA
November 18, 2004

Page 115

1              THE WITNESS:  No, I don't recall

2        any.

3              MR. MILES:  Okay.  Let's mark that

4    as Exhibit 7.

5

6              (Exhibit 7, document, marked)

7

8        Q.     (By Mr. Miles)  Let me ask you again

9    on the letter of November 3rd, 2003, which is now

10   Exhibit 7.  Subparagraph four.

11             During your office hours at the

12   police station please conduct only police

13   business.

14             What were the facts underlining the

15   board's warning to Ms. Karowski with respect to

16   only conducting police business?

17             MS. PELLETIER:  Objection.  Go

18        ahead.

19             THE WITNESS:  I'm only speaking for

20        myself.  It was just the phone calls to the

21        collector.

22        Q.     (By Mr. Miles)  From the police

23   station?

24        A.     Yes.

**ERIC CERRETA**
**November 18, 2004**

Page 116

1    Q.    And how did you become aware of

2    those?

3    A.    I don't remember how I became aware

4    of them, but I was.

5    Q.    Was there anybody who told you that

6    Karen Karowski was making telephone calls to the

7    collector from the police station?

8    A.    It might have been.  I don't

9    remember who it was.

10    Q.    Was there any written policy in

11    place that Ms. Karowski couldn't conduct town

12    business from the police department?

13    MS. PELLETIER:  Non police related

14    during police hours?

15    Q.    (By Mr. Miles)  During time she was

16    working at the police department as police

17    secretary, but was conducting town business?

18    A.    Was there a written policy?

19    Q.    Yes.

20    A.    Not that I'm aware of.

21    Q.    Was there any memorandum or writing

22    to Ms. Karowski before her non reappointment in

23    July of 2003, that she was not to conduct other

24    town business while she was working as police

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

ERIC CERRETA
November 18, 2004

Page 117

1    secretary?

2        A.    Not that I'm aware of.

3        Q.    Did anybody have any conversation

4    with her before her non reappointment that she

5    was not to conduct other town business while she

6    was working at the police department?

7            MS. PELLETIER:  On behalf of the

8        board you can answer, but not on behalf of

9        anybody else.  Go ahead.

10           THE WITNESS:  I don't -- can you ask

11       it again?

12           MR. MILES:  Sure.

13       Q.    (By Mr. Miles)  Are you aware of any

14   verbal communication to Ms. Karowski that

15   essentially informed her that while she was

16   working as police secretary she was not to

17   conduct other town business?

18       A.    I didn't.

19       Q.    Okay.  And you're not aware of

20   any?

21       A.    I'm not aware of anybody else doing

22   it or not doing it.

23       Q.    Okay.  Now, there's some mention --

24   there's a sentence here that says, in the past

ERIC CERRETA
November 18, 2004

Page 118

1   the town did not provide space for the treasurer;

2   however, we currently have space available in the

3   collector's office and will be sharing space in

4   the town clerk's office.

5           What is that in reference to?

6           MS. PELLETIER:  Again, only because

7       we're doing this with town counsel.  If

8       this involves communications with town

9       counsel as opposed to -- if he can answer

10      his questions separately and distinctive

11      from communications with town counsel then

12      go ahead.

13          THE WITNESS:  Regarding the move of

14      her office?

15          MR. MILES:  Yeah.  I'm just curious

16      about what that sentence has to do with the

17      conducting of business during office hours

18      at the police station.

19          MS. PELLETIER:  Objection.  Go

20      ahead.

21          THE WITNESS:  We added an elevator

22      to the town office and it opened the whole

23      upstairs to the public.  So at that time we

24      had extra space and we invited the

ERIC CERRETA
November 18, 2004

Page 119

1        treasurer to move her office to be in the

2        same office with the clerk, where our

3        office used to be prior to that.

4            Q.        (By Mr. Miles)   Okay.   Is it

5    accurate to say that the concern was that Ms.

6    Karowski was conducting business as treasurer

7    while she was at the police station during her

8    office hours at the police station?

9            A.        That wasn't a concern to me.

10           Q.        Was it a concern to anybody that you

11    knew of?

12           A.        I don't know.

13           Q.        What other business was it your

14    understanding she had conducted during her office

15    hours at the police station?

16               MS. PELLETIER:   Objection.   Go

17        ahead.

18               THE WITNESS:   I don't know what she

19        did.   Whether town employees were visiting

20        her, asking for W4 changes for their

21        payroll.   I don't know.   I assumed it was

22        stuff like that.

23           Q.        (By Mr. Miles)   Did you ever direct

24    anybody to go to the police station to see Ms.

**ERIC CERRETA**
**November 18, 2004**

Page 120

1    Karowski about treasurers or Finance Committee

2    business?

3         A.    I don't believe I ever did.

4         Q.    Are you aware of any other selectmen

5    telling people to do that?

6         A.    I don't believe.

7         Q.    Are you aware of Bonnie Roberge

8    telling anybody to do that?

9         A.    I'm not aware of anything Bonnie

10   did.

11        Q.    Okay.  And are you aware of how

12   frequently Ms. Karowski conducted other than

13   police business during her office hours at the

14   police station?

15             MS. PELLETIER:  Objection.  Go

16        ahead.

17             THE WITNESS:  I have no personal

18        knowledge of it.

19        Q.    (By Mr. Miles)  Okay.  Are you aware

20   of anybody who reported to you that Ms. Karowski

21   was conducting other than police business while

22   she was at the police station during her office

23   hours there?

24        A.    Just her calls to the town

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

**ERIC CERRETA**
**November 18, 2004**

Page 121

1  collector.

2      Q.    But who told you about that?

3      A.    I don't remember.  It might have

4  been Marge Dunfee.

5      Q.    Okay.  Then the last paragraph,

6  five.  And, again, I'm not asking you about any

7  communications with town counsel.

8      You say or it is said.  Lastly,

9  while you were working at the police station

10  please refrain from contacting other town

11  employees to discuss non police business.

12      And do you know what, again, that

13  refers to?

14      MS. PELLETIER:  Objection.  Go

15      ahead.  Other than which you've already

16      testified to.

17      THE WITNESS:  Yeah, nothing new that

18      I haven't said already.

19      Q.    (By Mr. Miles)  Does this refer to

20  her contact with the town collector?

21      A.    Yes.

22      Q.    Okay.  So paragraphs four and five

23  essentially refer to her contacts with the town

24  collector from the police station?