1              UNITED STATES DISTRICT COURT FOR

2              THE DISTRICT OF MASSACHUSETTS

3                            No. 3:03-CV-30314-MAP

4


5

KAREN KAROWSKI

6                    Plaintiff
vs.

7

ERIC CERRETA, ET ALS

8                    Defendants

9

10

11              DEPOSITION OF:  KAREN KAROWSKI, taken

12    before ROXANNE C. COSTIGAN, Notary Public

13    Stenographer, pursuant to Rule 30 of the

14    Massachusetts Rules of Civil Procedure, at the

15    offices of ROBINSON DONOVAN, P.C., 1500 Main Street,

16    Suite 1600, Springfield, Massachusetts on February 1,

17    2005.

18

19

20    APPEARANCES:  (See Page 2)

21

22

23

24                    Roxanne C. Costigan
                   Registered Merit Reporter

**Accurate Court Reporting * 1500 Main Street**
**Springfield, MA   01115**
**413-747-1806**

EXHIBIT

C

1        A.      Three years, until I became treasurer

2   myself.

3        Q.      So, you became treasurer in 1998?

4        A.      Yes.

5        Q.      Did the number of hours that you spent as

6   a treasurer's assistant remain the same between 1995

7   and 1998 when you became the treasurer?

8        A.      They varied.  Some weeks, I didn't work

9   at all.  Some weeks, I worked two or three hours.

10       Q.      Who did you run against for that

11   position?

12       A.      No one.

13       Q.      Was it an elected position?

14       A.      Yes.

15       Q.      Other than working as the secretary to

16   the treasurer, what if any training did you have to

17   be the treasurer?

18       A.      Specifically, none.

19       Q.      What was the role of the treasurer in the

20   Town of Williamsburg in 1998?

21       A.      The role?

22       Q.      What was your job?

23       A.      Payroll, accounts payable, borrowing.

24       Q.      Is that it?

1       Q.     Has your position as treasurer changed at

2  all since 1998 or are you essentially performing the

3  same tasks?

4       A.     Essentially the same tasks.  State

5  mandates have made the paperwork a little more

6  cumbersome.

7       Q.     Do you have an assistant?

8       A.     I do.

9       Q.     Who is your assistant?

10       A.     Diane Karowski.

11       Q.     Is that your daughter?

12       A.     It's my sister-in-law.

13       Q.     When did she become your assistant?

14       A.     I'm not sure exactly.  Might have been

15  two years ago.  Three years ago.

16       Q.     When you took over the position in 1998,

17  did you have an assistant?

18       A.     I tried to.  I had several people that

19  came and went.  It's such a small amount of time,

20  it's been hard to maintain anyone.

21       Q.     Who were the people that you had?

22       A.     The first person I had was Michael

23  Beattie.  Palmer Wilson.  And Diane.

24       Q.     Did Michael Beattie quit or did you

1    terminate his employment?

2        A.    It was a mutual decision.  He took a

3    full-time job out of town.

4        Q.    What does out of town mean?

5        A.    He used to work in town.  So, it was more

6    convenient.

7        Q.    I understand that.

8        A.    And he worked part time.  He took a

9    full-time job in Hatfield, I believe.

10       Q.    And you owned a store at the time you

11   were working as the assistant?

12       A.    Yes.

13       Q.    Did you have any problems or concerns

14   with Mr. Beattie's work?

15       A.    I did.

16       Q.    What were the problems or concerns?

17       A.    He wasn't consistent.  It never developed

18   to the point I had expected it to, the tasks that I

19   had originally intended for him to do.  We only got

20   to the first level.

21       Q.    Did you have anything in writing with

22   regard to what it is you expected of him?

23       A.    No.

24       Q.    Did you advise him of the problems that

1      Q.    One to two hours a week?

2      A.    Yes.

3      Q.    And they were what again, what are these

4    things you were doing one to two hours a week you

5    can't get someone to do?

6      A.    Mailing out checks, borrowing, bank

7    reconcillations which has become much more involved

8    than it was when I was doing them but that is what

9    Mr. Beattie was supposed to be doing.

10     Q.    Those three items?

11     A.    Actually, I prefer to do the borrowing

12   myself.  I probably would not have done that because

13   the other duties have become more involved.

14     Q.    So, mailing checks and bank

15   reconciliation, that's what you expected Mr. Beattie

16   to do that he did not do consistent?

17     A.    And file teachers retirement reports.

18     Q.    Were you doing that when you were the

19   assistant?

20     A.    When I was the assistant, we didn't have

21   to file the retirement reports.  That was software

22   initiated by the retirement Board later on.  Michael

23   was fairly consistent in doing that.

24     Q.    How long did he hold the position of

1    treasurer's assistant?

2         A.    I'm not positive.  A year, maybe.  Year

3    and a half.

4         Q.    Did he ever express any problems or

5    concerns to you about his position when he held it or

6    your expectations?

7         A.    Not that I'm aware, no.

8         Q.    Your testimony is that it was a mutual

9    decision that he leave the position because he took a

10   full-time job in Hatfield?

11        A.    I believe I did tell him I thought that

12   was in his best interest because of the fact that he

13   had not been keeping up with the work but I didn't

14   specifically say I don't want you here anymore.  It's

15   just maybe this was a good time to part ways.

16        Q.    What was his reaction?

17        A.    I don't recall specifically.  I mean, it

18   happened.  He didn't seem upset with me about it.

19        Q.    Have you worked on any other -- strike

20   that.

21             Have you worked with Mr. Beattie in any

22   other capacity since that time?

23        A.    Worked?

24        Q.    Worked.

1            MR. MILES:  Just answer the question

2        that's asked now.

3            THE WITNESS:  Okay.

4            MS. PELLETIER:  Well, that's the

5        question I asked and she read it back.  So --

6            THE WITNESS:  No.  In a previous

7        question --

8            MR. MILES:  Just answer the

9        question.

10            THE WITNESS:  All right.

11            MS. PELLETIER:  Do you want to

12        correct your testimony --

13            THE WITNESS:  Repeat it again.

14        Q.    (By Ms. Pelletier)  Do you want to

15    correct your testimony with regard to a response to a

16    previous question?

17        A.    No.  Go ahead.

18        Q.    With whom did you have a conversation

19    regarding an arrest in the Town of Williamsburg other

20    than the arrest of Michael Beattie?

21        A.    Maxine Schmidt.

22        Q.    Where were you when the conversation took

23    place?

24        A.    In the Collector's office which I shared.

1          Q.      That was the point in time when the

2    Collector's office didn't have a separate wall before

3    the building was reconfigured, is that correct?

4          A.      Collector's office had a wall, just not a

5    full wall.

6          Q.      At the time of the conversation, were you

7    and Maxine Schmidt on the same side of the half wall

8    or were you on opposite sides of the wall?

9          A.      We were at the Dutch door in the

10   Collector's office.

11         Q.      Who initiated the conversation?

12         A.      Maxine.

13         Q.      What did she say?

14         A.      She asked me if I knew if a particular

15   individual had been released from custody.

16         Q.      What did you say?

17         A.      I said I didn't know.  She would have to

18   call the police department and speak to Corporal

19   Scoble.

20         Q.      Did she say anything in response?

21         A.      She said -- she is the health agent for

22   the town and she said the reason she was asking is

23   because they had other -- the Board of Health had

24   issues with him also, and if he was being held, he

1      A.    Yes.

2      Q.    Was Margie Dunphy there?

3      A.    I don't know if she was on the other side

4  of the wall where I couldn't see her.

5      Q.    Is it your position that the information

6  that Margie Dunphy provided in the deposition was

7  false?

8              MR. MILES:  Objection to form of the

9          question.  You can answer.

10             THE WITNESS:  Yes.

11     Q.    (By Ms. Pelletier)  Yes?

12     A.    Yes.

13     Q.    Since you became aware that Margie Dunphy

14  claims to have heard a conversation between you and

15  either Maxine Schmidt or Tess Barstow regarding the

16  arrest of an individual, have you spoken to either

17  Maxine Schmidt or Tess Barstow about it?

18     A.    Yes, I have.

19     Q.    When did you have that conversation?

20  Strike that.

21             How many conversations have you had?

22     A.    One.

23     Q.    When was that?

24     A.    I don't recall exactly.

1          Q.      Approximately?

2          A.      In the last year.

3          Q.      When did you first become aware that

4    Margie Dunphy claimed to have heard this

5    conversation?

6          A.      I don't know the exact date.  The chief

7    spoke to me about it.  That was the first I knew.

8          Q.      You also sat through the chief's

9    deposition, correct?

10         A.      Yes, I did, no not the entire thing.  I

11   did not.  I came in late.

12         Q.      Have you read the transcript?

13         A.      No, I have not.

14         Q.      Have you read any portion of the

15   transcript?

16         A.      I have not.

17         Q.      What did the chief speak to you about?

18         A.      He said that one of the assessors had

19   approached him after a meeting somewhere and

20   mentioned the conversation, and he felt that he, you

21   know, had to bring it to my attention, although he

22   did not feel that the information she relayed to him

23   did breach any confidentiality.  He just asked me to

24   restate the conversation, which I did, and he didn't

1    feel that any breach had occurred and end of

2    discussion.

3         Q.    When did that conversation take place?

4         A.    I don't know exactly.

5         Q.    Do you have any idea?

6         A.    I don't.

7         Q.    Did the chief tell you that Mr. Morris

8    had spoken to him as well?

9         A.    He did not.

10         Q.    Prior to Mr. Morris' deposition at which

11    you were present, did you have any knowledge that Mr.

12    Morris had been spoken to by Marge Dunphy?

13         A.    I did not.

14         Q.    Prior to Mr. Morris' deposition, did you

15    have any knowledge that Mr. Morris had spoken to

16    Chief Archbald regarding the incident involving the

17    alleged conversation between you and Maxine?

18         A.    I did not.

19         Q.    Was the conversation that you had with

20    the chief part of an evaluation?

21         A.    No.

22         Q.    Where did it take place?

23         A.    In his office.

24         Q.    Do you have any recollection as to how

1          A.      That it was -- that was the conversation,

2     that's the one time he had spoken to me and that was

3     what it related to.

4          Q.      Why did you go ask him that?

5          A.      Because I hadn't heard her name mentioned

6     in any of the depositions.

7          Q.      What did he tell you?

8          A.      Yes.

9          Q.      Was that before or after he was deposed?

10         A.      After.

11         Q.      Did he mention her name in his

12    deposition?

13         A.      I don't know.  I wasn't there for his

14    entire deposition.

15         Q.      So, tell me about how this conversation

16    came to be that you went to talk to the chief about

17    this litigation.

18         A.      I just asked him, back when you had me in

19    your office and asked me about a conversation that

20    was held at the town office where Margie perceived

21    that I had breached confidentiality, if that was the

22    only time and that was with Maxine.  And he said yes,

23    end of conversation.

24         Q.      Who else was present?

1        Q.    Who did you tell?

2        A.    Might have been a banker.  Other town

3    employees.

4        Q.    Is there some reason why you couldn't do

5    that business after 12:30?

6        A.    I'm not sure that I specifically, as far

7    as town employees, maybe with forms and things, that

8    I specifically said, come see me at the police

9    station.  Sometimes they were sent to me at the

10   police station from the town office.  And as far as

11   bankers, sometimes there were documents that needed

12   to be signed pertaining to borrowing or something

13   that had to be filed by noon.

14       Q.    Who were the bankers?

15       A.    It would depend.  We would deal with

16   several banks.  It might have been Unibank, Clark

17   Roul, our fiscal adviser.

18       Q.    Were those the people that you understood

19   Officer Scoble was complaining about?

20       A.    No.

21       Q.    Well, then, what did you understand

22   Officer Scoble was complaining about?

23       A.    Other town people that came in, Chris

24   Morris, Michael Beattie.

1      Q.      That's it, in the whole town?

2      A.      No.  There might have been others.  Those

3  were the ones that were the most frequent visitors.

4      Q.      You can't remember the names of any

5  others?

6      A.      Dick Childs.  Bill Sayer, possibly.  I

7  don't know.  There may have been others.  I don't

8  recall.

9      Q.      What was Officer Scoble's complaint as

10  you understood it?

11      A.      As I understood it, he didn't want to

12  hear conversations about library or town issues.

13      Q.      That's it, he didn't want to hear

14  conversations about town issues?

15      A.      I don't know specifically.  I wasn't part

16  of that conversation that he had with the chief.  I

17  was just --

18      Q.      What did the chief tell you?

19      A.      The chief just said there was

20  conversations about town business going on that

21  Corporal Scoble had reported to him.  He did not give

22  me details of the conversation.  He just asked me to

23  be more aware of it.

24      Q.      Did he ask you to stop?

```
 1          A.    No.  He asked me to be more aware of it.

 2          Q.    What does that mean?

 3          A.    He understood --

 4                MR. MILES:  Objection to the form of

 5          the question.  You can answer.

 6          Q.    (By Ms. Pelletier)  What did you

 7     understand that to mean, be more aware of it, you

 8     could keep doing it?

 9          A.    Yes.  Actually, it was an understanding

10     that this would occur from time to time.  I did not

11     have office space and we exchanged time whenever

12     there were -- as I said with bankers, I would swap

13     time at the police station.

14          Q.    With whom did you have that

15     understanding?

16          A.    With the chief.

17          Q.    Is that documented anywhere?

18          A.    I don't know that it is, no.

19          Q.    When did you come to that understanding?

20          A.    When I ran for treasurer, he -- I spoke

21     to him about it, asked if it was going to be a

22     problem.

23          Q.    So, it's your testimony that you had an

24     agreement with the chief when you ran for treasurer
```

1    that you could have individuals come to the police

2    station during the time that you were performing your

3    duties as police secretary to conduct nonpolice

4    business?

5         A.    In exchange for time at a different time

6    to do police business.

7         Q.    Were the officers made aware of this --

8         A.    Yes.

9         Q.    -- understanding?

10         A.    Yes.

11         Q.    How do you know that?

12         A.    The chief told me.

13         Q.    Were the Select Board members made aware

14    of this understanding?

15         A.    Select Board members did it.  So, I

16    assumed they were.

17         Q.    Were the Select Board members made aware

18    of this understanding?

19         A.    Specifically, I don't know.

20         Q.    How would you keep track of the time so

21    that you could exchange it?

22         A.    I don't know.  If there was a day that

23    that occurred, then I would stay longer at the end of

24    the day.

1      Q.    Is there any mechanism for documenting

2    that?

3      A.    No.

4      Q.    You didn't punch in or punch out?

5      A.    No, I did not.

6      Q.    Would you tell the chief that you were

7    doing this?

8      A.    Yes.

9      Q.    Every single time you did it?

10     A.    Not every single time.

11     Q.    How often?

12     A.    I don't know.

13     Q.    The chief has a full-time job somewhere

14    outside the Town of Williamsburg, correct?

15     A.    Yes.

16     Q.    How often would you tell him, every six

17    months, every month, every day?

18     A.    No.  If I had a specific meeting

19    scheduled, I would make him aware of that.

20     Q.    And you would schedule a specific meeting

21    during the hours that you were at the police station?

22     A.    When it was absolutely necessary, and in

23    turn, I would stay the afternoon.

24     Q.    Approximately how many times did that

1    occur annually?

2         A.    Three, four.

3         Q.    That's not what Officer Scoble was

4    complaining about, correct?

5         A.    I don't know.  As I said, I was not part

6    of that conversation.

7         Q.    Well, I'm a little bit confused.  You

8    indicated that you had an understanding with the

9    chief that you could conduct nonpolice business

10   during the hours that you were working in the police

11   station, correct?

12        A.    Yes.

13        Q.    And you also understood that the police

14   officers were made aware of this, correct?

15        A.    Yes.

16        Q.    Officer Scoble came to the chief and said

17   something to the chief that caused the chief to have

18   a conversation with you?

19        A.    Yes.

20        Q.    What was it?

21        A.    Just that Officer Scoble had come to him

22   and I would be more aware of it.

23        Q.    Be more aware of what?  According to you,

24   you had an understanding that this was perfectly

1    okay, right?

2          A.    Yes.

3          Q.    So, what were you being made aware of?

4          A.    That it didn't happen as frequently or it

5    wasn't as long, you know, make the conversation

6    briefer, but Officer Scoble was also made aware that

7    this was the agreement and there were occasions where

8    it was going to happen.

9          Q.    That's what the chief told you?

10         A.    Yes.

11         Q.    Then you went to see Officer Scoble,

12   right?

13         A.    I didn't go directly to him.  We just had

14   a conversation one day.

15         Q.    Tell me about that conversation.

16         A.    I told him I would be more aware of it.

17   And he --

18         Q.    More aware of what?

19         A.    That if there was a conversation going on

20   and he was in the station, to keep it brief.

21         Q.    Just if it was Officer Scoble?

22         A.    He's the one I was there with the most.

23         Q.    What did he say?

24         A.    He said fine and he said he -- I don't

1    know what was -- he might have had something going on

2    that day, that it just irritated him more than usual

3    . and didn't mean to cause me any problems over it.

4         Q.    If I understand it correctly, the chief

5    didn't bother to mention this to you when Officer

6    Scoble came to him, it came up during your

7    evaluation?

8         A.    Correct.

9         Q.    And the only person identified was

10    Officer Scoble?

11        A.    Yes.

12        Q.    Did you ever have any other complaints by

13    any other officers regarding your performance of your

14    duties as police secretary?

15        A.    I believe in my most recent evaluation, I

16    wasn't given names.  The chief did say I believe two

17    officers mentioned something to him about filing.

18        Q.    When was the last time you -- strike

19    that.

20             Have you actually seen your evaluations

21    or were they just reported to you verbally?

22        A.    No.  We receive them.  We are allowed to

23    review them and comment.

24        Q.    Did you ever review your evaluations at

1       custodian.  I don't know.

2           Q.      (By Ms. Pelletier)  Did you ever go talk

3   to the custodian?

4           A.      No, I did not.

5           Q.      How come?

6           A.      I didn't see any need to.  I still was

7   never told what the complaints actually were.  He was

8   no longer working at the police station.  I get along

9   very well with him at the town office.

10          Q.      Just so I'm perfectly clear, after the

11  chief testified to this, you did not approach the

12  chief again --

13          A.      No, I did not.

14          Q.      -- regarding that subject?  You don't

15  have any memory as to when the conversation that you

16  did have with the chief occurred?

17          A.      I don't.

18          Q.      At any time, either within the course of

19  this litigation or outside the context of the

20  litigation, have you become aware that there was

21  anybody else that complained about you in the

22  performance of your duty as police secretary?

23          A.      Not that I can recall.

24          Q.      When you say that you became aware of the

1    situation relating to the custodian in some type of a

2    settlement document, can you describe for me what

3    you're talking about?

4           A.    I don't remember specifically.

5           Q.    Did you read it or did somebody tell you

6    about it?

7           A.    I read it.

8           Q.    Did you ever participate in any votes

9    taken at a Finance Committee meeting on issues that

10   related in any way to the police department?

11          A.    Did I vote on them?

12          Q.    Yes.

13                MR. MILES:  Objection to the form of

14       the question.  You can answer.

15                THE WITNESS:  To the best of my

16       knowledge, no.  I made it a point not to.

17          Q.    (By Ms. Pelletier)  Have you reviewed all

18   the minutes of the Finance Committee meetings

19   relating to police matters?

20          A.    Recently, you know --

21          Q.    Ever?

22          A.    Not as a whole.  I read them when I get

23   them.

24          Q.    Have you ever requested that any

1    you were acting as a citizen and registered voter in

2    voicing your opinions, is that correct?

3         A.    Yes.

4         Q.    Not as a member of the Finance Committee?

5         A.    Well, I was not voicing an opinion for or

6    against the Quinn Bill.

7         Q.    That's not the question.

8         A.    But it was in a Finance Committee meeting

9    and I guess my position would have been as a Finance

10   Committee member.

11        Q.    Not as --

12        A.    As it related to that.

13        Q.    Not as a citizen and registered voter?

14        A.    That also, but I didn't identify that.

15        Q.    Did you identify what hat you were

16   wearing when you made your statements on those

17   issues?

18        A.    I don't believe I did.

19        Q.    At any time have you been asked to

20   identify which hat you're wearing in connection with

21   the voicing of your opinions on various issues in the

22   Town of Williamsburg?

23        A.    Not that I recall.

24        Q.    Have you had any conversations with the

1    police chief regarding the voicing of your personal

2    opinions as opposed to opinions perceived to be those

3    of the police department when you were acting in any

4    of your various capacities in the Town of

5    Williamsburg?

6         A.    I did not.

7         Q.    To this day, have you identified which

8    hat you were wearing in any communications that you

9    have had in any of your various positions in the Town

10   of Williamsburg?

11        A.    Yes.

12        Q.    Why?

13        A.    When providing information, at a

14   committee meeting, I do identify which hat I'm

15   wearing.

16        Q.    Why?

17        A.    Because I'm aware that I hold different

18   positions.

19        Q.    And you were aware of that in 2002,

20   correct?

21        A.    Yes.

22        Q.    But you didn't so identify, correct?

23        A.    If I was in a Finance Committee meeting

24   and expressing or participating in a discussion, I

1      considered -- unless I identified myself differently,

2      I would consider myself as being a Finance Committee

3      member.

4          Q.    I understand what you consider yourself,

5      but you just told us that you actually now identify

6      yourself in these various capacities, correct?

7          A.    Yes.

8          Q.    And that's because you recognize that you

9      wear a variety of hats in the Town of Williamsburg,

10     correct?

11         A.    Yes.

12         Q.    I'm simply saying to you that in fact you

13     were wearing those same hats in calendar year 2002,

14     correct?

15         A.    Yes.

16         Q.    But you did not identify yourself,

17     regardless of what you were thinking, you did not

18     identify yourself outwardly as which hat you were

19     wearing in these various capacities, correct?

20         A.    Correct.

21         Q.    That's the same in 2001, correct, you

22     didn't identify which hat you were wearing?

23         A.    Correct.

24         Q.    And you began identifying yourself in

1    what year?

2         A.    I don't recall.  I was certainly more

3    aware of it when I became elected to the Finance

4    Committee.

5         Q.    When did you become elected to the

6    Finance Committee?

7         A.    I'm not sure exactly.  I had an

8    appointment first to fill out a term and then I was

9    elected.

10        Q.    What was the difference in your status

11   because you were appointed as opposed to elected, did

12   that change?

13        A.    There wasn't a difference.  Prior to

14   that, I was not a Finance Committee member.  I was

15   there as their recording secretary and a public

16   citizen and I did participate in discussions.

17        Q.    We're not talking about that.  We're

18   talking about you being on the Finance Committee.

19   There's no difference whether you were appointed or

20   elected in terms of your participation, correct?

21        A.    Yes.

22        Q.    And you testified that you became more

23   aware of it since you were elected.  Are you

24   distinguishing that from when you were appointed?

1    A.    No.  Just when I actually became a member

2  of the Finance Committee.

3    Q.    That was when?

4    A.    I believe it was November of 2000,

5  perhaps.

6    Q.    Okay.  But in November -- from November

7  2000 through when -- strike that.

8    When is it that you first began

9  identifying yourself or identifying which hat you

10  were wearing?

11    A.    I think I always did.  I just didn't feel

12  it necessary to say, I am speaking as a Finance

13  Committee member, because I was there as a Finance

14  Committee member.  I identified myself when I was

15  speaking outside of that for the purpose I was there.

16    Q.    Has that changed over the years?

17    A.    I don't believe so, no.

18    Q.    So, you're telling me now that you've

19  always done the same thing?

20    A.    I have always done the same thing.

21    Q.    To whom have you ever identified yourself

22  as wearing a particular hat during a conversation

23  relating to the Finance Committee?

24    A.    I'm not sure I understand the question.

1    determination that this change was made to allow the

2    Board of Selectmen not to reappoint you?

3         A.     Excuse me.  Could you repeat that?

4                   MS. PELLETIER:  Would you, please?

5                        (Whereupon, requested

6                        portion of record read)

7                   THE WITNESS:  I don't know

8         specifically.  It was just the time it

9         happened, I felt that that was probably a

10        consideration, that the change in the

11        appointment gave them that authority.

12        Q.     (By Ms. Pelletier)  Since that time, have

13   you learned any facts that support that position?

14        A.     Specifically, no.

15        Q.     Have you learned any facts that refute

16   that position?

17        A.     No.

18        Q.     Not including the fact that you were told

19   by the town clerk that she brought it to the

20   attention of the Board?

21                   MR. MILES:  Objection to the form of

22        the question.  You can answer.

23                   THE WITNESS:  No.

24        Q.     (By Ms. Pelletier)  Your complaint

1    alleges that Mr. Cerreta based his decision not to

2    reappoint you upon your criticism of the Selectmen's

3    handling of town financial matters including, for

4    example, their lack of support for the Quinn Bill

5    which she voiced during recent Finance Committee

6    meetings.  Do you understand that?

7         A.    Yes.

8         Q.    Upon what facts do you base that

9    allegation?

10        A.    Could you just read that to me again,

11   please?

12        Q.    Cerreta based his decision not to

13   reappoint Karowski upon her criticism of the

14   Selectmen's handling of town finance matters

15   including, for example, their lack of support for the

16   Quinn Bill which she voiced during recent Finance

17   Committee meetings?

18        A.    He actually, one of the newspaper

19   articles, I believe, after the nonreappointment, he

20   was quoted as making reference to the Quinn Bill.

21        Q.    Is that the only fact upon which you base

22   that allegation?

23        A.    Primarily.

24        Q.    Is that the only fact upon which you base

1    that allegation?

2         A.    We did have arguments about it, yes.

3         Q.    You and Mr. Cerreta had arguments about

4    it?

5         A.    In the context of a Finance Committee

6    meeting, not directly between ourselves.

7         Q.    Is that the only fact upon which you base

8    your allegation that Mr. Cerreta based his decision

9    not to reappoint you upon the information set forth

10   in that paragraph?

11        A.    No.  I think there were other factors.

12   That's not the only one.

13        Q.    What are they?

14        A.    I did criticize the Board, my criticism

15   of the way they handled things, not just specifically

16   to the Quinn Bill.

17        Q.    I'm asking you about this particular

18   paragraph.  You make a very specific allegation in

19   this paragraph.

20             MR. MILES:  Talking about paragraph

21        31?

22             MS. PELLETIER:  31.

23        Q.    (By Ms. Pelletier)  All I want to know is

24   what facts, what are the facts upon which you base

1    this allegation, and that is, that Cerreta based his

2    decision not to reappoint Karowski upon her criticism

3    of the Selectmen's handling of town financial matters

4    including, for example, their lack of support for the

5    Quinn Bill which she voiced during recent Finance

6    Committee meetings.  What are the facts upon which

7    you base that allegation other than those which

8    you've already articulated?

9         A.    The quotes he made in the newspaper, his

10   reaction toward me in Finance Committee meetings.

11        Q.    What is his reaction towards you in the

12   Finance Committee meetings, did he disagree with you?

13        A.    Yes.

14        Q.    That's the only fact that you are basing

15   your allegation on, he disagreed with you?

16        A.    Primarily, I don't know that --

17        Q.    Unfortunately, when you say primarily, I

18   have to ask you what other facts exist.  So, I

19   understand that's normally a statement you would make

20   every day, but unfortunately, in the course of a

21   deposition, if you say primarily, that's going to

22   lead me to assume there are other facts.

23             Sitting here today, can you articulate

24   any other facts other than those already articulated

1    to support that allegation?

2        A.    No.

3        Q.    Paragraph 22 of your complaint, you

4    allege, quote, Morris based his decision upon his

5    perception that Karowski, quote, relentlessly

6    criticized, end quote, the Selectmen for decisions

7    they made as police commissioners, end quote.  Upon

8    what facts do you base that allegation?

9        A.    Same thing.  It's the way I -- the letter

10   I was given signed by Mr. Morris and his comments in

11   the newspaper that was the basis of his decision.

12       Q.    Any other facts?

13       A.    No.

14       Q.    In paragraph 33, you allege, quote,

15   Haskell found Karowski's criticism, quote,

16   unacceptable, end quote, and said, quote, during the

17   budget process she was certainly less than

18   enthusiastic about how we were handling the budgets

19   that are under her control, end quote.  Upon what

20   facts do you base that allegation?

21       A.    It was the quote that he made in the

22   newspaper.

23       Q.    Any other facts?

24       A.    Can I just read that again?

1    Q.    For the record, you're reading it on

2    counsel's computer screen, is that fair to state?

3    A.    Yes.

4              MR. MILES:  It referring to the

5    paragraphs 33 through 36.

6              MS. PELLETIER:  It referring to

7    paragraph 33, which is the paragraph I just

8    read her.

9              MR. MILES:  Right.  And on the

10   screen is paragraphs 33, 34, and 35 in their

11   entirety and 36 in part.

12             THE WITNESS:  Could you repeat your

13   question?  I'm sorry.

14   Q.    (By Ms. Pelletier)  Were those the only

15   -- was that the only fact upon which you base that

16   allegation, that being that it was reported in the

17   newspaper?

18   A.    And his behavior towards me at Finance

19   Committee meetings.

20   Q.    Again, is his behavior towards you that

21   he disagreed with you?

22   A.    Not that he disagreed with me, that he

23   wouldn't allow me to disagree with him.

24   Q.    How would he not allow you to disagree

1          A.      Not for that purpose, no.

2          Q.      You never lost any income as a result of

3   any action by the defendants in this case, is that

4   fair to state?

5          A.      Yes.

6          Q.      For what period of time do you claim to

7   have suffered this emotional distress because you are

8   a single parent and you would have lost half your

9   income?

10         A.      During the time before my reappointment.

11         Q.      For what period of time?

12         A.      Sometime in July to sometime in November.

13         Q.      Did you seek employment elsewhere?

14         A.      I did not.

15         Q.      Did you seek any medical attention of any

16  sort?

17         A.      I did see a therapist on two occasions,

18  psychologist.

19         Q.      You did not identify the psychologist in

20  your automatic disclosure, is that correct?

21         A.      I don't know.  I thought we had.

22  Apparently not.

23         Q.      You said apparently not?

24         A.      Yes.

1                        (Mr. Cerreta and Mr. Morris now

2                        present)

3                        MS. PELLETIER:  I'm going to end up

4            having to mark this.  This is the automatic

5            disclosure.  I'm going to do it after.

6                        MR. MILES:  Sure.

7            Q.    (By Ms. Pelletier)  When I asked you

8       about your damages, you indicated that your damages

9       were, quote, unquote, primarily emotional and that

10      you suffered from stress, is that correct?

11           A.    Yes.

12           Q.    Other than that which you've already

13      articulated, is there any other way that you can

14      describe for me the damages that you claim you

15      suffered?

16           A.    There were places I went where if I just

17      said my name, they'd say, oh, you're that Karen.

18      Comments made at basketball games that I went to with

19      my son in other towns.  I went to a collector

20      treasurer meeting that same month in July, same

21      reaction, you know.  We had name tags.  People

22      approached me, oh, you're that person.  And, you

23      know, the assumption that I had done something wrong.

24           Q.    That was your assumption?

1     A.    Other people's assumption.

2     Q.    Did someone articulate that to you at any

3    of these events?

4     A.    Not in detail, just in general, you know.

5    It was in the paper what, you know.

6     Q.    No, I don't.

7     A.    The fact that I was not reappointed

8    indicated that there was something wrong with my

9    performance for them to have done that.

10     Q.    People specifically articulated that to

11    you?

12     A.    Some, yes.

13     Q.    Can you identify those individuals?

14     A.    Not specifically, no.

15     Q.    Not one?

16     A.    No.

17     Q.    That caused you emotional distress, that

18    manifested itself how?

19     A.    It was uncomfortable going out, going out

20    around town, not knowing how people did feel about

21    it, not having been able to defend myself against the

22    accusations.  They were only seeing one side of it.

23     Q.    Other than not being comfortable going

24    around town, did it manifest itself in any other way?

1          A.    I looked at other jobs.  I didn't apply

2     for any, but I looked at other jobs, but it's a

3     little difficult to submit an application somewhere

4     when, you know, publicly, you've not been reappointed

5     for some reason, and the position was not being

6     advertised.  At that point I was able to stay in the

7     position only until this was resolved or a suitable

8     replacement was found.  That was in the newspaper.

9     Which would make it difficult to go find another job

10    when in fact I wanted to keep the one I had.

11         Q.    But my question relates to how this

12    manifested itself in you, how did it affect you, that

13    you claim you --

14         A.    Depressed, sad.

15         Q.    Did you seek any help for depression

16    other than that which you've already discussed?

17         A.    No.

18         Q.    Do you claim that you were actually

19    suffering from clinical depression?

20         A.    No.

21         Q.    Were you ever prescribed any kind of

22    medication for depression?

23         A.    No.

24         Q.    So, are you using the term depressed in

1    the nonclinical sense?

2        A.    Yes.

3        Q.    Anything else?

4        A.    I'd get through the day, do my job and go

5    home and some days not be able to do anything else.

6        Q.    How often did that happen?

7        A.    More often than not.

8        Q.    Can you --

9        A.    I had horses.  I was training a young

10    horse at the time, and there were some times three,

11    four days went by, other than to feed him, I did

12    nothing.  There were games I missed of my son's.

13        Q.    Do you have any mechanism for documenting

14    the number of times you missed any of these events?

15        A.    I don't know.

16        Q.    Did that subside at some point?

17        A.    Well, once I was reappointed, I felt a

18    little bit more secure at least until the end of June

19    when the reappointment -- the appointment would come

20    up again.

21        Q.    Did you receive any negative comments as

22    a result of the filing of this litigation?

23        A.    There was one reported back to me.

24        Q.    Just one?

THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

Western Division
Civil Action No.:  03-cv-30314-MAP

------------------------------------

KAREN KAROWSKI, Plaintiff,

v.

ERIC CERRETA, DAVID HASKELL, CHRISTOPHER MORRIS, and THE
INHABITANTS OF THE TOWN OF WILLIAMSBURG, Defendants.

============================================================

AFFIDAVIT OF PETER MAHIEU

===================================

I, Peter Mahieu, of 89 Nash Hill Road, Williamsburg,
Hampshire County, Massachusetts, hereby depose and say under the
pains and penalties of perjury that the following statements are
true:

1.   I have been a member of the Finance Committee of the Town
     of Williamsburg (FinCom) for the past seven years. I am
     in the first year of my third term.

2.   During my tenure on the FinCom, Karen Karowski became the
     FinCom's recording secretary and then an elected member
     of the FinCom.

3.   I have missed two or three FinCom meetings in the seven
     years that I have been a member of it.

> **EXHIBIT**
>
> D

4.  At the meetings at which Ms. Karowski spoke, she usually spoke as a FinCom member.

5.  When Ms. Karowski spoke on some issue that concerned the police department she identified herself as the police department secretary.

6.  Ms. Karowski was the Treasurer of the Town of Williamsburg during her tenure as a member of the FinCom.

7.  When Ms. Karowski spoke to the FinCom as the Town Treasurer and not as a FinCom member she clarified the capacity in which she spoke. The capacity in which Ms. Karowski spoke was always clear to me.

8.  No other member of the FinCom ever expressed confusion about the capacity in which Ms. Karowski spoke.

9.  Michael Beattie, another member of the FinCom, occasionally told Ms. Karowski in substance that she should not speak on certain topics because of the various positions she held. If Ms. Karowski disagreed, she would let Mr. Beattie know that and continue to speak. Mr. Beattie did not ask the Chair of the FinCom to rule Ms. Karowski out of order, and the Chair did not rule her out of order on the Chair's own motion. Mr. Beattie never expressed confusion about the capacity in which Ms. Karowski spoke to the FinCom.

Signed under the pains and penalties of perjury this  25ᵗʰ

day of May, 2006, at Williamsburg.

Respectfully submitted,
The Affiant

Peter Mahieu

THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

Western Division
Civil Action No.:  03-cv-30314-MAP

------------------------------------

KAREN KAROWSKI, Plaintiff,

v.

ERIC CERRETA, DAVID HASKELL, CHRISTOPHER MORRIS, and THE
INHABITANTS OF THE TOWN OF WILLIAMSBURG, Defendants.

=============================================================

AFFIDAVIT OF MAXINE G. SCHMIDT

================================

I, Maxine G. Schmidt, of 43 Fairview Ave., Northampton,

Hampshire County, Massachusetts, hereby depose and say under the

pains and penalties of perjury that:

1.   I am currently employed as a librarian at the University

of Massachusetts.

2.   I used to be a shared health agent for the Town of

Williamsburg, Whately, Ashfield and Goshen through the

Foothills Health District from July 1994 through

February, 2005. It was a full-time position until January

of 2005 when I went part-time. I left to finish my degree

in library science.

EXHIBIT

E

1

3.    I worked in Williamsburg Town Offices when I was
      performing services for Williamsburg on Main Street in
      Haydenville at the Town Offices.

4.    I worked upstairs from Karen Karowski in the same
      building.

5.    I remember that I had a conversation with her about a
      person who had been incarcerated. It was the only
      conversation I ever had with Karen Karowski about any
      person who had been incarcerated.

6.    On the day of the conversation, I was going to issue an
      enforcement order against a person for housing code
      violations.

7.    The person would have had a very short time to comply
      with the enforcement order.

8.    I had found out through the newspapers and the person's
      tenant that the person had been incarcerated, and I did
      not want to issue an order to the person with which the
      person could not comply because he was incarcerated.

9.    I did not find out that the person had been incarcerated
      through Karen Karowski.

10.   I was walking by the Collector's office when I saw Karen
      Karwoski. I asked Karen Karowski if the person was still
      locked up and she said she did not know.

2

11. Tess Barstow, the tax collector, may have been in the office.

12. None of the Selectmen ever approached me about the conversation.

13. To my knowledge, there was never any attempt to investigate the conversation or to verify what I had said to Karen Karowski and what she had said to me.

Signed under the pains and penalties of perjury this 25th day of May, 2006, at Northampton.

Respectfully submitted,
The Affiant

*Maxine Schmidt*

Maxine G. Schmidt

3