**PATRICK ARCHBALD**
**November 19, 2004**

ORIGINAL

Page 1

1                COMMONWEALTH OF MASSACHUSETTS

2              Department of the Trial Court

3

4    Western Division      C.A No.:  03-CV-30314-MAP

5

6    * * * * * * * * * * * * * * * *

7    KAREN KAROWSKI,                    *

8             Plaintiff                 *

9    v.                                 *

10   ERIC CERRETA, DAVID HASKELL,       *

11   CHRISTOPHER MORRIS, AND THE        *

12   INHABITANTS OF THE TOWN OF         *

13   WILLIAMSBURG,                      *

14           Defendants                 *

15   * * * * * * * * * * * * * * * *

16

17        DEPOSITION OF:  PATRICK ARCHBALD

18          Green, Miles & Fitz-Gibbon

19               77 Pleasant Street

20          Northampton, Massachusetts

21             November 19, 2004

22

23          Jessica M. DeSantis

24            Court Reporter

EXHIBIT

F

**PATRICK ARCHBALD**
**November 19, 2004**

Page 16

1    secretary is appointed annually, also; is that

2    correct?

3         A.    Repeat the question.

4         Q.    Yes.

5               Is it accurate to say that the

6    police secretary is appointed annually, as well,

7    at this moment in time?

8         A.    I believe that's the case.

9         Q.    Okay.  Was that always the case.

10              MS. PELLETIER:  Objection.  Go

11         ahead.

12              THE WITNESS:  I don't believe that

13         was always the case.

14         Q.    (By Mr. Miles)  Okay.  Tell us what

15    your experience has been?

16              MS. PELLETIER:  Objection.  Go

17         ahead.

18              THE WITNESS:  My recollection is

19         that the secretary's position was not part

20         of the appointment/non appointment duties

21         of the board.

22         Q.    (By Mr. Miles) And was that the

23    situation when you came on board as chief?

24         A.    That's my recollection, yes.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

**PATRICK ARCHBALD**
**November 19, 2004**

Page 17

1      Q.    Do you know how long that had

2  existed?

3              MS. PELLETIER:  Objection.  Go

4      ahead.

5              THE WITNESS:  From the time I became

6      chief until the time I received a call of

7      it that she had not been appointed.

8      Q.    (By Mr. Miles)  When you say she

9  you're talking about Ms. Karowski?

10     A.    Correct.

11     Q.    How then was the police secretary

12  hired?

13             MS. PELLETIER:  Objection.  Go

14     ahead.

15             THE WITNESS:  I hired her.

16     Q.    (By Mr. Miles)  When did you hire

17  her?  And, is Karen Karowski the only police

18  secretary you've ever had?

19     A.    No.

20     Q.    Okay.  Who did you have before Karen

21  Karowski?

22     A.    Woman by the name of Roena Golash.

23     Q.    I'm sorry?

24     A.    Golash.

PATRICK ARCHBALD
November 19, 2004

Page 19

1    trial period.  Maybe something less than 20

2    hours.

3         Q.     And then in 1997, what happened?

4         A.     She was hired by me to work 20 hours

5    a week.

6         Q.     Did you get the approval by the

7    board of selectmen?

8         A.     I don't recall.

9         Q.     Did you submit her name for

10   approval?

11        A.     I don't recall.

12        Q.     We don't have her personnel file

13   back, but do you remember if there's any document

14   in the personnel file concerning her initial

15   hiring?

16        A.     I don't.

17        Q.     From after 1997, when she was first

18   hired did you ever go to the selectmen to approve

19   her hiring or retention?

20        A.     No.  I'm sorry.  The question about

21   hiring.  I believe I hired her exclusively.

22        Q.     Okay.

23        A.     And I don't recall ever going to the

24   board to have any discussion about a

**PATRICK ARCHBALD**
**November 19, 2004**

Page 23

1      Q.     What does it mean to you?

2      A.     You are doing your job and doing it

3 well.

4      Q.     And did Karen Karowski get several

5 good guy letters or good guy communications?

6           MS. PELLETIER: Objection. Go

7           ahead.

8           THE WITNESS: I'd have to look at

9           the personnel file.

10           Yes, there are a few in here from

11           me.

12      Q.     (By Mr. Miles) Okay. And I noticed

13 there was one in particular that is a piece of

14 white paper with the word excellent and a couple

15 of explanation points after the word.

16         Do you have any idea what that

17 concerns?

18      A.     I don't. I suspect it was attached

19 to something at some time and got unattached.

20      Q.     Do you recall any particular

21 instances when Karen Karowski's work was

22 exceptional?

23      A.     Yes.

24      Q.     Could you describe them?

PATRICK ARCHBALD
November 19, 2004

Page 24

1        A.      That would have been work around the

2    grants.  Her organizational skills, as I recall,

3    were exceptional.

4        Q.      And what years did you -- did that

5    occur?

6        A.      1998, through 2001.

7        Q.      What did she do?

8        A.      She assisted me with keeping on

9    track with -- there was a board that was formed

10   to manage the grant.  And I asked Karen to keep

11   board members on track and organized, prepared

12   for meetings.  It was a 15-person board so it was

13   a lot of administrative work involved.

14       Q.      And is she still working 20 hours a

15   week?

16       A.      She was.

17       Q.      And how many days a week did she

18   work?

19       A.      Five.

20       Q.      So she'd work four hours a day?

21       A.      That's right.

22       Q.      Did she ever work overtime?

23       A.      For pay?

24       Q.      Just, did she ever work overtime?

PATRICK ARCHBALD
November 19, 2004

Page 29

1     Q.    And, again, how frequently did you

2   hear about that from other officers?

3     A.    In this particular case of visitors

4   doing town business in the police station.  It

5   would have only been Sergeant Graham who brought

6   it to my attention a handful of times.

7     Q.    Did you speak to Ms. Karowski about

8   that?

9     A.    I did not have an issue with it.

10    Q.    Okay.

11    A.    No.

12    Q.    And I take it then you didn't

13  discipline her for that?

14    A.    I did not.

15    Q.    Okay.  Do you know if other town

16  officials came to the police station to do town

17  business with Ms. Karowski?

18    A.    Yes.

19    Q.    Okay.  And do you know who came to

20  the police station to do town business with Ms.

21  Karowski?

22    A.    Over her full employment?

23    Q.    Yes.

24    A.    I've seen many select board members.

PATRICK ARCHBALD
November 19, 2004

Page 30

1    Well, I've seen Chris Morris at our station.

2    Jeff Ciuffreda.

3          Q.      Mr. Ciuffreda was a selectman at

4    some point?

5          A.      Yes.

6          Q.      And do you know how to spell his

7    name?

8          A.      C-I-U-F-F-R-E-D-A.

9          Q.      Go ahead.

10         A.      Dick Childs was a frequent

11   visitor.

12         Q.      Was he a selectman as well?

13         A.      No.  On another board.  Water and

14   sewer possibly.

15         Q.      All right.

16         A.      Michael Beady.

17         Q.      And what was his position?

18         A.      I don't know at the time.  And in

19   terms of Michael Beady.  I don't know if, at the

20   time he was at our station, whether he was a part

21   of a board or not.

22              But the others I am certain were

23   there in their official capacity.

24         Q.      How often did Mr. Morris visit the

PATRICK ARCHBALD
November 19, 2004

Page 32

1          ahead.

2                   THE WITNESS:  Not that I recall.

3          Q.      (By Mr. Miles)  Okay.  And did you

4    have any policy with respect to the conducting of

5    town business that was not police business in the

6    police station?

7          A.      A policy?

8          Q.      Yes.

9          A.      No.

10         Q.      Did you ever prohibit Ms. Karowski

11   to conduct non police business in the police

12   station?

13         A.      Forbid, no.

14         Q.      Okay.  Did you ever discourage her

15   from conducting non police business in the police

16   station?

17         A.      Yes.

18         Q.      And when did you do that?

19         A.      I don't recall.

20         Q.      Was it within the last year?

21         A.      No.

22         Q.      How long ago was it if you

23   remember?

24         A.      If I could look at the

PATRICK ARCHBALD
November 19, 2004

Page 33

1   evaluations.

2          Q.      Sure.  Go ahead.

3          A.      1999, approximately.

4          Q.      Okay.  Did she -- did you and she

5   have a discussion about it?

6          A.      I don't recall.

7          Q.      Okay.  How did you discourage her

8   from doing non police business in the police

9   station?

10         A.      By business you mean phone or

11  personal?  I mean, person to person or by phone

12  business?

13         Q.      All right.

14         A.      I never discouraged her from

15  doing -- by people coming in to do town business.

16  I understood that that needed to happen.

17              But from times when officers might

18  bring it to my attention that Karen was on the

19  phone doing non police business.  That is --

20  those officers brought that to my attention and

21  then I spoke with Karen.

22         Q.      Now, you said you got a complaint

23  from the select board about Ms. Karowski doing

24  non police business at the police station.

PATRICK ARCHBALD
November 19, 2004

Page 34

1              **When did that occur?**

2        A.        It was a meeting I had with Chris

3    Morris when he came to the station.

4        Q.        **When was that?**

5        A.        I don't recall.

6        Q.        **Was it this year?**

7        A.        No.

8        Q.        **Was it 2003?**

9        A.        May have been.

10       Q.        **Was it 2002?**

11       A.        More likely 2003.

12       Q.        **Was it before or after Ms. Karowski**

13   **had been reappointed in 2000?**

14       A.        Before.

15       Q.        **What did Mr. Morris say to you and**

16   **what did you say to him?**

17       A.        The general context of the

18   conversation, my recollection, is that it was

19   believed there was excessive conversation going

20   on during the day about town business, not police

21   related, from Karen.

22       Q.        **Did Mr. Morris tell you from who he**

23   **had learned this?**

24       A.        I don't recall.

**PATRICK ARCHBALD**
**November 19, 2004**

Page 35

1      Q.      Did Mr. Morris indicate to you why

2    that was a concern -- strike that.

3                Was Mr. Morris speaking on behalf of

4    the select board or individually?

5      A.      I believe at the time, I believe, it

6    was a concern for all board members, yes.

7      Q.      Was Mr. Morris police liaison at

8    that time?

9      A.      I believe so.

10      Q.      Did he make the complaint in

11    writing?

12      A.      No.

13      Q.      Did you object to specific kinds of

14    non police business being conducted in the police

15    station?

16      A.      I don't recall.

17      Q.      And did he ask you to do anything in

18    particular?

19      A.      I left that meeting with the

20    expectation that I would follow up and correct

21    the behavior.

22      Q.      And what did you do?

23      A.      I did nothing with that

24    information.

**PATRICK ARCHBALD**
**November 19, 2004**

Page 36

1    Q.    And why is that?

2    A.    It wasn't a significant enough

3  concern for me.

4    Q.    Did you report back to Mr. Morris

5  about any follow up?

6    A.    No.

7    Q.    Did Mr. Morris inquire again about

8  any follow up?

9    A.    No.

10    Q.    Did you receive any inquiry from any

11  other board of selectmen about Ms. Karowski

12  conducting non police business at the police

13  station?

14    A.    No.

15    Q.    Did you receive any inquiry from any

16  other town official regarding Ms. Karowski

17  conducting non police business at the police

18  station?

19    A.    No.  That was not the sum total of

20  the conversation.

21    Q.    I'm sorry.  Then give me the sum

22  total of the conversation, please.

23    A.    I left that meeting with the clear

24  understanding that the board had gotten

**PATRICK ARCHBALD**
**November 19, 2004**

Page 39

1    talk to you about Ms. Karowski representing the

2    police department without authority?

3                    MS. PELLETIER:  Objection.  Go

4        ahead.

5                    THE WITNESS:  Repeat the question.

6        Q.      (By Mr. Miles)  Did Mr. Morris ever

7    talk to you about Ms. Karowski representing the

8    police department inappropriately?

9                    MS. PELLETIER:  Objection.  Go

10       ahead.

11                   THE WITNESS:  Yes.

12       Q.      (By Mr. Miles)  And when did he talk

13   to you about that?

14       A.      I believe it was at this meeting.

15       Q.      What did he say?

16       A.      That with some of her involvement in

17   other boards she would express opinions, strong

18   opinions, about how she thought things should be

19   run and decisions should be made.

20       Q.      Did he object to that?

21       A.      Yes.

22       Q.      And what did he say?

23       A.      I believe he felt that she was

24   acting outside her scope of her job.

PATRICK ARCHBALD
November 19, 2004

Page 40

1 Q. Did he ask you to do anything about

2 it?

3 A. I don't recall.

4 Q. Did he provide you anything in

5 writing indicating that she -- that Ms. Karowski

6 had acted outside the scope of her employment?

7 A. No.

8 Q. Did he tell you that you were the

9 person to represent the police department at

10 board meetings?

11  MS. PELLETIER:  Objection.  Go

12  ahead.

13  THE WITNESS:  I don't recall.

14 Q. (By Mr. Morris)  Did he indicate to

15 you that you were the individual -- strike that.

16  Did he indicate or say to you that

17 you were the sole individual who could represent

18 the police department?

19  MS. PELLETIER:  Objection.  Go

20  ahead.

21  THE WITNESS:  I don't recall.

22 Q. (By Mr. Miles)  Did any of the other

23 selectmen make any statements to you about Ms.

24 Karowski's behavior at other town board

**PATRICK ARCHBALD**
**November 19, 2004**

Page 41

1    meetings?

2          A.      Yes.

3          Q.      **Who else talked to you about it?**

4          A.      Previous board member, Bertle

5    Leander.

6          Q.      **What did Mr. Leander say?**

7          A.      He was concerned about the many hats

8    that Karen wore and expressing opinions outside

9    her scope.

10         Q.      **When did he express concern?**

11         A.      I don't recall.

12         Q.      **Was he a member of the board at the**

13   **time he expressed this concern?**

14         A.      He was.

15         Q.      **And do you remember when he was a**

16   **member of the board of selectmen?**

17         A.      I don't.

18                 Can I make a point of clarification?

19         Q.      **Sure.**

20         A.      The conduct which was brought to my

21   attention at the meeting by Mr. Morris was

22   conduct that I understood -- I left that meeting

23   understanding that it was taking place while she

24   was in her capacity outside the four corners of

PATRICK ARCHBALD
November 19, 2004

Page 42

1    my building of the police station.

2         Q.      And did you also understand it was

3    conduct that took place which was at the inner

4    capacities as a member of the finance

5    committee?

6         A.      Yes.

7         Q.      And with respect to Mr. Leander.

8    Was he talking about the same kind of conduct?

9         A.      Yes.

10         Q.      Did you take any action based upon

11    Mr. Leander's statement?

12         A.      No.

13         Q.      Did you take any action based upon

14    Mr. Morris' statement?

15         A.      No.

16         Q.      Did Ms. Karowski stay at the police

17    station after her normal hours at any time to

18    conduct business as treasurer?

19         A.      Not that I know.

20         Q.      Did anybody ever inform you that she

21    was doing that?

22         A.      No.

23         Q.      Now, did you ever receive any

24    complaint from Marge Dunfee about Ms. Karowski?

PATRICK ARCHBALD
November 19, 2004

Page 43

```
 1        A.    No.

 2        Q.    Did you ever receive any complaint

 3   that Ms. Karowski had disclosed confidential

 4   information?

 5        A.    Yes.

 6        Q.    And when did you receive that

 7   complaint?

 8        A.    I believe that was the meeting with

 9   Mr. Morris.

10        Q.    So this was all in the same

11   meeting?

12        A.    I believe so.

13        Q.    What did Mr. Morris say?

14        A.    I believe there was question about

15   confidential information being overheard at the

16   town hall.

17        Q.    Did he say what confidential

18   information had been overheard?

19             MS. PELLETIER:  Object.  And I don't

20        know if he knows details, but if he does,

21        because it was confidential details, I

22        don't want him testifying as to the

23        identity of anybody involved.  If he can

24        testify generally to the subject matter,
```

PATRICK ARCHBALD
November 19, 2004

Page 45

1   there were two other employees of the town Maxine

2   Smith and Tess Barstow.

3       Q.      And what else did he say?

4       A.      I just remember the allegation that

5   there was police information that was

6   confidential that was shared at the town hall.  I

7   don't remember the detail.

8       Q.      Did he tell you how it came to his

9   attention?

10      A.      I don't recall.

11      Q.      Did he tell you who brought it to

12  his attention?

13      A.      I don't recall.

14      Q.      Did you document this conversation

15  with Mr. Morris in anyway?

16      A.      I didn't.

17      Q.      And did you talk to Ms. Karowski

18  about it?

19      A.      I don't recall.

20      Q.      I take it from your answer that you

21  didn't institute any disciplinary action against

22  Ms. Karowski as a result of this conversation?

23      A.      Correct.

24      Q.      And why was that?

**PATRICK ARCHBALD**
**November 19, 2004**

Page 84

1      Q.      And when has he had conversations

2   about Ms. Karowski?

3      A.      Normal course of business.  I don't

4   recall the dates.

5      Q.      Has he had any conversations with

6   you about Ms. Karowski in which he was critical

7   about the way she performed any aspect of her

8   job?

9      A.      Not that I recall.

10     Q.      In the last year has any other

11  officer had any conversation with you in which

12  that officer was critical about the manner in

13  which Ms. Karowski performed any aspect of her

14  job?

15     A.      Yes.

16     Q.      Okay.  Who talked to you?

17     A.      Without being able to give dates I

18  think every officer in the department.

19     Q.      I'm saying within the last year?

20     A.      Oh, within the last year.  It would

21  just be a guess.

22     Q.      Okay.  Do you have any specific

23  memory of any particular criticism that any

24  officer has brought to your attention about the

**PATRICK ARCHBALD**
**November 19, 2004**

Page 85

1   manner in which Ms. Karowski performed her job in

2   the last year?

3        A.      Can you repeat the question?

4        Q.      Sure.

5                Do you have any specific

6   recollection of any conversation with any officer

7   in which the officer criticized any aspect of the

8   manner in which Ms. Karowski performed her job in

9   the last year?

10       A.      Yes.

11       Q.      What is your memory?

12       A.      Corporal Skobal and Sergeant Graham

13  spoke to me about, a few months ago, about filing

14  paperwork.

15       Q.      And what did they say?

16       A.      They thought that the paperwork

17  should take priority and should be filed first

18  thing in the morning and that they did not think

19  it was happening and wanted me to talk to her.

20       Q.      Did you?

21       A.      I did.

22       Q.      What was the response?

23       A.      It's been corrected.

24       Q.      Now, in the year before Ms. Karowski

PATRICK ARCHBALD
November 19, 2004

Page 88

1      A.      I don't.

2      Q.      And what did you say to Mr. Haskell

3  and what did he say to you?

4      A.      I don't know the specifics.  Just a

5  general recollection that he took issue with her

6  criticism of the board.

7      Q.      Did he say anything specific about

8  it?

9      A.      Not that I recall.

10      Q.      Do you have any recollection of

11  speaking with Mr. Cerreta about Ms. Karowski's

12  criticism of the board?

13      A.      No.

14      Q.      During the conversation with

15  Mr. Haskell did the issue of freedom of speech

16  come up at all?

17      A.      I don't recall.

18      Q.      During the conversation with

19  Mr. Morris did the -- about Ms. Karowski's

20  criticism of the board, did the issue of freedom

21  of speech come up at all?

22      A.      In my mind it did, but I don't

23  recall saying it to him.

24      Q.      Did he say anything to you about

PATRICK ARCHBALD
November 19, 2004

Page 89

1    it?

2              A.    No.

3                    MR. MILES:  Okay.  Can I have a

4         minute to talk to Ms. Karowski?

5                    MS. PELLETIER:  Sure.

6

7                    (Break taken)

8

9                    MR. MILES:  Back on the record.

10         Q.    (By Mr. Miles)  I may have asked you

11    this.  If I did I apologize.

12              Did you talk to any of the selectmen

13    about your evaluations of Ms. Karowski before her

14    non reappointment?

15                    MS. PELLETIER:  You did ask him the

16         question, but you can ask him again.

17                    THE WITNESS:  No.

18         Q.    (By Mr. Miles)  Have you talked with

19    any of the selectmen since Ms. Karowski was

20    reappointed about your evaluations of her?

21              A.    Not that I recall.

22         Q.    Okay.  And did any of the selectmen

23    approach you or talk to you about your

24    evaluations of Ms. Karowski?

**PATRICK ARCHBALD**
**November 19, 2004**

Page 102

1    the office about Karen being involved with inner

2    wranglings of the town.

3         Q.    Okay.  That was a concern of yours

4    and you put it in your evaluation?

5         A.    Yes.

6         Q.    The other items, the specific items

7    that you testified to with regard to the

8    conversation with Mr. Morris including, but not

9    limited to, a representation to you that Ms.

10   Karowski had breached confidentiality are not

11   contained in her personnel file; is that

12   correct?

13        A.    Right.

14        Q.    You also testified that you did not

15   have communications with Ms. Karowski about that,

16   correct?

17        A.    That's right.

18        Q.    So members of the board raised

19   concerns about Ms. Karowski to you as their

20   direct supervisor, correct?

21        A.    Yes.

22        Q.    But you didn't bring them up to

23   her?

24        A.    That's right.  I did not agree with

**PATRICK ARCHBALD**
**November 19, 2004**

Page 103

1    it.  I was not satisfied that those problems were

2    in her performance while police secretary.

3          Q.      What about the communication of

4    police information to the public and breech of

5    confidentiality?

6          A.      That would be excluded, yes.

7          Q.      And you still didn't talk to her

8    about it?

9          A.      That's right.

10         Q.      And you can't tell us why?

11         A.      No.

12         Q.      But when a couple of police officers

13   talk to you about filing.  You did talk to her?

14         A.      That's right.

15         Q.      Okay.  You can't tell us why you

16   would have done that, but not talked to her about

17   the breached confidentiality of the police

18   department?

19         A.      Could you repeat that?

20         Q.      You felt it necessary to talk to Ms.

21   Karowski about the filing, but not about

22   breaching the confidentiality of the police

23   department?

24         A.      That's right.

PATRICK ARCHBALD
November 19, 2004

Page 105

1    further questions.  Thank you.

2

3    REDIRECT EXAMINATION BY MR. MILES:

4

5        Q.    Would one of the reasons you

6    wouldn't put it in her personnel file is that you

7    were satisfied that it didn't occur?

8            MS. PELLETIER:  Objection.

9            THE WITNESS:  Occur the way it was

10           reported to me by Mr. Morris, correct.

11           MR. MILES:  I don't have any further

12           questions.

13

14   RECROSS EXAMINATION BY MS. PELLETIER:

15

16       Q.    On what basis do you have to make

17   the statement that you wouldn't put it in her

18   personnel file because you were satisfied that it

19   didn't occur the way it was reported to you by

20   Mr. Morris?

21       A.    I'm sorry.  Was that a question?

22       Q.    Yeah, it was a question.

23       A.    Sorry.

24           MS. PELLETIER:  Can you read it

**PATRICK ARCHBALD**
**November 19, 2004**

Page 106

 1          back?  Well, strike the question.

 2              Q.      (By Ms. Pelletier)  Do you have any

 3      reason to believe sitting here today that the

 4      incident did not occur as reported to you by

 5      Mr. Morris?

 6              A.      Yes.

 7              Q.      What would that be?

 8              A.      Very generally, I don't recall the

 9      specifics.  I have had conversations with Ms.

10      Karowski about her side of that situation.

11              Q.      Well, I just asked you, did I not,

12      whether or not you communicated with Ms. Karowski

13      about that incident and you indicated that you

14      have no recollection of that?

15              A.      Of the evaluation.

16              Q.      No, I didn't ask you that.

17              A.      I thought it was in reference to the

18      evaluation.

19              Q.      Nope.

20                      We can go back to the questions if

21      you like?

22              A.      Okay.

23              Q.      I'll go back to the questions, sir.

24                      There were complaints that were

1

```
 1              COMMONWEALTH OF MASSACHUSETTS

 2            Department of the Trial Court

 3

 4   Western Division    C.A NO.:  03-CV-30314-MAP

 5

 6   * * * * * * * * * * * * * * * *

 7   KAREN KAROWSKI,                 *

 8             Plaintiff            *

 9   v.                              *

10   ERIC CERRETA, DAVID HASKELL,    *

11   CHRISTOPHER MORRIS, AND THE     *

12   INHABITANTS OF THE TOWN OF      *

13   WILLIAMSBURG,                   *

14             Defendants           *

15   * * * * * * * * * * * * * * * *

16

17        DEPOSITION OF:  CHRISTOPHER MORRIS

18          Green, Miles & Fitz-Gibbon

19             77 Pleasant Street

20          Northampton, Massachusetts

21             November 19, 2004

22

23          Jessica M. DeSantis

24             Court Reporter
```

EXHIBIT

G

```
 1        Q.      What's your marital status?

 2        A.      I am married.

 3        Q.      And what is your wife's name?

 4        A.      Michelle Joseph Morris.

 5        Q.      Do you have any children?

 6        A.      I have two children.

 7        Q.      How old are they?

 8        A.      My older son is 15 and the younger

 9   one is 12.

10        Q.      What is your 15 year old's name?

11        A.      His name is William.

12        Q.      What is your 12 year old's name?

13        A.      His name is Sam.

14        Q.      How long have you lived in

15   Williamsburg?

16        A.      For about nine years.  It's the only

17   place I've lived in Williamsburg.

18        Q.      And where did you live before

19   that?

20        A.      I lived in West Lynn, Oregon.

21        Q.      Are you a lawyer?

22        A.      I am.

23        Q.      And are you licensed to practice in

24   Massachusetts?
```

6

```
1        A.     Yes, I am.

2        Q.     When were you admitted?

3        A.     1995.

4        Q.     Before you were -- sorry.

5               When did you go to law school?

6        A.     Graduated from law school in 1992.

7               Did you ask me where?

8        Q.     Sorry.  I asked you when.

9        A.     When.  Yes.

10        Q.     Where did you go to law school?

11        A.     I went to the Northwestern School of

12   Law at Lewiston Clark College in Portland,

13   Oregon.

14        Q.     What is your date of birth?

15        A.     My date of birth is 12.27.59.

16        Q.     What did you do before you went to

17   law school?

18        A.     I was playing music in

19   Philadelphia.

20        Q.     What kind of music were you

21   playing?

22        A.     I was playing popular rock music.

23        Q.     Were you a member of a band?

24        A.     Yes, I was.
```

1        A.     Yes.

2        Q.     What made it unclear to you whether

3   she was speaking as a finance committee member or

4   a representative of the police department?

5               MS. PELLETIER:  Objection.  Go

6         ahead.

7               THE WITNESS:  I can't recall that

8         Ms. Karowski ever made it clear that she

9         was not speaking -- I can't recall her ever

10        saying she was not speaking for the police

11        department.

12       Q.     (By Mr. Miles)  Did she ever say

13   that she was speaking for the police

14   department?

15       A.     I can't recall that.

16       Q.     Did she ever say that she was

17   speaking as a representative of the police

18   department?

19       A.     I can't recall that.

20       Q.     Did she ever say that she was

21   speaking at the direction of the chief for the

22   police department?

23       A.     No.

24       Q.     Did you ever approach Ms. Karowski

46

1    Exhibit 1?

2        A.    No, we did not.

3        Q.    Did you act as an attorney in any of

4    your dealings with the board in terms of Exhibit

5    1?

6        A.    No.    In the sense that I gave other

7    members of the board any kind of legal advise.

8    No, I did not.

9        Q.    In what manner did you understand,

10   you individually, understand Ms. Karowski to

11   attempt to undermine the authority of the

12   board?

13       A.    I think that in the sense that we're

14   the police commissioners.  We're elected to make

15   decisions regarding the police department.  And

16   for good or ill these are the decisions that we

17   make.  I think people are entitled to criticize

18   them, but I don't -- in Ms. Karowski's capacity

19   as police secretary I didn't feel that that was

20   appropriate because she is not the spokesman for

21   the department.

22              And I think it -- I was concerned

23   that it lent the impression to people that

24   there's dissension within the police department

1    that the chief is upset with our decisions and

2    that the ranking file officers may be unhappy

3    with our decisions, also.

4         Q.    Did you, you individually, speak

5    with any of the ranking file officers to see if

6    there was dissension in the department?

7         A.    No, I did not.

8              MS. PELLETIER:  Objection.  Go

9         ahead.

10             THE WITNESS:  No, I did not.

11        Q.    (By Mr. Miles)  Did you individually

12   speak with any of the ranking file officers to

13   determine whether they perceived that people

14   thought there was dissension in the department?

15             MS. PELLETIER:  Objection.  Go

16        ahead.

17             THE WITNESS:  No.

18        Q.    (By Mr. Miles)  Did you speak with

19   any of the ranking file officers about any of the

20   complaints about Ms. Karowski that you had spoken

21   to the chief about?

22        A.    No, I did not.

23        Q.    Do you know if any of the other

24   selectmen did?

1    distinction between discussing non police

2    business and discussing town business.

3        Q.    Feel free.

4        A.    'Cause it's not the same thing.

5        Q.    Then let me break the question down.

6              Before July 10th --

7              MS. PELLETIER:  Hang on a second.

8    You just said feel free.

9              THE WITNESS:  Maybe if you can just

10   clarify it.

11             MR. MILES:  Sure.

12             THE WITNESS:  Prior to our non

13   reappointment the issue was not -- I did

14   not have an issue with Ms. Karowski

15   performing town business at the station.

16   The issue was, I would say, I'm drawing a

17   distinction between conducting town

18   business, which would be someone calling

19   Karen with a payroll issue with discussing

20   town politics, which is, you know,

21   complaining about something we did at the

22   finance committee meeting last night.

23             And my sense is that Karen has every

24   right to her opinion and to express it, but

1          not in the police station during regular

2          office hours when she's supposed to be

3          doing police work.  That's the issue.  And

4          on her own she can say whatever she wants.

5          She has every right to her opinion.  It's

6          more -- it's time, place, and manner is

7          what I'm thinking.

8          Q.     (By Mr. Miles)  Okay.  Next

9     question.

10             When before July 10th, 2003, did Ms.

11    Karowski express her political opinions during

12    the time that she was working at the police

13    station?

14             MS. PELLETIER:  Objection.  Go

15        ahead.

16             THE WITNESS:  I know of it partly

17        because of what is in, I believe, one of

18        the evaluations where Chief Archbald raised

19        the issue.  That Karen was discussing

20        political goings on at the station.

21             There's -- I understand at times it's

22        a difficult distinction to make because in

23        some instances it would really relate to --

24        as it would relate directly to, I mean, the

```
1          ahead.
2               THE WITNESS:  So you're saying after
3          we voted not to reappoint her did we
4          contact Ms. Karowski and say would you want
5          to talk about this?
6               MR. MILES:  Correct.
7               THE WITNESS:  The only conversation
8          I had with Ms. Karowski, anything close to
9          that, not really -- I personally told Ms.
10         Karowski.  I agreed that I would go and
11         inform her of our decision.  Which we did
12         not think it was appropriate for her to
13         read about it in the newspaper.  The
14         reporter indicated that he was going to run
15         a story on it and that he wanted to talk to
16         her.  And I remember asking, could you give
17         us some time.  I think he gave us until
18         nine o'clock, something like that, before
19         he would start making phone calls to Karen
20         and the chief.
21              At that time I found Karen at the
22         town offices and informed her of our
23         decision.  And we began to have a
24         conversation of it.  And Karen abruptly cut
```

```
1        it off and left.  I hardly blame her.  She

2        was very upset and had every reason to be

3        upset.

4            And so that was really -- I don't

5        know if that was -- I think our only

6        contact with Karen about this until, oh,

7        probably until you came into the picture

8        I'd say.

9        Q.    (By Mr. Miles)  Did the board

10   advertise the position of secretary?

11       A.    No.

12       Q.    Did the board receive any

13   applications for the position of police

14   secretary?

15       A.    I don't know.

16            MS. PELLETIER:  I assume you're

17       talking about the non reappointment?

18            MR. MILES:  Yes.

19            THE WITNESS:  Again, reiterating

20       that we never -- I'll just reiterate that

21       we did not advertise the position.  I don't

22       believe we ever discussed advertising the

23       position and the position was never

24       advertised.
```

THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

Western Division
Civil Action No.:  03-cv-30314-MAP

-------------------------------------

KAREN KAROWSKI, Plaintiff,

v.

ERIC CERRETA, DAVID HASKELL, CHRISTOPHER MORRIS, and THE
INHABITANTS OF THE TOWN OF WILLIAMSBURG, Defendants.

===========================================================

PLAINTIFF'S AFFIDAVIT IN OPPOSITION TO THE DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT.

===========================================================

I, Karen Karowski, the plaintiff in this matter, make oath
and depose that the following statements are true, accurate, and
complete:

1.   I performed my duties as police secretary professionally
and efficiently.

2.   I never attempted attempted to undermine the authority of
the Select Board.

3.   As a member of the Finance Committee, I performed my duty
to participate in advising the Select Board about the Town's
financial concerns.

4.   For example, the Chief asked the Select Board to put an
article on the warrant for the annual Town meeting concerning



**EXHIBIT**

H

the Quinn Bill, which gives police officers additional compensation for educational achievement. At a joint Finance Committee / Select Board meeting, the defendant members of the Select Board waited for the Chief to leave the meeting and then told the Finance Committee that they would not put the Quinn Bill article on the warrant. I objected to them not putting the Quinn Bill article on the warrant. I stated that our form of government is town meeting, so that as long as the request is reasonable, it should be brought to town meeting.

5.    An article concerning the library had been proposed. At the same meeting, the defendant members of the Select Board said that they were not putting the library article on the warrant. I disagreed with that action as well. I said that the Board of Trustees of the Library had followed the process, were expecting the article to be on the warrant, and that it should be put before the Town meeting.

6.    This was a common pattern with which I disagreed.

7.    I have been accused of doing non-official or personal business at the police station while I was acting in my capacity as police secretary.

8.    I never did non-official or personal business at the police station.

2

9.   From time to time, I did official Town business at the
police station during the hours I was scheduled to be the police
secretary. Defendant Morris came to the police station to
conduct Town business during the entire time that he was a
Selectman. Bonnie Roberge, the Administrative Assistant to the
Select Board sent new Town employees over to the police station
to speak with me in my capacity as Town Treasurer. Sometimes she
sent people over concerning issues about the Town's insurance.
Telephone calls concerning issues for the Town Treasurer were
referred over to the police station. At that time, the Select
Board had made no provision for the Treasurer to have an office.
The Chief was fully aware of my activities and gave me
permission to conduct Town business that was not police business
at the police station.

10.  I have been accused of breaching confidentiality by talking
to Maxine Schmidt, the Town Health Agent, about an arrest. That
is not true. Maxine Schmidt had read in the newspaper that a
particular person had been arrested and held. She approached me
and told me that she needed to know if the person was still
being held because she was going to issue an enforcement order,
and did not want to issue it if the person could not comply with
it in the time allotted. I told her to talk with Corporal
Scoble. That was the entire conversation. We did not discuss the

3

facts underlying the arrest or the investigation. I talked to the Chief about it and he was satisfied that there was no violation of any confidentiality.

11.  The defendants claim that I was known by the police officers as someone who would "leak" confidential information. That is not true. One officer, William Chapman, said that. As far as I can determine, the issue first arose after the defendants had determined not to reappoint me. Officer Chapman and I did not work together. I spoke to the Chief about it, and I asked if anyone had ever come to him and complained that they couldn't speak in front of me or that I could not be trusted. The Chief said that it had never happened. He did not discipline me or caution me as a result of Officer Chapman's statement.

12.  I have been accused of causing a custodian to stop working at the police station because of the way I treated him. That is not true. I was rarely in the police station while the custodian was there. I did complain to the Chief on one occasion that the custodian had failed to clean the toilet. However, we were always friendly with each other on the rare occasions I saw him at the police station. I know that he left the job at the police station so that he could spend more time at the Town Offices. Another person was hired to perform custodial services at the police station. After I got an office at the Town Offices in my

4

capacity as Town Treasurer, I saw the custodian more often. We are both there early in the morning. We get along well.

13.  The defendants have alleged that I have represented the police department at meetings of the Finance Committee or Town Meetings. I have not represented the police department at meetings of the Finance Committee or at Town Meetings. I have been asked to verify information about the police department or as Town Treasurer. For example, I was asked about how many miles were on a cruiser. I was asked about the costs of custodial service and trash disposal at the police station.

14.  I did lose time as a result of the defendants' refusal to reappoint me. I took two days off to consult a therapist about my emotional reaction to the defendants' refusal to reappoint me.

Signed under the pains and penalties of perjury this 30th day of May, 2006, at Northampton.

Respectfully submitted,
The Affiant

*Karen Karowski*

Karen Karowski

5